Hoch Affidavit (USDC)
EXHIBIT A

# EXHIBIT A

1   Q.   Do you know what defamation is?

2   A.   Yes, I do.

3   Q.   And tell me what your understanding is a defamation.

4   A.   Well, I feel they maligned by making false

5        accusations against me and never rectifying them.

6   Q.   Who maligned you?

7   A.   Massport or Phyllis Daigle or whomever else was

8        involved in H.R.

9   Q.   Well, I need names and I need what they said.

10  A.   Well, Tonda Lumley wrote a memo that she definitely

11       found me in violation.  And then like -- and then

12       you know, that I was in the office without

13       authorization.  And then they later found out that

14       I signed out for a key and never, you know,

15       retracted that.

16  Q.   So let me see, Tonda Lumley's defamation was her

17       written report and essentially her investigation

18       report?

19  A.   Correct.

20  Q.   Was Tonda Lumley the H.R. employee who investigated

21       the October 16th incident?

22  A.   I believe so.  I mean all correspondence seemed to

23       come from her and I didn't understand why.  She was

24       only -- her title was recruiter.

1   Q.  She sent you some letters to your house?

2   A.  She did and I believe to my -- who the attorney that

3       was handling it at the time, Mike Kelly.

4   Q.  As far as you're concerned were any of those letters

5       defamatory?

6   A.  I didn't really -- I didn't really look at them.  I

7       just gave them to the attorney.

8   Q.  Are you claiming today that those letters were

9       defamatory?

10  A.  Again, I state I didn't really look at them.  I just

11      handed them to my attorney.  So I don't -- I don't

12      even -- I don't know to this day really what they've

13      said.  But I did see the one from -- it was a short

14      note that she said that -- well, they told me, the

15      attorneys told me that she said that I entered the

16      office without authorization and they questioned me.

17  Q.  So is the substance of Tonda Lumley's defamation her

18      description of her view of the facts of the October

19      16, 2001 incident?

20          MS. BRASSIL:  Objection.

21          MR. HOCH:  You can answer that.

22  A.  I don't know what her thoughts were.  But I

23      certainly know that the statement she made to me

24      were false.  That I was not in an office without

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

27

| | | |
|---|---|---|
| 1 | | authorization. |
| 2 | | **(BY MR. HOCH)** |
| 3 | Q. | When did Tonda Lumley make statements to you? |
| 4 | A. | I don't -- I don't know the dates.  I don't recall |
| 5 | | the dates. |
| 6 | Q. | Well, did you speak to her in person ever? |
| 7 | A. | No. |
| 8 | Q. | Did you speak to her over the phone? |
| 9 | A. | No. |
| 10 | Q. | Did you -- |
| 11 | A. | The first time I saw her was at the meeting in |
| 12 | | January. |
| 13 | Q. | Have you ever spoken to her since that meeting? |
| 14 | A. | No. |
| 15 | Q. | So the only oral statement she could have made to |
| 16 | | you was at that January meeting? |
| 17 | A. | I don't know if she made a statement -- and what her |
| 18 | | statements were in writing. |
| 19 | Q. | So the only defamatory statements from Tonda Lumley |
| 20 | | were in writing; is that correct? |
| 21 | | **MS. BRASSIL:**  Objection. |
| 22 | | **MR. HOCH:**  You have to answer the |
| 23 | | question. |
| 24 | A. | I don't recall.  I just remember that. |

28

1      (BY MR. HOCH)

2      Q.   You remember what?

3      A.   The writing.

4      Q.   And that was her investigation report?

5      A.   Yes.

6      Q.   And is it your belief that that investigation report

7           is defamatory?

8      A.   Yes.  Because --

9      Q.   And what is it in that report that is defamatory?

10     A.   I was not in that office without authorization.

11     Q.   So  you  believe  her  report  contained  a  false

12          statement; is that --

13     A.   Yes.  Yes.  Along with Phyllis Daigle saying that I

14          copied papers, which I didn't do.

15     Q.   Has  anyone  ever  reported  to  you  that  Tonda  Lumley

16          has spoken about your situation to people outside of

17          Massport?

18     A.   No.  I wouldn't know anybody that she knows.

19     Q.   Do you have any reason to believe Tonda Lumley has

20          spoken about you to people outside of Massport?

21     A.   No.  How would I -- I would not know that.

22     Q.   Do  you  have  any  evidence  that  Tonda  Lumley  has

23          talked about you and defamed you inside of Massport,

24          talking to people inside of Massport?

1   A.   No one has ever said -- I don't speak to anybody, so

2        I wouldn't know.

3   Q.   Your partner was still working at Massport at the

4        time that you left Massport; is that correct?

5   A.   Yes.

6   Q.   Did he ever come to you and say I hear Tonda Lumley

7        is speaking about you or bad mouthing you?

8   A.   No.  They would never say anything to him anyway.

9   Q.   Did he ever come to you and tell you that anybody

10       was talking about you?

11  A.   No.  I don't recall him ever mentioning.

12  Q.   So then again, as you sit here today, the only thing

13       that you can point to that Tondaleya Lumley did that

14       was defamatory was the investigation report that she

15       wrote?

16  A.   Right.  I don't -- I don't know what was contained

17       in it.  But there could have been two or three

18       items.  And again, to me, they were all false

19       because I wasn't in the office without

20       authorization.  I did not copy papers.  I did not

21       take any papers.  I don't know what the other one --

22       again, and we've discussed this on two or three

23       occasions, their complaint against me changed three

24       or four times from the key, to copying papers.  And

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

1    when they found out I signed for the key, they

2    dropped the key issue.  Now, they're started to work

3    on copying paper issue.  And when they couldn't come

4    up with -- Tonda Lumley did say to me in the

5    January, they weren't aware of what papers were

6    copied.  So it changed back and forth.  And I'm not

7    a legal person and I just felt that was defaming me

8    by making false accusations against me.  And no one

9    ever even apologized, well, we did make a mistake,

10    you did sign out for the key.  You know, and it went

11    on and on and on.

12    Q.  So other than those things that you just talked

13         about involving Tonda Lumley and her work as an

14         employee of Massport and the report she wrote in

15         your post termination hearing, are you aware of any

16         other statements either written or oral that Tonda

17         made that were defamatory about you?

18    A.  At this time, I don't recall.  I would have to go

19         look back and see whatever documents were sent.

20    Q.  Well, what would you look back at to see?

21    A.  I would have to ask you know, counsel what they have

22         in their records.

23    Q.  So you're talking about correspondence from

24         Massport --

31

1    A.   Yes.

2    Q.   -- to you?

3    A.   Yes.

4    Q.   So   maybe   there   would   be   something   in   those

5         correspondence, correct?

6    A.   Possibly.   And I don't -- I don't recall at this

7         time.

8    Q.   Can you think of anything else?

9    A.   Not at this time.

10   Q.   Were there ever any stories in the newspaper where

11        Tonda Lumley was quoted about you?

12   A.   About me?

13   Q.   Yes.

14   A.   No.   Not --

15   Q.   In the press, on the news?  What did Phyllis Daigle

16        do that was defamatory against you?

17   A.   Accusing me of doing something I didn't do.

18   Q.   Who did she make the statement to?

19   A.   I assumed -- well, I shouldn't assume.   It was

20        certainly made to H.R. and she was in the huddle

21        with her immediate supervisor Mary Ann Bradley and

22        I would venture to gain they were discussing the

23        situation.

24   Q.   That however is a guess on your part; am I correct?

1    A.   At this point, yes.

2    Q.   You have no knowledge of exactly what was said in

3         that conversation?

4    A.   No.  I wasn't invited into it.

5    Q.   Are you aware of any other statements Phyllis Daigle

6         made about you that you considered defamatory?

7    A.   No.  I don't know if there's any affidavits that she

8         has signed or anything else.  So I don't know.

9    Q.   Has anybody ever come to you from outside Massport

10        and said that Phyllis Daigle was speaking ill of

11        you?

12   A.   No.

13   Q.   Anybody inside Massport ever say Phyllis Daigle was

14        saying untruthful things about you?

15   A.   No.

16   Q.   John Clifford ever tell you that he heard Phyllis

17        Daigle was talking poorly about you?

18   A.   I don't recall that at all.

19   Q.   So again, the statements that Phyllis Daigle made

20        that you allege are defamatory are the statements

21        she made in the course of Massport's investigation

22        into the October 16, 2001 incident?

23   A.   Yes.

24   Q.   Do you have any evidence that Phyllis Daigle was

1    A.   I don't know that.

2    Q.   So do you have any evidence that Phyllis Daigle

3         spoke to people who had no reason to know about the

4         investigation?

5    A.   I don't know that.

6    Q.   Do you have any evidence that Tonda Lumley spoke to

7         people who had no reason to know about the

8         investigation?

9    A.   I don't -- I don't know that.

10   Q.   So as far as you're aware, both Tonda and Phyllis

11        kept their conversations about you to the small

12        circle of people who were involved in the

13        investigation?

14   A.   I would venture to gain that that would be the

15        situation.

16   Q.   So you agree that they kept their conversations to

17        that small group who were involved in the

18        investigation?

19   A.   Massport has a -- it's almost a policy that if one

20        person knows, everybody knows.  Things get around

21        here like wildfire.  So I don't know if they spoke

22        to anyone else.

23   Q.   Are you aware of Tonda Lumley spreading information

24        about you around Massport?

36

1    A.   No.  I never spoke to anybody at Massport.  I left

2          here that day and that was it.

3    Q.   Are   you   aware   of   Phyllis   Daigle   spreading

4          information about you at Massport?

5    A.   Not aware of it.

6    Q.   Is there anybody else at Massport who defamed you?

7                  **MS. BRASSIL:**  Objection to the form.

8                  **MR. HOCH:**  You may answer the question.

9    A.   I haven't really thought about it.  I don't know.

10         I'm only talking about people that were involved in

11         the situation.

12   **(BY MR. HOCH)**

13    Q.   And so right now that's Tonda Lumley and Phyllis

14         Daigle?  Is there anybody else who you believe at

15         Massport who made false statements about you?

16    A.   Well, Kathleen Conlin was involved with Tondaleya

17         Lumley.  She agreed with her, so you know, I --

18    Q.   Are you aware that Kathleen Conlin wrote a report

19         after your post termination hearing?

20    A.   At this time I don't recall.  I don't know if I ever

21         saw it.

22    Q.   Well then tell me what --

23    A.   Is it something that I would have received?

24    Q.   I'm just asking if you remember.  Mr. Pione, as far

1      as you're aware --

2                  MS. BRASSIL:  Can we take just a second

3            break?

4                  MR. HOCH:  Yes, sure.  Go off the record.

5            (OFF THE RECORD)

6                  MR. HOCH:  Back on the record.

7      (BY MR. HOCH)

8      Q.   Do you have any evidence that Kathy Conlin who was

9            the director of H.R. at the time made any false

10           statements about you to anyone?

11     A.   To anyone?

12     Q.   To anyone.

13     A.   I'm not aware of that.

14     Q.   So do you have any reason to believe that Kathy

15           Conlin defamed you?

16     A.   Only if she -- only if her reports were in the same

17           vain as Tonda Lumley and Phyllis Daigle's.

18     Q.   So to the extent Kathy Conlin defamed you, you're

19           alleging it was part of the investigation and the

20           outcome of the investigation into your behavior on

21           October 16, 2001?

22     A.   Yes.

23                 MS. BRASSIL:  Objection to the form.

24     (BY MR. HOCH)

1  Q.  Could you repeat your answer, Mr. Pione?

2  A.  Yes.

3  Q.  Is there anybody else who you believe made false

4      statements about you at Massport?

5  A.  Whomever was involved in that investigation as far

6      as I was concerned, they made false statements. And

7      I don't know of all the people that were involved.

8  Q.  Other than statements that were made as part of the

9      investigation, are you aware of any other false

10     statements that were made by employees of Massport

11     about you?

12 A.  No, not at this time.

13 Q.  As far as you're aware are there any false

14     statements -- well, were any false statements made

15     about you by anyone at Massport after your post

16     termination hearing?

17 A.  Not that I'm aware of.

18 Q.  So as far as you're concerned any false statements

19     made about you would have stopped after the post

20     termination hearing?

21 A.  I can't answer that honestly. I don't know if they

22     stopped or continued or you know. I don't know.

23 Q.  Have you made any effort to find out whether people

24     were making false statements about you at Massport?

1    A.   No.

2    Q.   So in terms of what you know defamatory statements

3         that you allege have been made by Massport involved

4         Tonda Lumley, Phyllis Daigle and Kathy Conlin?

5    A.   And who else may have been involved in the

6         investigation and utilizing the same information.

7    Q.   So you agree it was those three people plus anyone

8         else involved in the investigation?

9    A.   Yes.

10   Q.   And the tenure of those statements involved the

11        descriptions of what you did on October 16, 2001

12        that right or wrong the statements involve your

13        behavior on October 16, 2001?

14   A.   The statements involved, yes.  They involve my

15        they made the statements of my behavior on that

16        date, yes.

17   Q.   And those are the statements you believe are

18        defamatory?

19   A.   Yes.

20   Q.   And Mr. Pione, I'm -- you know in my mind

21        contrasting those where somebody is saying you're a

22        terrible human being or you're a murderer or you're

23        you know a thief -

24             MS. BRASSIL:   Objection to the form of

1              this question.

2    (BY MR. HOCH)

3    Q.  So what I'm asking you is, whether you're alleging

4         there were any sort of statements made like that

5         about your character or about your criminal record

6         or about your history in life?

7    A.  No.

8    Q.  Were there any statements like that that you're

9         alleging were defamatory?

10               MS. BRASSIL:  Let me speak.  I'm just

11          going to reserve my right to motion to strike

12          on this particular question.

13   A.  Do I have to answer?

14   (BY MR. HOCH)

15   Q.  You have to answer.

16               MS. BRASSIL:  I think you might have to

17          read it back.

18               MR. HOCH:  That's up to him to tell me,

19          not you to coach him.

20               MS. BRASSIL:  I'm not coaching him.

21   A.  I -- would you rephrase the question because I've

22         lost you on it now.

23   (BY MR. HOCH)

24   Q.  Well, Mr. Pione, you've lost me.  I'm trying to find

1      out whether the sum and substance of the defamatory

2      statements that you allege involve your behavior on

3      October 16th, and I'm just trying to make sure

4      because you seem fairly vague about all of this,

5      that there are no other statements out there --

6              MS. BRASSIL:  Objection to the form of the

7         question.  Objection to the comment by counsel.

8   (BY MR. HOCH)

9   Q.  I'm just trying to make sure Mr. Pione, that there

10      are no other statements out there that would be

11      considered defamatory that you are going to allege

12      in this case.

13  A.  I don't know what statements are out there.  All I

14      know is if someone said that I was in an office

15      without authorization, that's a lie.  And if someone

16      said I copied papers, which I didn't, that's a lie.

17      And if someone said I took papers off someone's

18      desk, that's a lie.  That to me is defamation.  And

19      that's in laymen's terms.  I can't answer you any

20      other way and I don't know what these people are

21      thinking or saying.

22  Q.  And beyond the three people we've talked about,

23      you're not aware of anybody else making those

24      statements about your behavior on October 16th?

1    A.    Again, I don't know legalese.  I just know that it

2          wasn't the right thing to say when she did know it.

3    Q.    And Mr. Pione, I'm not asking you legalese.  I'm

4          asking you to tell me people who made false

5          statements about you, or people who made derogatory

6          statements about you that you are alleging give rise

7          to damages that you seek compensation for in this

8          case.  And you should know that and so that's what

9          I'm trying to exhaust your memory on.  If your

10         memory is exhausted, you can tell me that.  But I

11         need to know every single person and every single

12         statement they made.

13   A.    This is all I remember.  And the last one was Anita

14         Jansky and in her affidavit she did say she didn't

15         know about the key and she did know about it.  If

16         she forgot, she may have forgotten.

17   Q.    And you believe that statement may reflect poorly

18         upon you?

19   A.    Yes, I do.  It made me look like a liar.

20   Q.    And has anybody outside of Massport ever mentioned

21         this incident to you?

22   A.    Who outside of Massport?  I wouldn't know anybody

23         outside of Massport would know what was involved.

24         I don't --

44

1    Q.   So I'll take that -- is that a no?

2    A.   Yes, that's a no.

3    Q.   Has anyone ever refused to hire you for a job

4         because of the way in which your employment with

5         Massport terminated?

6    A.   No.

7    Q.   Has anyone ever said to you, let's say in a job

8         interview you know, I heard you left Massport

9         under --

10   A.   No.

11   Q.   Has anyone ever refused to associate with you

12        because of these defamatory statements you allege?

13   A.   No.

14   Q.   Other than losing your job, do you believe any of

15        those statements caused you any economic harm?

16   A.   Yes.

17   Q.   How is that?

18   A.   By losing my job.

19   Q.   Other than that.  So inability to get other jobs?

20   A.   Absolutely.  It's ruined my life.

21   Q.   Is that because other people won't hire you or is

22        that because you are unable to go out and look for

23        work?

24   A.   I'm unable to -- I am going -- I see constantly

1        physician and a psychotherapist.

2   Q.   But so, no employer or contractor has ever refused

3        to work with you because of --

4   A.   No.

5   Q.   -- how you left Massport?

6   A.   No.

7   Q.   Mr. Pione, let's talk a little bit about October 16,

8        2001.  Can you give me a brief overview of what

9        happened that day starting from when you first went

10       to work?

11  A.   When the incident occurred?

12  Q.   I believe that was October 16, 2001.

13  A.   I don't even remember the date anymore.  Yeah.  I

14       see it here, yes, it is.  I was coming out of the

15       office after I had printed something on the printer

16       that was in that -- in Anita Jansky's office and

17       Phyllis Daigle was out there and she said to me

18       What's going on here?  And I thought she was

19       kibitzing with me.  I had seen her earlier and she

20       said good morning and walked by.  I said, What are

21       you talking about what's going on -- two or three

22       times.  She says, I said, what's going on here?  And

23       I says, I don't know what you're talking about.  Why

24       are you coming out that office?  I was like I'm

1    Q.   So you went home on October 16, 2001 and you never

2         returned to work at Massport, correct?

3    A.   No.  I called the EAP, they weren't able to see me

4         till the next day, I believe on the 18th.  And when

5         I was interviewed by the EAP's psychotherapist, who

6         Massport pays for, he said to me, I don't want you

7         anywhere near that -- those offices.  You're not to

8         go back there.  And I want the name of your primary

9         care   physician.    I'm   going   to   contact   him

10        immediately.

11   Q.   Did you make any phone calls to anybody at Massport

12        after you left on the 16th?

13   A.   I tried to contact Mary Ellen Murphy and it took me

14        some time and I finally got her and she said to me

15        that H.R. told her that -- not to -- she was not to

16        speak to me.

17   Q.   How many times did you have to call her before you

18        reached her?

19   A.   I don't know.  I don't recall.  Several -- several

20        times.

21   Q.   So was it a couple of days later do you think?

22   A.   No.  I don't know if it was the same day or the day

23        after.

24   Q.   So either the 16th or the 17th it's your memory you

53

1        spoke to Mary Ellen Murphy?

2    A.  Just briefly and she told me she wouldn't speak to

3        me.

4    Q.  Did you leave a message for anybody else or did you

5        speak to anybody else at Massport?

6    A.  No.

7    Q.  Do you recall leaving a message for Mary Ann

8        Bradley?

9    A.  Oh, I may have left a message for Mary Ann Bradley

10       when I couldn't get Mary Ellen.  But, I don't think

11       she ever called me back.

12   Q.  Now, Mr. Pione, if you flip through the packet a

13       couple of pages you're going to see a handwritten

14       piece of paper.

15   A.  Mm-hmm.

16   Q.  Do you have a document in front of you that down at

17       the bottom there's a stamp that says the number 26?

18   A.  Yes.

19   Q.  Now, I admit some of the writing at the top of this

20       is hard to read, but do you see your name at the

21       top?

22   A.  I do see that and I can't read anything else, just

23       a date 10/17.

24   Q.  Yes.  And can you see Mary Ann Bradley's name up at

54

1          the top there or Mary Ann --

2     A.   Oh, I see Mary, yeah.

3     Q.   And is it possible that up at the top it says

4          "message Larry Pione left for Mary Ann"?

5     A.   It could say that.

6     Q.   And then what's written below -- well, it says on

7          10/17/01; is that correct?

8     A.   Correct.

9     Q.   And then what's written, (reading) "I am at home

10         because I'm really sick to my stomach.  You know

11         what the incident was about.  I don't feel that I

12         should have been ostracized the way that I was by

13         Phyllis D. for walking out of an office where my" --

14         the word is cut off -- "is located and I'm just

15         doing my job.  I don't want anyone to think that I'm

16         a derelict from doing my duties.  I" -- something --

17         to you further about this.  Call me at home."  And

18         then there's a telephone number.  Do you recognize

19         that telephone number?

20    A.   That looks -- yeah, that's my home phone.  I think

21         that says I wish --

22    Q.   I wish to --

23    A.   -- to speak to you further about this.

24    Q.   Does this -- do you believe this is a message that

1        you left for Mary Ann Bradley?

2    A.   I imagine I did.  I said I didn't recall a time.  I

3        thought I left a message for Mary Ann Bradley too.

4        Because I don't think I was getting -- that's why I

5        don't know when I spoke to Mary Ellen Murphy.  Maybe

6        after  I  spoke  to  Mary  Ellen  Murphy  I  tried  to

7        contact Mary Ann Bradley.

8                MR.  HOCH:   Can  we  mark  this  as  the  next

9        Exhibit?

10                    (Handwritten note dated 10/17/01 was

11                    marked as Exhibit No. 4)

12    (BY MR. HOCH)

13    Q.   So at least on the 17th of October you were able to

14        make some phone calls to Massport --

15    A.   I made one --

16    Q.   -- to try and discuss the incident on the 16th?

17    A.   Yeah.  I wanted to know what was going on.

18    Q.   Now, Mr. Pione, I want you to sort of take me in

19        some detail through the 16th when you got home and

20        then through the next week if you can in terms of

21        how you were feeling.

22    A.   It was a blur.

23    Q.   And tell me why it was a blur?

24    A.   Well, because it was just overwhelming.  No one was

66

1   A.  It stayed about the same.  It was just a very bad

2       low time.

3   Q.  At some point did it get better or worse?

4   A.  Maybe after a couple of months you might have had a

5       little -- a day of, you know, you didn't think about

6       it.  I never -- I didn't even want to see an

7       envelope come from Massport with the logo on it, it

8       upset me.  I didn't want to see anything on

9       television or the papers.

10   Q.  After that first week, at any point did your mental

11       health take a turn for the worse?

12   A.  I don't -- I don't understand your question.

13   Q.  Well, when did you first -- when did you start

14       getting out of bed on a regular basis?  How long did

15       that take?

16   A.  I don't recall that.

17   Q.  Was it a week?  Was it two weeks?  Was it a month?

18   A.  I don't recall.  Most of the time I just -- I laid

19       low.

20   Q.  When did you go to Florida?

21   A.  I believe in December.

22   Q.  Was that the first time you were out bed to drive to

23       Florida?

24   A.  More or less.  More or less.  I was -- I was --

1      medications were kind of helping me out a little bit

2      and Dr. Freeman and -- thought that I should leave.

3      And again, he spoke to the -- my primary care

4      physician and he said it would be a good idea to get

5      away.

6   Q.  You were terminated on November 30th, correct?

7   A.  Correct.

8   Q.  You were in Florida at the time?

9   A.  Yes, I was.

10  Q.  So you went to Florida prior to November 30th?

11  A.  I don't know any of the exact dates -- it could be

12     -- it could have been a couple of days.  It could

13     have been a week.  I don't know the exact dates.

14  Q.  How did you get to Florida?

15  A.  You've asked me that before and I don't recall.  I

16     don't remember if we drove, if we flew or we took

17     the auto-train.

18  Q.  Who is we?

19  A.  John and I.

20  Q.  So you and John went --

21  A.  John Clifford.

22  Q.  -- together?

23  A.  Yeah.

24  Q.  Would you have done any of the driving?

80

1    A.   Yes.

2    Q.   Were those demands made through letters?

3    A.   I believe so.

4    Q.   Did anybody ever call you at home and demand that

5         you --

6    A.   I don't recall anyone --

7    Q.   -- participate?

8    A.   I don't recall anyone calling me.

9    Q.   Some of those letters went to you directly and some

10        went to your lawyer; is that correct?

11   A.   I believe so.  I'm not clear on -- you know, it's

12        been a while.

13   Q.   Mr. Pione, what medical provider told you that you

14        should not participate in the investigation?

15   A.   Both Bruce Freeman and my primary care physician.

16   Q.   Now, previously you said to me they told you not to

17        return to Massport.

18   A.   Right.

19   Q.   But did they separately tell you don't participate

20        in the investigation?

21   A.   That I don't recall.  I just -- I don't recall that.

22   Q.   So when you say for health reasons you were unable

23        to participate in the workplace investigation, can

24        you tell me what you mean by that?

81

```
1   A.   My -- the attorney at the time wrote that and I

2        don't know if he conferred with both the physician

3        and the psychotherapist.

4   Q.   Well, did you believe in October -- second half of

5        October and November of 2001 that you were unable to

6        participate in the investigation for health reasons?

7   A.   Really, I had -- I didn't want -- I didn't want to

8        even hear the word Massport.

9   Q.   Just so I'm clear, this all started when Phyllis

10       Daigle said what are you doing there?

11  A.   When she accused me of whatever.

12  Q.   Mr. Pione, please skip to page five of your

13       complaint, Exhibit Three.  You'll see at the top

14       count five: "Intentional infliction under emotional

15       distress", do you see that?

16  A.   Yes.

17  Q.   Can you read page -- paragraph 46 out loud please?

18  A.   "The defendant by and through its employees

19       intentionally or recklessly accused the plaintiff of

20       violating policy and subsequently fired the

21       plaintiff after months of harassment and thereby

22       caused the plaintiff to suffer severe emotional

23       distress."

24  Q.   Now, the intentionally or recklessly accusing you of
```

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

```
 1              anything else that Massport did that's caused you

 2              severe emotional distress after you went home on the

 3              16th?

 4       A.     That meeting in January, it was just like -- it was

 5              almost like a kangaroo court.  They just sat there

 6              like motionless everyone and they didn't -- I don't

 7              know, there was no kind of interaction or any kind

 8              of responses.  I just felt, you know, they were just

 9              doing what they thought they had to do and pacifying

10              me.  They've already made their determinations and

11              they're going to go on with it.

12       Q.     Now, when you say they sort of sat there passively;

13              is that what you said?

14       A.     Yes.

15       Q.     Isn't it accurate to say that you and your lawyer

16              refused to allow Massport to ask you any questions?

17       A.     We did.

18       Q.     So is it fair to say that the entire hearing was an

19              opportunity for you to ask questions and make a

20              statement, correct?

21       A.     It was, correct.

22       Q.     And there was no opportunity for Massport to ask you

23              questions?

24       A.     Correct.
```

1   Q.   Do   you   recall   that   Massport   made   an   initial

2        statement of the facts of the investigation?

3   A.   I don't recall that.   I know you've asked that

4        before.   I don't recall what went on that day

5        really.   And I -- I mean I remember reading from a

6        piece of paper.   I don't know what Massport said to

7        me.

8   Q.   But you agree that you and your lawyer did not give

9        Massport the opportunity to ask you any questions or

10       clarify anything with you?

11  A.   It wasn't my decision.   It was my counsel's decision

12       for them not to ask me any questions.

13  Q.   And you went along with your counsel's decision?

14  A.   Well, I -- I assume counsel knows what they were

15       doing and I had to agree with it.

16  Q.   Backing up a little bit.   You said the Port officer

17       coming to your house and the letters from Tonda

18       Lumley caused you some emotional distress.   Was

19       there anything else between the Port officer coming

20       to your house and getting the termination letter

21       that caused you any distress that Massport did?

22  A.   In what time frame?

23  Q.   From the time frame of --

24  A.   October 16 --

110

1    A.    Yes.

2    Q.    -- seen him between October 16th and November 13th?

3    A.    Yes.   Yes.

4    Q.    And you see on the first page he says your condition

5          may persist indefinitely?

6    A.    Yes.

7    Q.    Do you think your condition has ever improved?

8    A.    With the anxiety and depression?

9    Q.    Yes.

10   A.    Not really.

11   Q.    Could you return to work at Massport?

12   A.    I doubt it.

13   Q.    At any point since you left Massport, could you have

14         returned to work at Massport?

15   A.    I doubt it very much.

16   Q.    Why not?

17   A.    Just the thoughts of it gives me the shakes.

18   Q.    You have since filed for long term disability and

19         have been granted it, correct?

20   A.    Long term disability?

21   Q.    LTD benefits?

22   A.    Yes.

23   Q.    So you received two years of LTD benefits?

24   A.    I did.

111

```
 1   Q.   Are  you  currently  getting  any  benefits  from  any
 2        health plan or insurance plan or government plan for
 3        your disability?
 4   A.   No.  I receive my social security check monthly.
 5   Q.   Is that a social security disability check?
 6   A.   It  was  originally.   I'm  regular  social  security  I
 7        believe.  I receive it on the 3rd of the month.
 8   Q.   If  in  December  of  --  well,  is  there  anything
 9        Massport could have done that would have allowed you
10        to return to work?
11   A.   I don't understand that question.
12   Q.   Is  there  anything  Massport  could  have  done  after
13        October 16, 2001 when you left work that would have
14        allowed you to return to work?
15   A.   Probably if they sat and talked to me and cleared my
16        name and said, you know, we realize you didn't go in
17        that office without authorization.  We realize you
18        didn't take any paperwork or copy any papers.   I
19        don't -- but I don't know again -- yeah.  I would
20        imagine.
21   Q.   So if Massport clears your name that might have
22        resolved your stress and anxiety enough that you
23        could come back to work?
24   A.   I don't know.  I couldn't tell you that.  It would
```

1      have been -- it would have been a nice scenario.

2      But I couldn't tell you that exactly if that would

3      have been --

4  Q.  So you don't know for sure whether you could have

5      returned to Massport had your name been cleared?

6  A.  At that point.

7  Q.  Could you return today?

8  A.  I doubt it very much.

9  Q.  Why is that?

10 A.  I just -- I told you I don't even like being in this

11     building.

12 Q.  So even if your name was cleared, you don't think

13     you could return?

14 A.  I doubt it very much.

15 Q.  What if Massport instead in clearing your name said,

16     hey, look we think you did it, but we'll give you a

17     week suspension, so it's going to go in your record

18     as discipline for inappropriate behavior, but you

19     can come back to work.  We're going to rescind the

20     termination.

21              MS. BRASSIL:  Objection.

22 (BY MR. HOCH)

23 Q.  Do you think you could have returned to work?

24 A.  I --

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

```
 1                    MS. BRASSIL:  Objection.

 2                    MR. HOCH:  You can answer.

 3                    THE WITNESS:  Excuse me?

 4                    MR. HOCH:  You can answer.

 5    A.   I doubt it.

 6    (BY MR. HOCH)

 7    Q.   You doubt it?  And that was true in December of 2001

 8         and it's true today?

 9    A.   I believe --

10                    MS. BRASSIL:  Objection.

11    (BY MR. HOCH)

12    Q.   So you're saying there's nothing Massport could do

13         or could have done after you left work on the 16th

14         that would have helped you return to work in your

15         view?

16                    MS. BRASSIL:  Objection.

17                    THE WITNESS:  Do I have to answer that?

18                    MR. HOCH:  Yes.

19    A.   I don't know what my mental state would be and I --

20         and I was advised by your EAP representative not to

21         come back here also because of the interview and

22         they saw how I was.

23    (BY MR. HOCH)

24    Q.   Have your doctors told you you shouldn't return to
```

```
1          any work whatsoever?

2    A.    My psychotherapist tells me that I have very little

3          if any -- I can't even think of the word.   I forget

4          words -- concentration with post traumatic stress.

5    Q.    So you requested family medical leave from Massport,

6          correct?

7    A.    I did.

8    Q.    And Massport granted that, correct?

9    A.    Yes, they did as far as -- I understood they did.

10   Q.    Are you aware of whether other employees at Massport

11         had taken leave under the FMLA?

12   A.    No.   I have nothing to do with that.

13   Q.    Had you ever heard anybody at Massport badmouth or

14         complain about people taking leave under the FMLA?

15   A.    No.   I've never -- no one would -- no one ever

16         discussed anything like that with me.

17   Q.    Are you aware of any bias at Massport against people

18         who take FMLA?

19   A.    I'm not familiar with anyone that's taken FMLA.

20   Q.    Mr. Pione taken -- I'm sorry, Mr. Pione, Mr.

21         Clifford has taken FMLA?

22   A.    Yes, he has.

23   Q.    Had he taken it prior to your going on leave on the

24         16th of 2001?
```

1    A.   I don't recall when he took it.  He ended up in a

2         hospital for a while.

3    Q.   Did anybody ever talk to you about the fact that you

4         were on FMLA?

5    A.   Like --

6    Q.   Anybody from Massport?

7    A.   I don't recall that.

8    Q.   Did anybody ever call you up to check on whether you

9         could return to work?

10   A.   No.  I don't recall anybody speaking to me.

11   Q.   Do you have any evidence that Massport ignores the

12        Family Medical Leave Act in the way it treats its

13        employees?

14   A.   Well, obviously I was terminated while I was under

15        the Family and Medical Leave Act, so I would say

16        that in my case they certainly ignored it.

17   Q.   And other than you, are you aware of Massport

18        flouting or ignoring the requirements of the FMLA?

19   A.   I've mentioned before, I'm not -- I'm not privy to

20        anyone being on FMLA or having any situations with

21        FMLA.

22   Q.   So why is it -- do you think you were fired for

23        taking FMLA?

24   A.   I mean the modus operandi at Massport, it could be

116

1    any reason.  I don't know if that was part of the

2    reason.

3  Q.  So is it fair to say you have no evidence or no

4      information to suggest you were fired because you

5      requested or were granted family medical leave?

6  A.  I  don't  have  any  information.    If  there's

7      information around, I'm not aware of it.

8  Q.  So  your  claim  is  not  that  Massport  took  action

9      against  you  for  taking  FMLA,  but  that  your

10      termination was in violation of the FMLA?

11              MS. BRASSIL:  Objection.

12  A.  I don't know what you mean by that question that my

13      claim is -- I don't know what that means.

14  (BY MR. HOCH)

15  Q.  It sounds like you're saying you don't believe or

16      you don't have any evidence that Massport fired you

17      because you took FMLA; is that correct?

18              MS. BRASSIL:  Objection.

19  A.  I'm not aware of it.  I've said that to you -- this

20      is the second or third time.

21  (BY MR. HOCH)

22  Q.  But you have no --

23  A.  I'm not aware of it.

24  Q.  But  you  feel  the  fact  while  you  were  on  FMLA

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

1         Massport should not have fired you?

2    A.   I would -- I would believe that to be the situation.

3         Yes.

4    Q.   And that's essentially what you're arguing in this

5         case with your FMLA claim that Massport should not

6         have fired you while you were on leave?

7              MS. BRASSIL:  Objection.

8    A.   Absolutely.

9    (BY MR. HOCH)

10   Q.   Mr. Pione, you've alleged in this case that you have

11        a contract with Massport; is that correct?

12            MS. BRASSIL:  Objection.

13   A.   If that's what's in the complaint, that's what's in

14        the complaint.  My attorneys have written it.

15   (BY MR. HOCH)

16   Q.   Mr. Pione, if you look on page three at the bottom,

17        do you see count three breach of contract?

18   A.   Mm-hmm.

19   Q.   How did Massport breach it's contract with you?

20   A.   I'm not versed in legalese and I can't answer that

21        honestly to you, so --

22   Q.   Well, what's the contract as you understand it?

23   A.   I don't understand it.

24   Q.   So you have no idea whether you have a contract at

1          Massport or not?

2    A.    I'm not aware -- again, I'm not versed in legalese.

3    Q.    Mr. Pione, have you ever had renovations done to

4          your house?

5    A.    Yes.

6    Q.    Did you enter --

7    A.    I know what a contract is.

8    Q.    Did you enter into contracts?

9    A.    Yes.  I know what a contract is.

10   Q.    Your profession has been dealing with financial

11         matters in life?

12   A.    Yes.  Yes.

13   Q.    You're familiar with contracts?

14   A.    Yes.

15   Q.    Usually people sign them?

16   A.    Yes.

17   Q.    Usually there are terms to a contract?

18   A.    Yes.

19   Q.    Are you aware of whether you have any contracts with

20         Massport and what the terms of that contract are?

21   A.    I'm not.  And I don't know what constitutes a

22         contract legally.

23   Q.    Mr. Pione, do you -- are you familiar with

24         Massport's policy on employment terms and

1   Q.  Why do you think you were entitled to a hearing on

2       the merits before you could be terminated?

3   A.  As far as I knew they were in the policies and

4       procedures that you were entitled to a hearing after

5       a termination.  But I was terminated, I felt,

6       falsely because I didn't do the things that they

7       said I did.

8   Q.  Mr. Pione, did you think you had a right to a

9       hearing before or after your termination?

10  A.  Why would I have a hearing before my termination?

11  Q.  Mr. Pione, I'm just asking you a question.  So is it

12      your --

13  A.  No.  I'm sorry.

14  Q.  So your belief is you were entitled to a post

15      termination hearing?

16  A.  Right.  If I was terminated wrongfully, I would want

17      it explained why I was terminated.

18  Q.  So if you look at line 34 in your complaint that's

19      different from what you believe to say, "Mr. Pione

20      could only be terminated after a hearing".  Your

21      feeling was you could be terminated and then have

22      the hearing afterwards?

23  A.  Again, I'm not versed in legalese and this paragraph

24      really did not sink into me what it meant -- what it

```
1              means.

2       Q.     Why did you think you were entitled to a full and

3              fair investigation?

4       A.     To me that's a normal thing to happen between human

5              beings.

6       Q.     Do you think Massport promised you that anywhere in

7              its policies?

8       A.     Massport    professes    to    be    a    diverse,    fair

9              organization and they're anything but.

10      Q.     Mr. Pione, does Massport's policy ever work at --

11             anywhere promise you a full and fair investigation?

12      A.     They constantly state that.

13      Q.     Where?

14      A.     That they're a diverse and fair organization with

15             equal opportunity, etcetera, etcetera.

16      Q.     So does it ever say anywhere that you're entitled to

17             a full and fair investigation before you can be

18             terminated?

19      A.     I don't know.  I'm not -- again, I'm not versed in

20             legalese.  So I don't know how -- what the verbiage

21             is.

22      Q.     So you don't know whether Massport ever promised you

23             that?

24      A.     Again, I'm not -- I'm not versed in legalese.
```

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

1    Q.   Mr. Pione, do you understand the phrase "full and

2          fair investigation"?

3    A.   Yes.

4    Q.   Okay.  So that's not legalese is it?

5    A.   Well, it is and it isn't.

6    Q.   Well, let's use it in a way that's not.  Let's use

7          it in a way that you understand it.

8    A.   Fine.

9    Q.   Does anywhere in Massport or has Massport ever

10         promised you a full and fair investigation prior to

11         your termination?

12    A.   I don't feel that I got a full and fair

13         investigation.

14    Q.   Mr. Pione, did Massport ever promise you that you

15         were entitled to one?

16    A.   I guess they have.

17    Q.   Where?

18    A.   In maybe the handbook.

19    Q.   Okay.  But you have no idea?

20    A.   No, I'm not -- I'm not certain about it.

21    Q.   You can't point to anything?

22    A.   Not at this point.

23    Q.   Do you recall ever reviewing something that said

24         that?

1    Q.   So you don't recall ever relying on the language of

2         the policies prior to accepting employment?

3              **MS. BRASSIL:**  Objection.

4    A.   I don't recall.

5    **(BY MR. HOCH)**

6    Q.   Mr. Pione, what would a fair investigation in this

7         instance mean to you?  What did Massport do that was

8         unfair and what should Massport do to make it -- or

9         should have done to make it fair?

10   A.   I don't know.  I just know how things operate at

11        Massport and I know when they do things they really

12        don't do always the things above board.  That's my

13        opinion.

14   Q.   But what can you tell me that Massport --

15   A.   And I don't --

16   Q.   -- did that was unfair in it's investigation?

17   A.   Just making accusatory remarks against me and then

18        terminating me.

19   Q.   Mr. Pione, doesn't any investigation into behavior

20        involve some accusatory comments?  Doesn't that kick

21        off --

22   A.   Being accused -- they didn't prove that I did those

23        things.

24   Q.   No.  But let's talk about the investigation.  What

1       was unfair about the investigation?

2   A.  The investigation was unfair because they never

3       proved what they -- what they alleged that I had

4       done.

5   Q.  And what could they have done to have a more fair --

6   A.  Rectify it.

7   Q.  How?

8   A.  Come back and say we made a mistake.

9   Q.  Mr. Pione, did you ever tell Massport they made a

10      mistake?

11  A.  That's not -- that's not -- wasn't my position to

12      tell them.

13  Q.  Mr. Pione, did you ever tell Massport that they had

14      made a mistake?

15  A.  I made statements to them.

16  Q.  When?

17  A.  At the January meeting.

18  Q.  Did you ever make any statements prior to your

19      termination?

20  A.  I don't recall that.  Why would I --

21  Q.  Did you make any --

22  A.  -- excuse me.  I wouldn't make any statements prior

23      to my termination.

24  Q.  Did you make any statements through your lawyer?

```
 1    A.   I believe they were made through the attorney.  I
 2         don't recall.
 3    Q.   Did you ever have -- did your lawyer ever write up
 4         your position and submit it to Massport?
 5    A.   I don't recall.  They may -- they may --
 6    Q.   Do you recall ever signing an affidavit or a
 7         statement prior to termination?
 8    A.   Prior to the November 30th date?
 9    Q.   Yes.
10    A.   I don't recall.
11    Q.   So is it fair to say you gave Massport no
12         information to assist in it's investigation?
13    A.   I don't believe that I -- no.  I made statements
14         that I said that I didn't do those things.  So I
15         don't say that I didn't give them any information.
16    Q.   Prior to your termination, did you give Massport's
17         investigators any information to present your
18         position in the investigation?
19    A.   I don't recall when that information was given to
20         them.
21    Q.   You never spoke to Tonda Lumley until the post
22         termination hearing; is that correct?
23    A.   I believe so.
24    Q.   So you never spoke to Tonda Lumley during the course
```

```
1              of your investigation?

2     A.   I don't recall that.  I don't recall speaking to

3              her.

4     Q.   And how could they -- well, how was the hearing that

5              you received post termination unfair?

6     A.   They did nothing to rectify it.  I mean if I --

7     Q.   And how was the hearing --

8     A.   -- made the statement that I did not do those

9              things, and they just didn't want to hear it.  They

10             already determined that they wanted me out of here

11             and they did it and that was it.

12    Q.   So they didn't accept your version of events?

13    A.   Correct.

14    Q.   And that's why the hearing was unfair?

15    A.   I feel that's --

16    Q.   Is there anything else about the hearing that made

17             it unfair to you?

18    A.   I just felt there was so many, they were like

19             ganging up on me.  You know, there was four or five

20             women sitting there staring at me.  I didn't think

21             that was a fair -- fair venue.

22    Q.   Did it matter that they were women, Mr. Pione?

23    A.   No.  It just happened to be all those people, excuse

24             me.
```

1  Q.  Did you have a problem with the fact that they were

2      women there?

3  A.  No.  I have no problem with women.  I guess I have

4      to be politically correct and say persons.

5  Q.  So other than the outcome, can you give me anything

6      or tell me anything Massport could have done

7      differently with the hearing that would have made it

8      more fair?

9  A.  I don't know.  I've never been involved in a

10     situation like this.  So I don't really -- I can't

11     give you a honest answer.

12 Q.  And Massport wanted to question you and you and your

13     lawyer refused, correct?

14 A.  My lawyer and the EAP psychologist and the

15     physician.

16 Q.  Was the EAP psychologist and the physician there at

17     the hearing?

18 A.  No.

19 Q.  Had the EAP psychologist told you, don't answer

20     questions at your post termination --

21 A.  He just told me to stay away from it -- this whole

22     situation.

23 Q.  But you went to the hearing?

24 A.  Well, eventually, yeah, I had to.

1   Q.   Do you know what your level was at Massport ?

2   A.   I believe I was a level six.

3   Q.   Can you jump back to the very first page or put your

4        finger on page 172 because we're going to come back

5        to it?

6   A.   The same document?

7   Q.   Yes.  The very first page down towards the bottom it

8        says "definitions A, B, C"?

9   A.   Yes.

10  Q.   "ESPM or executive senior professional or senior

11       management employee means any employee in a non-

12       union position classified at level six or above".

13       Would you understand that to mean that you were an

14       ESPM employee?

15  A.   Yes.  It says level six.

16  Q.   Mr. Pione, going back to the page that's bates-

17       stamped 172, this is the discussion in Massport's

18       policy on terms and conditions that relates to

19       disciplinary terminations and it discusses

20       procedures for that.  This might be a good time to

21       take a lunch break, Mr. Pione, and have you sort of

22       look at this because what I'd like to ask you is

23       whether in this policy and anywhere outlined that

24       you're entitled to a full and fair hearing or a full

1    A.   There's some -- some money.

2    Q.   Mr. Pione, have you ever taken any steps to try and

3         return to the workforce?

4    A.   No, I haven't.

5    Q.   And why is that?

6    A.   I just don't feel capable.  I have not been able to

7         concentrate long enough to do any of the work that

8         I used to do.

9    Q.   Do you ever anticipate returning to the workforce?

10   A.   Excuse me?

11   Q.   Do you ever anticipate returning to the workforce?

12   A.   I don't know.  At this point I don't think so.

13   Q.   Is it a goal that you would like to attain?

14   A.   To return to the workforce?

15   Q.s  Sure.

16   A.   If my physical and mental capacity would improve.

17        They don't seem to be.

18   Q.   Since the day you left Massport, has one of your

19        goals been to return to some sort of employment?

20   A.   I hadn't thought of it for a long time.  I just

21        didn't know what I was capable of doing, if

22        anything.

23   Q.   Did you think about it some at first?

24   A.   No.  That was -- I didn't think anything about it.

```
1    A.   -- they would have thought me to be dishonest?

2    Q.   Correct.

3    A.   I would guess so.  I don't know.  I don't know why

4         they wouldn't believe me, but -- I really didn't

5         have that much opportunity to plead the case with

6         Leslie  Kirwan  or  Mary  Ann  Bradley  or  Kathleen

7         Conlin.

8    Q.   You were given a post termination hearing, right?

9    A.   Yes.  But I --

10   Q.   At that point --

11   A.   But here I thought --

12   Q.   At that --

13   A.   -- it says that I could meet with my department

14        head.

15   Q.   Well, we're not there yet, Mr. Pione.  But you were

16        given a post termination hearing, correct?

17   A.   In January.

18   Q.   Yes.  Mary Ann Bradley was there?

19   A.   Yes.  She had nothing to say.

20   Q.   At various times you felt she might be your

21        department head, it wasn't clear?

22   A.   It wasn't -- well, I thought Leslie Kirwan was the

23        department head, but she was her designee.

24   Q.   And the director of H.R. was at that hearing,
```

1           correct?

2    A.    Yes, she was.

3    Q.    And you were given multiple opportunities to explain

4           yourself during the course of the investigation; is

5           that correct?

6    A.    In what manner?

7    Q.    Well, Massport asked -- Massport reached out to you

8           and asked for your input?

9    A.    But I wasn't able to speak to my supervisors.

10   Q.    But you agree Massport reached out to you to get

11          your input?

12   A.    They asked for my input.  I wasn't able to speak to

13          them.

14   Q.    Now, Mr. Pione, if you look at paragraph three it

15          says, "In the case of a demotion, involuntary

16          transfer,    reduction    in    pay    or    involuntary

17          termination ESPM employee typically will receive

18          reasonable notice that one, provides an explanation

19          of why discipline is being contemplated".  You were

20          given a termination notice; is that correct?

21   A.    Yes.

22   Q.    And it outlined why you were being terminated?

23   A.    It said because of -- I don't recall it now, but I

24          believe it was because of going into that office.

1          I don't remember what the termination --

2    Q.  But you did get the letter?

3    A.  Well, I didn't get it, my attorney got it and I

4          don't remember what was said in it.

5    Q.  It was sent to your attorney at your request?

6    A.  I think he was -- it may have been his request.  He

7          was -- he was dealing with H.R.

8    Q.  Do you agree that you knew and you were told the

9          possible disciplinary action for you which could be

10         termination?

11   A.  I don't know what's contained in that letter, so I

12        can't answer to it specifically.

13   Q.  Paragraph three, number three says the notice will

14        "provide a reasonable amount of time for the ESPM

15        employee to prepare to respond".  Do you agree that

16        we scheduled the post termination hearing at your

17        convenience?

18   A.  I don't know if it was at my convenience or my

19        attorney's or whomever it was.

20   Q.  Well Massport agreed to an extension and the

21        deadline which your lawyer requested?

22   A.  I honestly don't remember that.  I didn't know there

23        was a deadline.

24   Q.  Were you aware that the hearing was scheduled in the

1          end of December and then your lawyer asked to have

2          it postponed because the holidays are a difficult

3          time for you?

4     A.   It could have been and I don't remember at that

5          time.

6     Q.   That paragraph continues, "The ESPM employee

7          generally will thereafter have an opportunity to

8          meet with his or her department head or the

9          department head's designee". And we agreed you got

10         to meet with Leslie Kirwan's designee, correct?

11    A.   No.  I never got to meet with Leslie Kirwan's

12         designee.

13    Q.   At your post termination hearing you got to meet

14         with Leslie --

15    A.   I don't consider that a meeting.  I thought it was

16         a one on one thing.

17    Q.   At your post termination hearing you were -- you met

18         with Massport representatives that included Leslie

19         Kirwan's designee, Mary Ann Bradley?

20    A.   She was there at that meeting.

21    Q.   And the director of Human Resources was there?

22    A.   Yes, she was.

23    Q.   But again, I don't feel that that meeting was fair

24         due to them coming and taking -- sending the

1  A.  I don't recall.

2  Q.  Would you agree for a couple of days Massport had no

3      idea what your employment status was because you had

4      left without telling anybody?

5  A.  I don't -- that's not true.  I tried to tell.  I

6      tried to tell Mary Ann Bradley and I tried to -- and

7      I told -- I don't know if I told Ann Fortier I was

8      leaving that day or if I told our pool secretary to

9      relay it to Mary Ann Bradley.  Because Mary Ann

10     Bradley was in that huddle with Daigle and Titus, so

11     I couldn't even speak to her.  I wanted to speak to

12     her then.

13 Q.  But you didn't wait around to speak to her when she

14     was available?

15 A.  I was vomiting and I had diarrhea and I certainly

16     couldn't stay on the premises.

17 Q.  If you look at paragraph three on what's bates-

18     stamped page 173.

19 A.  Yes.

20 Q.  It starts in the case of a demotion.  Do you see the

21     last sentence in that paragraph, it says, "Under

22     appropriate  circumstances,  immediate  suspension

23     without  pay,  demotion  or  termination  may  be

24     required; provided the notice and opportunity to be

1          heard and discussed above generally will be provided

2          subsequently in due course"?    Did I read that

3          correctly?

4     A.   Have you read it --

5     Q.   Yes.

6     A.   You have read it correctly.

7     Q.   You were given leave with pay, correct?

8     A.   Yes.  They paid me through November 30th.

9     Q.   But even prior to your putting in for FMLA, you were

10         placed on a paid leave of absence.

11    A.   30 day leave of absence.

12    Q.   Do you recall that?

13    A.   Yes, I -- again, I don't know if that went to my

14         attorney or it came to me.

15    Q.   So you recognize that Massport could have terminated

16         you or could have suspended you without pay, but

17         chose to suspend you with pay, correct?

18    A.   I don't -- I don't know that, but --

19    Q.   You agree they did suspend you with pay?

20    A.   They did suspend me with pay.

21    Q.   And you see here in paragraph three where it says

22         you could be suspended without pay?

23    A.   Yes.

24    Q.   And do you agree that prior to your post termination

Floch Affidavit (USDC)
EXHIBIT B

# EXHIBIT B

FORM 117

**The Commonwealth of Massachusetts**
**Department of Industrial Accidents – Department 117**
600 Washington Street – 7th Floor, Boston, Massachusetts 02111
Info. Line 800-323-3249 ext. 470 in Mass. Outside Mass. – 617-727-4900 ext. 470
http://www.state.ma.us/dia

DIA Board # EXHIBIT B
(If Known):

5209201

## AGREEMENT FOR REDEEMING LIABILITY
## BY LUMP SUM UNDER G.L. CH. 152
## FOR INJURIES OCCURRING ON OR AFTER NOV. 1, 1986

Page 1 of 2
*Please Print or Type*

| | | | | |
|---|---|---|---|---|
| EMPLOYEE | Larry Pione | **LUMP SUM AMOUNT** | $ | 15,000.00 |
| EMPLOYER | Massachusetts Port Authority | TOTAL DEDUCTIONS | $ | 2,250.00 |
| INSURER | Massachusetts Port Authority | NET TO CLAIMANT | $ | 12,750.00 |
| BOARD NUMBER | 5209201 | TOTAL PAYMENTS | $ | 15,000.00 |
| | | | | (Weekly benefits plus lump sum) |
| DATE OF INJURY | 10/16/2001 | | | |

---

CHECK WHERE APPLICABLE

( )   Liability has been established by acceptance or by standing decision of the Board, the Reviewing Board, or a court of the Commonwealth and this settlement shall not redeem liability for the payment of medical benefits and vocational rehabilitation with respect to such injury.

(X)   Liability has **NOT** been established by standing decision of the Board, the Reviewing Board, or a court of the Commonwealth and this settlement shall redeem liability for the payment of medical benefits and vocational rehabilitation benefits with respect to such injury.

( )   In addition to the lump-sum, the insurer agrees to pay all outstanding reasonable and related medical bills incurred as of this date.

( )   The employee is currently receiving a cost-of-living adjustment.

DEDUCTIONS: From the lump-sum amount as stated above, the amount(s) listed below will be deducted and paid directly to the following parties:

| | | NAME | ADDRESS |
|---|---|---|---|
| 1. | $ 2,250.00 | Ferriter & Costello | 171 Third Street, Cambridge, MA 02141 |
| | Attorney's Fee | | |
| 2. | $ | | |
| | Attorney's Expenses | (Please attach documentation) | |
| 3. | $ | | |
| | Liens | Please attach discharges) | |
| 4. | $ | | |
| | Inchoate Rights | (Please specify release) | |
| 5. | $ | | |
| 6. | $ | | |
| 7. | $ | | |

(OVER)

Form 117 Revised 8/2001 - Reproduce as needed.
PSC (978) 343-2500

EXHIBIT
5
L Pione

**AGREEMENT FOR REDEEMING LIABILITY BY LUMP SUM SETTLEMENT**

**EMPLOYEE MEDICAL INFORMATION:**

Age ___60___ No. of Dependents ___0___ Average Weekly Wage $ __1,050.00__ Compensation Rate $ ___630.00___

Social Security No.*: __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__ Occupation __project manager__ Educational Background __Assoc. Degree__

On Social Security: YES( ) NO(x)

On Public Employee Disability Retirement: YES( ) NO(x)

DIAGNOSIS __Depression/anxiety__ PRESENT MEDICAL CONDITION __stable__

Present Work Capacity: __unable to work__ Third Party Action __none__

### *PLEASE GIVE A BRIEF HISTORY OF THE CASE AND INDICATE WHY THE SETTLEMENT IS IN THE EMPLOYEE'S BEST INTEREST (Specify all allocations):*

The employee alleges that he suffered severe anxiety and depression related to his bad faith termination by his employer on October 16, 2001. He requested benefits and the self-insured contested the claim. The employer contends that the termination was a bona fide personnel action.

A conference was held before Judge Harris and a denial order was issued. The employee appealed the order. This settlement was negotiated prior to the hearing.

The 11A report indicates that the employee is partially disabled.

Serious issues of causal relationship and compensable injury are present in this case. The employee's condition has improved with treatment

Based upon the issues of causal relationship and compensible injury, I believe the settlement to be in his best interest.
(Please attach a separate sheet if necessary.)

Received of __Massachusetts Port Authority__ the Lump Sum of __Fifteen Thousand__

__Dollars__ dollars and __zero__ cents ($ __15,000.00__)

This payment is received in redemption of the liability of all weekly payments now or in the future due me under the Workers' Compensation Act, for all injuries received by __Larry Pione__

on or about __10/16/2001__ while in the employ of __Massachusetts Port Authority__

_____ . I fully understand that after all of the deductions herein I will receive

$ __12,750.00__ . I am fully satisfied with and request approval of this settlement. This agreement has been translated for me into my native language of __English__ .

| | SIGNATURE | ADDRESS | ZIP CODE |
|---|---|---|---|
| **CLAIMANT:** | ✓ *[signature]* | 36 Fowler Ave. Revere, MA | 02151 |
| **CLAIMANT'S COUNSEL:** | *[signature]* | 171 Third Street Cambridge, MA | 02141 |
| **INSURER'S COUNSEL:** | *[signature]* | 20 Summer Street Boston, MA | 02210 |

Signed this __8th__ day of __April__ 2003.

*Disclosure of Social Security Number is Voluntary. It will aid in the processing of this document.

*Ferriter & Costello*

*Attorneys at Law*

(617) 547-6600

Fax (617) 547-4719

171 Third Street

Cambridge, Massachusetts 02141

February 19, 2002

Department of Industrial Accidents
600 Washington St., 7th. Floor
Boston, MA 02111
ATTN: Department 110

RE:  <u>Employee</u>:          Larry Pione
     <u>Employer</u>:          Massachusetts Port Authority
     <u>Insurer</u>:           Massachusetts Port Authority
     <u>Date of Injury</u>:    10/16/01

Dear Sir/Madam:

  Enclosed is the original Employee's Claim. A copy was sent to the self-insurer, Massachusetts Port Authority.

  Please note that the employee is requesting a conference be set down as soon as possible.

  Kindly note my attorney's lien for fees under Massachusetts General Laws, Chapter 152 and Chapter 221, Section 50, as amended.

  Your anticipated attention to this matter is greatly appreciated, and if you should have any questions, please do not hesitate to contact me at your convenience.

    Very truly yours,

    *Michael C Costello*

    Michael C. Costello

MCC:ah
Enclosures

cc: Massachusetts Port Authority, c/o Managed Benefits, 425 Summer Street, Boston, Ma 02120



# Ferriter & Costello

*Attorneys at Law*

(617) 547-5600

Fax (617) 547-9719

*171 Third Street*

*Cambridge, Massachusetts 02141*

February 19, 2002

**CERTIFIED MAIL/RETURN RECEIPT REQUESTED**
Massachusetts Port Authority
c/o Managed Benefits
425 Summer Street
Boston, Ma 02120

RE:   <u>Employee</u>:     Larry Pione
       <u>Employer</u>:     Massachusetts Port Authority
       <u>Insurer</u>:       Massachusetts Port Authority
       <u>Date of Injury</u>:   10/16/01

Dear Sir/Madam:

     Please be advised that I represent the above-named employee in his claim for workmen's compensation resulting from incident on or about 10/16/01 while in the employment of Massachusetts Port Authority.

     In accordance with M.G.L., Ch. 152, D.I.A. Regulation 452 C.M.R. 1:12(2), I am requesting at this time that you provide me with copies of any and all medical records which you have received pertaining to the above client's medical treatment which occurred as a result of this injury

     Furthermore, please be advised that this is a continuing request, so that I am asking that you provide me with any documents or records which you receive subsequent to this request.

     You will find enclosed herewith a copy of Employee's Claim; the original of which is being filed with the Department of Industrial Accidents.

     Kindly note my attorney's lien for fees under Massachusetts General Laws, Chapter 152 and Chapter 221, Section 50, as amended.

                        Very truly yours,

                        Michael C. Costello

MCC:ah
Encl.

cc:   D.I.A., 600 Washington St., 7th. Floor, Boston, MA 02111

RECEIPT NO.:   <u>7001 9490 0003 5311 8531</u>

FORM 110



## The Commonwealth of Massachusetts
### Department of Industrial Accidents – Department 110
600 Washington Street – 7th Floor, Boston, Massachusetts 02111
Info. Line 800-323-3249 ext. 470 in Mass. Outside Mass. - 617-727-4900 ext. 470
http://www.state.ma.us/dia

DIA Board EXHIBIT B
(If Known):

# EMPLOYEE'S CLAIM

**FOR USE BY EMPLOYEES OR DEPENDENTS CLAIMING BENEFITS AS A RESULT OF INJURY OR DEATH.
ALL OTHER CLAIMANTS SHOULD USE FORM 115**

*IMPORTANT - INSTRUCTIONS AND CODES ON THE REVERSE SIDE - Please Print Legibly or Type - Unreadable forms will be returned.*

**E M P L O Y E E**

| 1. Employee's Name (Last, First, MI) | 2. Social Security Number* | 3. Home Telephone No.: | 4. Number of Dependents: |
|---|---|---|---|
| Pione, Larry | 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 | 781-284-4518 | 0 |

| 5. Home Address (No., Street, City, State & Zip Code): | 6. Date of Birth: |
|---|---|
| 36 Fowler Avenue, Revere, MA 02151 | 7/16/43 |

7. Name of Employee's Attorney (Last, First, MI) and Board of Bar Overseers Number (if no attorney leave blank)**:
Costello, Michael C    B.B.O. #101260

| 8. Attorney's Address: | 9. Attorney's Telephone No.: |
|---|---|
| 171 Third Street, Cambridge, MA 02141 | (617) 547-5600 |

**E M P L O Y E R**

| 10. Employer's Name & Address (No., Street, City, State & Zip Code): | 10a. Industry Code (See Reverse Side): |
|---|---|
| Mass Port Authority<br>1 Harborside Drive, East Boston, MA 02128 | 96 |

11. Workers' Compensation Insurance Carrier's Address and Tel. No. (NOT LOCAL AGENT/ADMINISTRATOR - See instructions on reverse side):
Mass Port Authority
c/o Managed Benefits
425 Summer Street, Boston, MA 02120

**I N J U R Y  I N F O R M A T I O N**

12. **DATE OF INJURY** (mm/dd/yyyy):  10/16/01

| 13. FIRST day of Total or Partial Incapacity to Earn Wages (mm/dd/yyyy): 10/16/01 | 14. FIFTH day of Total or Partial Incapacity to Earn Wages (mm/dd/yyyy): 10/20/01 |
|---|---|

| 15. If Employee has Died, Date of Death (mm/dd/yyyy): | 16. Describe Injury (Lower Back... leg... arm... etc.): Depression, Anxiety |
|---|---|

| 17. Briefly Describe How Injury/Exposure Occurred and Body Part(s) involved:  Terminated in bad faith by employer | 17a. Injury Code(s) | Body Part Code(s) |
|---|---|---|
| | a. 540   to body part | a. 100 |
| | b.   to body part | b. 410 |
| 18. Name(s) of Witness(es): | c.   to body part | c. |

| 19. Employee's Regular Occupation: Financial Project Manager | 20. Average Weekly Wage: $1,050.00  ☐Actual ☒Estimated | 21. Has Employee Returned to Work?: ☐Yes ☒No |
|---|---|---|

22. Has the Insurer Made Any Payments On Your Claim?  ☐Yes  ☒No   If Yes - Indicate Type of Benefits and Amounts (Medical Bills, Wages, etc.):
_____ in the amount of $_____

**B E N E F I T S  C L A I M E D**

23. Section(s) of Law Claimed. Check all appropriate boxes below and attach documentation as required by M.G.L. c 152, § 7G, §10(1) and 452 CMR 1.07.

a. Sec. 34 ☐ Total, Temporary Incapacity Comp. from (date): from 10/16/01 to date and continuing and

from _____ to _____

b. Sec. 35 ☐ Partial Incapacity Comp. from (date): from _____ to _____ and

from _____ to _____

c. Sec. 36 ☐ Specific Comp. in the Amount of $_____

d. Sec. 31 ☐ Survivor's Benefits  e. Sec. 33 ☐ Burial Expenses f. Secs. 13 & 30 ☒ Medical Expenses g. ☐ Other (Specify Sec.): 13A

| 24. Name and Address of Facility Where Employee was First Treated: Belmont Medical Associates, 25 Concord Ave, Cambridge, MA | 25. Name of Treating Physician: Dr. Ranere |
|---|---|

| 26. Employee's/Claimant's Signature: *Larry Pione* | 27. Date (mm/dd/yyyy): 2·26·02 |
|---|---|

| 28. Attorney's Signature (if applicable): *Michael C Costello* | 29. Date (mm/dd/yyyy): 2-26-02 |
|---|---|

*Disclosure of Social Security Number is voluntary. It will aid in the processing of your claim.    Form 110 - Revised 8/2001 - Reproduce as needed
**Representation by an attorney is not required (see instructions on reverse side).

**\*Attached is medical report of Bruce Freeman, L.I.C.S.W. dated 11/6/01**

(Family and Medical Leave Act of 1      )

Employment Standa/    dministration
Wage and Hour Division

Pioch Affidavit (USDC)

**EXHIBIT B**

*(When completed, this form goes to the employee, **not to the Department of Labor**.)*

OMB No.: 1215-0181
Expires:    06/30/02

**1. Employee's Name**

Larry Pione

**2. Patient's Name** *(If different from employee)*

Same

**3.** Page 4 describes what is meant by a **"serious health condition"** under the Family and Medical Leave Act. Does the patient's condition[1] qualify under any of the categories described? If so, please check the applicable category.

(1) _____ (2) ✓ (3) _____ (4) ✓ (5) _____ (6) _____ , or None of the above _____

**4.** Describe the **medical facts** which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories:

Marked stress and anxiety. Abdominal pain.

**5. a.** State the approximate date the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present **incapacity**[2] if different):

Approx 10/10/01 - Duration unknown - may persist indefinitely.

**b.** Will it be necessary for the employee to take work only **intermittently or to work on a less than full sche**dule as a result of the condition (including for treatment described in Item 6 below)?

If yes, give the probable duration:

**c.** If the condition is a **chronic condition** (condition #4) or pregnancy, state whether the patient is presently incapacitated[2] and the likely duration and frequency of **episodes of incapacity**[2]: likely duration is 12 weeks or so. Patient is advised to rest and be stress free.

[1] Here and elsewhere on this form, the information sought relates only to the condition for which the employee is taking FMLA leave.

[2] "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.

Form WH-380
Revised December 1999



EXHIBIT
7
Pione

8. a. If leave is required to care for a family member of the employee with a serious illness condition, does the patient require assistance for basic medical or personal needs or safety, or for transportation?

n/a

b. If no, would the employee's presence to provide **psychological comfort** be beneficial to the patient or assist in the patient's recovery?

c. If the patient will need care only **intermittently** or on a part-time basis, please indicate the probable **duration** of this need:

_____
Signature of Health Care Provider

Stephen P. Ranere, MD

_____
Address

BELMONT MEDICAL ASSOC., INC.
725 CONCORD AVENUE #4100
CAMBRIDGE, MA 02138
(617) 864-8822

Internal Medicine
_____
Type of Practice

_____
Telephone Number

11 - 13 - 01
_____
Date

**To be completed by the employee needing family leave to care for a family member:**

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

_____          _____
Employee Signature                                                Date

| Massachusetts Port Authority | Policy Reference | HR1.03 |
|---|---|---|
| Human Resources Policies and Procedures Manual | Date Revised | 9/21/00 |

*This policy has been approved by the Massport Board.*

## POLICY ON EMPLOYMENT TERMS AND CONDITIONS

### I. SCOPE AND EFFECTIVENESS

#### A. Scope

All employees, as defined in Section II below, shall be subject to this Policy unless otherwise expressly excluded. None of the provisions of this Policy shall pertain to any employee of the Authority whose terms and conditions of employment are established by a collective bargaining agreement or whose employment with the Authority is considered temporary, nor shall this Policy apply to independent contractors, students or leased workers.

#### B. Effectiveness

The Authority shall review this policy each year at a meeting of its Personnel Committee. In the event that the Authority changes the benefit provided for in Section VII(D) as it is amended from time to time, the change shall not be effective for any ESPM employee employed at the time of the change until twelve months following the date of the change.

### II. DEFINITIONS

#### A. "Days" means working days.

#### B. "Employee" means a person duly appointed to a regular non-union employment position or a job share position (provided the job share contract has been signed and approved) with the Authority. Unless otherwise specified, the term "employee" as used in this Policy shall refer to both MSPA and ESPM employees.

#### C. "ESPM" or "Executive, Senior Professional, or Senior Managerial" employee means any employee in a non-union position classified at Level 6 or above in the Authority's classification plan, and includes the position of Executive Director.

#### D. "MSPA" or "Managerial, Supervisory, Professional, or Administrative" employee means any employee in a non-union position classified at Level 5 or below in the Authority's classification plan who has been continuously employed by the Authority for more than six months.



C00163

E. "Termination" means cessation of an employee's employment at the Authority for any reason, including without limitation, voluntary resignation, voluntary retirement, retirement for superannuation, involuntary termination pursuant to disciplinary procedures, involuntary termination for substandard performance, or involuntary termination due to reduction in staff, reorganization, or as a result of a change in Administration or changing needs. Any involuntary termination of an MSPA employee, or any material reduction in salary or classification for an MSPA employee by reason of demotion, involuntary transfer, unpaid suspension or otherwise, generally will entitle the affected MSPA employee to invoke the Hearing and Grievance Procedure described in Section V(F) as to the relevant personnel action.

F. "Hearing and Grievance Procedure" means the procedure outlined in Section V(F) below.

## III. PERFORMANCE APPRAISALS

### A. Annual Performance Appraisals

1. Employees are evaluated on performance criteria established by the Executive Director or his/her designee. Annual performance appraisals for each employee generally are conducted on a fiscal year basis as the Executive Director shall direct. Performance appraisals for each employee shall be summarized for each employee in a performance appraisal rating based on the established criteria. The performance appraisal form shall include a rating scale that will measure the employee's overall performance.

2. At the request of the Board, performance ratings shall be submitted by the Executive Director to the Board.

3. Any Department Head may request from the Director of Human Resources an extension of up to six months for the submission of a performance appraisal for a particular employee, if, in the Department Head's opinion, additional time is required to evaluate the performance of such employee. If the Directo of Human Resources grants such a request, the Department Head shall promptly notify the affected employee of the performance appraisal schedule to be followed. The Executive Director shall have the same option with respect to employees who report directly to him/her.

C00164

B. Salary Review

An annual salary review for employees shall be conducted as the Executive Director shall direct. As part of the budget cycle of each fiscal year, the Executive Director shall recommend to the Board a merit percentage increase, if appropriate. If a merit percentage increase is not rejected by the Board, then merit increases, as determine by Department Heads based on performance appraisal results, shall become effective on July 1 of each year. Employees must receive a rating at least equivalent to a satisfactory rating on their annual performance appraisals in order to be eligible for any merit increase adjustment.

## IV. EMPLOYMENT STATUS

### A. MSPA Employees

1.  For the first six months of their employment, employees in non-union positions classified at Level 5 or below in the Authority's classification plan shall be considered "at-will" employees of the Authority. Any MSPA employee who has been continuously employed by the Authority for more than six months shall be considered, for purposes of this Policy, an employee of the Authority with a continuing employment status that will terminate involuntarily only upon good faith compliance with the terms and conditions of this Policy. After the first six months of employment, an MSPA employee may not be terminated involuntarily except for "just cause" (as that term is defined in Section V), a statement of which shall be provided at the time notice of termination is given. An MSPA employee employed for more than six months shall be entitled to invoke the Hearing and Grievance Procedure t review the causes stated for any involuntary termination.

2.  Procedures for termination of an MSPA employee are outlined in Section V below. Any MSPA employee who is terminated from employment, either voluntarily or involuntarily, shall be required to return all Authority property in his or her possession, including the items listed on the final termination form, prior to release of any termination benefit to which the employee woul otherwise be entitled pursuant to this Policy or any other policy of the Authority.

### B. ESPM Employees

1.  Employment of an ESPM employee is on an "at-will" basis.

2.  Guidelines for termination of an ESPM employee are outlined in Sections V and VII below. Any ESPM employee who is terminated from employment, either voluntarily or involuntarily, shall be required to return all Authority property in his or her possession, including the items listed on the final

C00165

termination form, prior to release of any termination benefit to which the
employee would otherwise be entitled pursuant to this Policy or any other
policy of the Authority.

## C. Management Discretion

Nothing in this Policy shall be construed to limit or alter the sole discretion of the
Authority, acting through its Executive Director or his/her designee, to discipline,
demote, transfer, suspend, terminate or take any other personnel action as to any
employee for any reason deemed by management to be appropriate from time to
time, and under any terms and conditions as to such action that the Authority, actin
through its Executive Director or his/her designee, chooses to impose, except that
MSPA employees may be involuntarily terminated, or subjected to a material
reduction in salary or classification, only for "just cause" (as that term is defined in
this Policy) in accordance with Sections II (E) and V.

## V.    TERMINATION: MSPA Employees

For purposes of this Policy, the involuntary termination of an MSPA's employment for
"just cause" shall mean involuntary termination for one or more of the reasons set forth
in Sections V(B)-(E) below. "Just cause" for involuntary termination as defined in this
Section V will also constitute "just cause" for any material reduction in an MSPA
employee's salary or classification.

### A. Voluntary Resignation/Retirement

The Authority shall request a minimum of two weeks written notice of any such
resignation or retirement.

### B. Reorganization/Layoff

1.    An MSPA employee is subject to involuntary termination due to layoff and/c
      departmental reorganization. Just cause for such layoff and/or departmental
      reorganization shall include insufficient work as determined by the
      Department Head or adverse financial conditions affecting part of the
      Authority, the Authority as a whole, or any particular unit of the Authority.

2.    An MSPA employee subject to a personnel action described in Section
      V(B)(1) above shall be entitled to reinstatement if the particular position from
      which he/she is involuntarily terminated, as described in the previous
      paragraph, is filled within one year of the date of layoff or termination,
      provided that the employee notifies the Authority in writing of an interest in
      reinstatement within 30 days of such layoff or involuntary termination.

*HR1.03 Policy on Employment Terms and Conditions*                    **Page 1**

C. **Disciplinary Termination**

1. The Authority, acting through the Executive Director or his/her designee, typically shall impose a progressive disciplinary process when an MSPA employee has a problem on the job which may lend itself to rectification through such process. Supervisors and managers are authorized to issue both oral and written warnings and/or any other form of progressive discipline up to and including termination and may impose such discipline for infractions policies and/or procedures, or behaviors disruptive to the workplace and/or productivity, which they deem to merit such discipline. Any MSPA employee who receives a warning generally will have the opportunity, if he/she so requests, to meet with his/her supervisor to discuss the issue. The progressive disciplinary process described in this paragraph may, at the discretion of the Authority, acting through its Executive Director or his/her designee, include, among other things, oral warning(s), written warning(s), suspension and/or termination, not necessarily in that order. The severity of the infraction and the employee's employment record, among other things, may determine the degree of disciplinary action taken by management. In addition, at management's sole discretion, serious disciplinary sanctions, up to and including termination, may be imposed in lieu of any step in the progressive discipline process. Any involuntary termination implemented in accordance with this Section V(C)(1) shall constitute termination for just cause.

2. In the case of infractions of policies and/or procedures, or behaviors disruptive to the workplace and/or productivity, which the Authority, acting through its Executive Director or his/her designee, deems in its sole discretion to be serious, including but not limited to infractions or behaviors involving the MSPA employee's honesty, abusive or harassing behavior toward other employees or the public, and/or workplace substance abuse, the Authority, acting through the Executive Director or his/her designee, may discipline or terminate the MSPA employee without first imposing progressive discipline. Any involuntary termination implemented in accordance with this Section V(C)(2) shall constitute termination for just cause.

D. **Unsatisfactory Performance**

1. The MSPA employee may be put on probation for a three month period for unsatisfactory performance at any time by his/her Department Head. No MSPA employee may be terminated as a result of poor performance without having received notice and an opportunity to cure as described herein. Termination for poor performance (as determined at the discretion of the Authority, acting through its Executive Director or his/her designee), after said notice and opportunity to cure has been completed, shall constitute termination for just cause. Notice for these purposes shall consist of:

a.  a written letter to the employee from the Department Head;

b.  any rating on an annual performance appraisal that reflects a less than
satisfactory review, as identified on the performance appraisal form.

Such notice shall contain specific reference to the defects in the MSPA
employee's performance, and a statement of the expected standards of
performance. The MSPA employee shall have the opportunity to meet with
his/her manager and the Department Head to discuss proposed remedies. If
appropriate, the MSPA employee may be referred to the Director of Human
Resources for additional resources.

2.  If the MSPA employee's performance has not reached a satisfactory level at
the end of the probationary period, the Department Head may terminate the
MSPA employee. Notwithstanding anything to the contrary in Section
V(D)(1), if the MSPA employee's performance does not show reasonably
sufficient improvement (as determined at the discretion of the Authority,
acting through its Executive Director or his/her designee) during the
probationary period, the Department Head may terminate the MSPA employe
at any time after the first four weeks of the probationary period have elapsed,
provided that the Department Head receives prior written approval of such
termination decision from the Director of Human Resources. At his/her
discretion, the Department Head may extend the probationary period. This
extension shall be no longer than three months. If the employee has not
achieved satisfactory performance by the end of the extension, the employee
may be terminated.

E.  **Probationary Transfer**

1.  There may be circumstances where the Authority's business needs may best
served by transferring to a new position an employee who is performing
poorly in his/her current position and who would otherwise be subject to
probation in that position. In such cases, the Director of Human Resources,
with the approval of the affected Department Head(s), may authorize the
probationary transfer of an employee to a new position in the Authority. In
such cases, the employee will be placed on three months' probation,
commencing on the date of the transfer. The employee will, prior to the
transfer, receive written notice of the transfer, which shall describe, at a
minimum, the length of the employee's probationary period, the performanc
deficiencies which form the basis for the probation and transfer and the job
title and job description of the position to which the employee is being
transferred.

2.  Following the transfer, the employee generally will meet with his/her new
supervisor, who shall review with the employee the job description for the

new position and who shall communicate the supervisor's work performance expectations. The employee and the new supervisor typically will meet during the employee's first month in the new position to review the employee's job performance.

3. In the event the employee's new Department Head determines at any time after the first four weeks of the probationary period have elapsed that the employee is unable or unwilling to perform the duties of his/her new position the employee may, with the approval of the Director of Human Resources, be immediately terminated by the Department Head for poor performance. At the end of the probationary period described in Section V(E)(1) above, the Department Head may, with the approval of the Director of Human Resource extend the probationary period for up to three months. If the employee has n achieved satisfactory performance by the end of the extended probationary period, the employee may be terminated for poor performance. Termination of an MSPA employee in accordance with this paragraph shall constitute termination for just cause.

## F. Hearing and Grievance Procedure

This Hearing and Grievance Procedure may be invoked by any MSPA employee discharged pursuant to Sections V(B), (C), (D) or (E) above, as well as by any MSPA employee entitled to invoke the same pursuant to Section II(E) above. Employees eligible to invoke this procedure MUST do so if they wish to challenge any personnel decision to which the Hearing and Grievance Procedure applies.

1. Hearing Process

Any MSPA employee upon whom the Authority, acting through its Executive Director or his/her designee, is considering imposing a personnel action subject to this Hearing and Grievance Procedure generally will receive notice of that fact and an opportunity to respond to management's basis for considering such action before the relevant personnel action is implemented.

2. Grievance Procedure

a. During the grievance procedure set forth below, an MSPA employee sha be considered terminated and remain off the payroll, or shall otherwise remain subject to the terms of the challenged personnel decision, unless and until the challenged decision is overturned through this grievance procedure. If an MSPA employee's appeal is successful and the relevan decision is overturned, retroactive pay may be awarded, as appropriate.

C00169

b.  The following steps shall constitute the grievance procedure:

STEP 1:

Within five days of receipt of the statement of reasons for the relevant personnel decision, the MSPA employee must submit to his/her Department Head written objections to that statement. The Department Head may, at his/her discretion, reverse the decision by expressly withdrawing the stateme of reasons for such decision.

STEP 2:

If the statement of reasons is not withdrawn within five days of the MSPA employee's objection to the Department Head, the MSPA employee shall hav five further days to request that a hearing be held. Said hearing shall be conducted by the Director of Labor Relations, or such other suitable employe that the Executive Director may designate, within five days of the request for hearing, and the purpose of said hearing shall be to inquire into whether the statement of reasons has support in the underlying factual circumstances and whether those facts constitute "just cause" for termination under the terms of this Policy, or constitute "just cause" under this Policy for a material reducti in salary or classification to which the terms of this Hearing and Grievance Procedure apply, as appropriate. Any allegation of unlawful discrimination i employment opportunity raised during the grievance procedure shall, in addition to being considered at the various procedural steps during which it i raised, be referred to the Director of Compliance or his/her designee for investigation. The hearing shall be suspended until such time as the Director of Compliance's, or his/her designee's, investigation has been concluded. A the conclusion of the investigation, the Director of Compliance or his/her designee shall report the findings to the person conducting the hearing ("hearing officer").

Any MSPA employee making such an allegation of discrimination with respect to his/her termination or other personnel action subject to this Hearir and Grievance Procedure shall have the right to have the Director of Compliance or his/her designee present at the hearing. Any report of the Director of Compliance or his/her designee hereunder shall not be conclusiv but shall be entitled to due consideration.

STEP 3:

If the statement of reasons is not withdrawn within five days of the issuance findings by the hearing officer, the MSPA employee shall have five further days to appeal in writing to the Executive Director. The Executive Director if he/she so designates, the Deputy Executive Director, shall make a decisio on any such appeal and said decision shall be final and without further recourse except as provided in Step 4.

C00170

STEP 4:

If the MSPA employee claims that the relevant personnel decision was a
violation of his/her right to free speech or freedom of association protected b
the First and Fourteenth Amendments of the United States Constitution as pi
of the Step I written objections and presents evidence supporting such claim
at the hearing, the MSPA employee shall be entitled within five days of
receiving the decision of the Executive Director, or the Deputy Executive
Director, as the case may be, adverse to the employee to commence arbitratio
of that claim with the American Arbitration Association. If the MSPA
employee prevails, all costs of arbitration (exclusive of attorney's fees) shall
be borne by the Authority. If the Authority prevails, fifty percent of the
arbitration costs (exclusive of attorney's fees) will be borne by the MSPA
employee. The burden of persuasion shall be on the MSPA employee to
establish that the exercise of constitutionally protected rights addressed by th
paragraph (Step 4) was the primary motive for the relevant personnel decisio

3.   The  Hearing and Grievance Procedure involves the employment relationshi
between the Authority and the individual employee. Therefore, the
opportunity to meet described in the above paragraphs (with the exception o
Step 4) is accorded to the MSPA employee, not to legal counsel or any other
representative of the MSPA employee. Should the MSPA employee request
the presence of legal counsel or other representation, such presence may be
allowed on the condition that the individual observe but not participate in th
meeting between the Authority and its employee. If the MSPA employee is
accompanied by legal counsel, the Chief Legal Counsel, or his/her designee,
may serve as the legal advisor for the Authority in the meeting.
Notwithstanding the foregoing, to the extent that anything in this subsection
V(F)(3) is inconsistent with governing law, said law shall apply.

## G. Severance Allowance

MSPA employees may be considered for severance allowance if, in the sole
discretion of the Authority, acting through the Executive Director or Deputy
Executive Director, extenuating circumstances warrant such consideration. MSP
employees with less than sixty (60) months service to whom the Authority, acting
through its Executive Director or his/her designee, in its discretion grants a
severance allowance shall be paid said severance in accordance with the severanc
formula established by vote of the Authority on June 10, 1976, as amended on Jul
18, 1987.

C00171

## VI.  TERMINATION: ESPM Employees

### A.  Voluntary Resignation/Retirement

The Authority shall request a minimum of two weeks written notice of any such resignation or retirement.

### B.  Involuntary Termination

ESPM employees are "at-will" employees of the Authority.  As such, they may be terminated at any time for any reason, with or without notice.  ESPM employees terminated for reasons other than "cause", as that term is defined in Section VII below, shall be provided with severance in accordance with Section VII.

## VII.  SEVERANCE: ESPM Employees

ESPM employees terminated for any of the reasons described in Sections VII(A), (B or (C) below will be deemed to have been terminated for "cause" and will not be entitled to severance.  ESPM employees terminated for reasons other than "cause" will be provided with severance in accordance with Section VII(D).

### A.  Disciplinary Termination

1.  The Authority, acting through the Executive Director or his/her designee, typically shall impose a progressive disciplinary process when an ESPM employee has a problem on the job which may lend itself to rectification through such process.  Supervisors and managers are authorized to issue both oral and written warnings and/or any other form of progressive discipline up to and including termination and may issue such discipline fo those infractions of policies and/or procedures, and/or behaviors disruptive to the workplace and/or productivity, which they deem to merit such discipline.  The infractions and/or behaviors described in the preceding sentence shall constitute grounds for termination for cause.  Any ESPM employee who receives a warning generally will have the opportunity, if he/she so requests, to meet with his/her supervisor to discuss the issue.  Th progressive disciplinary process described in this paragraph may, at the discretion of the Authority, acting through its Executive Director or his/he designee, include, among other things, oral warning(s), written warning(s) suspension and/or termination, not necessarily in that order.  The severity the infraction and the employee's employment record, among other things. may determine the degree of disciplinary action taken by management.  In addition, at the sole discretion of the Authority, acting through its Executiv Director or his/her designee, serious disciplinary sanctions, up to and including termination, may be imposed in lieu of any step in the progressiv

discipline process.

2.   In the case of infractions or behaviors constituting cause pursuant to Sectio VII(A)(1) above which the Authority, acting through its Executive Director or his/her designee, deems in its sole discretion to be serious, including but not limited to infractions or behaviors involving the ESPM employee's honesty, abusive or harassing behavior toward other employees or the publ and/or workplace substance abuse, the Authority, acting through the Executive Director or his/her designee, may discipline or terminate the ESPM employee without first imposing progressive discipline.

3.   In the case of a demotion, involuntary transfer, reduction in pay, or involuntary termination, the ESPM employee typically will receive reasonable notice that (1) provides an explanation of why discipline is bein contemplated; (2) explains the possible disciplinary action that may be taken; and (3) provides a reasonable amount of time for the ESPM employe to prepare to respond. The ESPM employee generally will thereafter have a opportunity to meet with his or her Department Head (or the Department Head's designee) and the Director of Human Resources to discuss the actic being contemplated. Under appropriate circumstances, immediate suspension without pay, demotion or termination may be required; provide the notice and opportunity to be heard discussed above generally will be provided subsequently in due course.

4.   The disciplinary process involves the employment relationship between th Authority and the individual employee. Therefore, the opportunity to mee described in the previous paragraph is accorded to the ESPM employee, nc to legal counsel or any other representative of the ESPM employee. Shoul the ESPM employee request the presence of legal counsel or other representation, such presence may be allowed on the condition that the individual observe but not participate in the meeting between the Authorit and its employee. If the ESPM employee is accompanied by legal counsel the Chief Legal Counsel, or his/her designee, may serve as the legal advisc for the Authority in the meeting. Notwithstanding the foregoing, to the extent that anything in this subsection VII(A)(4) is inconsistent with governing law, said law shall apply.

B. Unsatisfactory Performance

1.   The ESPM employee may be put on probation for any period that the Authority, acting through its Executive Director or his/her designee, deem appropriate, up to a three month period, for unsatisfactory performance at any time by his/her Department Head. ESPM employees generally will ne be terminated as a result of poor performance without having received notice and an opportunity to cure during a probationary period. Notice of t

*HR1.03 Policy on Employment Terms and Conditions*                **Page 1·**

probationary period typically will consist of:

a.   a written letter to the employee from the Department Head; or

b.   any rating on an annual performance appraisal that reflects a less than satisfactory review, as identified on the performance appraisal form.

Such notice normally will contain specific reference to the defects in the ESPM employee's performance, and a statement of the expected standards of performance. The ESPM employee typically will have the opportunity t meet with his/her manager and the Department Head to discuss proposed remedies. If appropriate, the ESPM employee may be referred to the Director of Human Resources for additional resources.

2.   If the ESPM employee's performance has not reached a satisfactory level at the end of the probationary period, the Department Head may terminate the ESPM employee. If the ESPM employee's performance does not show reasonably sufficient improvement during the probationary period, the Department Head may terminate the ESPM employee during the probationary period, provided that the Department Head receives prior written approval of such termination decision from the Director of Human Resources. At his/her discretion, the Department Head may extend the probationary period. This extension shall be no longer than three months. I: the employee has not achieved satisfactory performance by the end of the extension, the employee may be terminated.

## C. Probationary Transfer

1.   There may be circumstances where the Authority's business needs may be: be served by transferring to a new position an employee who is performing poorly in his/her current position and who would otherwise be subject to probation. In such cases, the Director of Human Resources, with the approval of the affected Department Head(s), may authorize the probationary transfer of an employee to a new position in the Authority. In such cases, the employee will be placed on probation, commencing on the date of the transfer. The employee will, prior to the transfer, receive writte notice of the transfer, which typically will describe, at a minimum, the length of the employee's probationary period, the performance deficiencie: which form the basis for the probation and transfer and the job title and jot description of the position to which the employee is being transferred.

2.   Following the transfer, the employee typically will meet with his/her new supervisor, who shall review with the employee the job description for the new position and who shall communicate the supervisor's work performance expectations. The employee and the new supervisor generall:

C00174

will meet during the employee's first month in the new position (assuming the employee remains employed at that time) to review the employee's job performance.

3. In the event the employee's new Department Head determines at any time during the course of or at the conclusion of the probationary period th the employee is unable or unwilling to perform the duties of his/her new position, the employee may, with the approval of the Director of Human Resources, be immediately terminated by the Department Head for poor performance. At the end of the probationary period described in Section VII(C)(1) above, the Department Head may, with the approval of the Director of Human Resources, extend the probationary period for up to thr months. If the employee has not achieved satisfactory performance by the end of the extended probationary period, the employee may be terminated for poor performance.

## D. Severance Policy

1. The severance policy applies to all involuntary ESPM employee terminations other than terminations for "cause" as described in Section V above; provided, that it shall not apply to job share employees and employees working a part-time work schedule who are terminated after th have been offered a comparable position with a full-time schedule and hav rejected said offer.

2. Any ESPM employee having completed one year of satisfactory service at the time of an involuntary termination (other than a termination for "cause") shall receive eight weeks base salary severance allowance in accordance with Section VII(D)(1) above. An additional two weeks base salary shall be awarded for each additional year of service at Massport, fo a combined total not to exceed 26 weeks. In addition, at the sole discretio of the Authority, acting through its Executive Director or his/her designe and without any obligation to do so, the Authority may, acting through th Executive Director or Deputy Executive Director, pay to any ESPM who has completed at least five years of service an additional severance allowance. The amount of such additional allowance shall not exceed th months' base salary. In granting such discretionary severance allowance the Authority, acting through its Executive Director or his/her designee, shall consider the employee's length of service and job performance. The severance policy as discussed above shall, for ESPM employees, replace previous severance allowance policies, including without limitation the severance allowance policy established by vote of the Authority on June 1976, as amended June 18, 1987.

# GUARDIAN

February 24, 2005                                          **Group LTD Claims**

Larry Pione
36 Fowler Avenue
Revere, MA  02151

Re:   NOTICE OF UNDERPAYMENT
        Plan # 298126
        Claim# 017262

Dear Mr. Pione:

We are writing regarding an increase in your Long Term Disability Monthly benefit.

On February 9, 2005, we received a letter from you stating that we were grossly misinformed by your employer and a letter dated July 6, 2001 from Massachusetts Port Authority addressed to you stating that your annual salary of $51,059.50 was effective as of July 1, 2001.

The salary of $44,830.50 was the salary reported for you on Massachusetts Port Authority's Census as of your date last worked October 16, 2001.   Based on the information provided by you, we have adjusted your monthly earnings to reflect $4,254.96. The result is an underpayment in the amount of $7,464.00.

Below are our calculations as to how we arrived at your underpayment and new monthly benefit.

**Your Benefits**
| | | |
|---|---|---|
| Guardian Long Term Disability | 01/16/2002 – 01/15/2004 | $2,242.00/month |
| Guardian Long Term Disability Revised | 01/16/2002 – 01/15/2004 | $2,553.00/month |
| Workers' Compensation Benefit | 01/16/2002 – 01/15/2004 | $  212.50/month |
| Social Security Disability Benefit | 01/01/2003 – 01/15/2004 | $  938.00/month |

**We Paid:**

01/16/2002 – 12/31/2002  11 months 15 days          @   $2,029.50/month  = $23,339.25
($2,242.00 - $212.50)

01/01/2003 – 01/15/2004  12 months 15 days          @   $1,091.50/month  = $13,643.75
                                                                             Total      $36,983.00

**The Guardian Life Insurance Company of America**

**Northeast Regional Office  P.O. Box 26025  Lehigh Valley, PA 18002-6025
tel: 800.538.4583  fax: 610.807.8221  e-mail: group_ltd_claims@glic.com**



**We Should Have Paid:**

01/16/2002 – 12/31/2002 11 months 15 days      @   $2,340.50/month = $26,915.75
($2,553.00 - $212.50)

01/01/2003 – 01/15/2004 12 months 15 days      @   $1,402.50/month = $17,531.25
 ($2,553.00 - $212.50 - $938.00)             Total     $44,447.00

Therefore, $44,447.00 less $36,983.00 equals **$7,464.00 underpaid amount due.**

This calculated underpayment amount will be sent to you under separate cover.

If you have any questions regarding this letter, please contact me at extension 6812.

Sincerely,

Donna Pavlick
Group LTD Disability Analyst

cc: Attorney Brassil

# GUARDIAN

January 24, 2005

Sarrouf, Tarricone & Flemming
Attn: Elise Brassil
95 Commercial Wharf
Boston, MA 02110

Re:    Larry Pione
       Long Term Disability
       Group Plan # 298126
       Group Claim # 017262

Dear Attorney Brassil:

We have completed our review of Mr. Pione's Long-Term Disability claim and have determined that benefits are payable.

With the completion of the 90 day "Elimination period", benefit payments commence on January 16, 2002. Mr. Pione's payment will cover the period January 16, 2002 through January 15, 2004. The gross monthly benefit is $2,242.00. This amount may be reduced by income from other sources. Mr. Pione should refer to the following sections of the Certificate Booklet: "Income We Integrate With"; "Application for Other Income Required"; and "Overpayments - Our Right for Recovery".

**The condition for which Mr. Pione is claiming disability has a limited benefit duration under the Group Long Term Disability Plan. Please refer to the section of the Certificate Booklet entitled "Special Limitations." We are paying your claim for the diagnosis of Stress and Anxiety, ICD 9- 300.0.**

Mr. Pione has reached his maximum duration of benefits as of January 15, 2004. Therefore, no further benefits are payable.

If you have any questions, please contact our office at (800)-538-4583.

Sincerely,

Donna L. Pavlick

Donna Pavlick
Group Disability Benefit Analyst

cc: Larry Pione

The Guardian Life Insurance Company of America

Northeast Regional Office  Group LTD Claims  P.O. Box 26025 Lehigh Valley, PA 18002-6025
tel: 800.538.4583  fax: 610.807.8221  e-mail: group_ltd_claims@glic.com



# GUARDIAN

December 6, 2004

Sarrouf, Tarricone & Flemming
Attn: Elise A. Brassil
95 Commercial Wharf
Boston, MA 02110

Re:    Long Term Disability
       Claimant -            Larry Pione
       Group Plan #          298126
       Group Claim #         17262

Dear Attorney Brassil,

I am writing to inform you we have made an Appeals Committee decision with
regard to Larry Pione's Long Term Disability claim. Upon thorough review of
the information submitted we have decided to reverse our original decision to
decline benefits, due to the late filing of his claim.

After careful review of all of the medical documentation submitted, it has been
determined that Mr. Pione's disability began on October 18, 2001 due to the
conditions of "Anxiety and Stress". Therefore, Mr. Pione's claim for disability
benefits will be paid under the "Special Limitations" plan provision of Plan
298126, as follows:

Special Limitations

We limit the maximum payment period, if you are disabled due to a condition
listed below.

The maximum payment period for all such periods of *disability* is 24 months.
This is a combined maximum for all such conditions and all periods of *disability*.

We limit the maximum payment period for disabilities caused or contributed to
by the following conditions:

- Mental or emotional conditions
- Drug or alcohol abuse
- Musculoskeletal and connective tissue disorders including, but not
  limited to:

The Guardian Life Insurance Company of America, New York, NY

Northeast Regional Office  Group LTD Claims  P.O. Box 26025  Lehigh Valley, PA 18002-6025
tel: 800.538.4583    fax: 610.807.8221    e-mail: group_ltd_claims@glic.com

- Sprains or strains of joints and muscles
- Soft Tissue Conditions
- Repetitive motion syndrome or injuries
- Fibromylgia
- Chronic fatigue conditions including, but not limited to:
  - Chronic fatigue syndrome
  - Chronic fatigue immunodeficiency syndrome
  - Epstein-barr syndrome
- Chemical and environmental sensitivities
- Headache
- Chronic pain, myofascial pain
- Gastro-esophageal reflux disorder
- Irritable bowel syndrome
- Vestibular dysfunction, vertigo, dizziness…

Please be advised, the above is only a brief outline of the plan provisions. Mr. Pione should refer to his Plan Booklet for a complete summary.

Mr. Pione's claim file has been forwarded to a benefit analyst for further processing. Benefits covering the period January 16, 2002 through January 15, 2004 will be issued under separate cover.

Should Mr. Pione wish to appeal this decision, he must state his reasons for appeal in writing and provide Guardian with objective medical evidence supporting a physical condition, so severe, that precludes him from working full-time.

The company reserves all of its rights and defenses under the terms of the plan or as provided by law. For instruction on how to appeal this decision, please refer to the attached document. Your appeal should be accompanied by all the information requested above.

Please feel free to contact our office at (800) 538-4583 with any questions.

Sincerely,

Roberta Mortimer
Group Disability Claims
Appeals Committee Member

CC:    Mr. Larry Pione

2



# GUARDIAN℠

# ERISA – NEW PROCEDURES FOR DISABILITY CLAIMS

## HOW TO APPEAL THIS DECISION

You have the right to appeal this decision under regulations specified by the Employee Retirement Income Security Act (ERISA) 1974, as amended.  You need to:

- Submit your formal request for reconsideration in writing **within 180 days of the date of the attached letter** with the additional medical and/or other information mentioned within the letter. Please include your claim and plan number and address your correspondence and enclosures to:

> The Guardian Life Insurance Company of America
> P.O. Box 26025
> Lehigh Valley, PA  18002-6025

Guardian will notify you of its decision within 45 days of receipt of your written request for review.  If special circumstances require an extension of time for a decision on review,  the review period may be extended by an additional 45 days (90 days in total). Guardian will notify you in writing if an additional 45 day extension is needed.  If an extension is necessary due to your failure to submit the information necessary to decide the appeal, the notice of extension will specifically describe the required information, and you will be afforded at least 45 days from receipt of the notice to provide the specified information.  If you deliver the requested information within the time specified, the 45 day extension of the appeal period will begin after you have provided the information.  If you fail to deliver the requested information within the time specified, we may decide your appeal without that information.

You will have the opportunity to submit written comments, documents, or other information in support of your appeal.  You will have access to all relevant documents as defined by applicable U.S. Department of Labor regulations.  The review of the adverse benefit determination will take into account all new information, whether or not presented or available at the initial determination.  No deference will be afforded to the initial determination.  Unless there are special circumstances, this administrative appeal process must be completed before you begin any legal action regarding your claim.

The review will be conducted by us and will be made by a person different from the person who made the initial determination and such person will not be the original decision maker's subordinate.  In the case of a claim denied on medical judgment, we will consult with a health professional with appropriate training and experience.  The health care professional who is consulted on appeal will not be the individual who was consulted during the initial determination or a subordinate.  If the advice of a medical or vocational expert was obtained by the Plan in connection with the denial of your claim, we will provide you with the names of each such expert, regardless of whether the advice was relied upon.

A notice that your request on appeal is denied will contain the following information:
(a)     the specific reason(s) for the appeal determination;
(b)     a reference to the specific Plan provision(s) on which the determination is based;
(c)     a statement disclosing any internal rule, guidelines, protocol or similar criterion relied on in making the adverse benefit determination (or a statement that such information will be provided free of charge upon request);
(d)     a statement describing your right to bring a civil suit under federal law;
(e)     a statement that you are entitled to receive upon request, and without charge, reasonable access to copies of documents, records or other information relevant to the determination; and
(f)     a statement that "you or your plan may have other alternative dispute resolution options, such as mediation.  One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency."

Notice of the determination may be provided in written or electronic form.  Electronic notices will be provided in a form that complies with any applicable legal requirements.   Guardian does not waive our defenses under the terms of the plan or as provided by law.

Updated January, 2003

### BRUCE H. FREEMAN, L.I.C.S.W.
**388 Pleasant Street**
**Malden, MA  02180**
*Telephone: (781) 321-2224*

**TO:**      Stephen Ranere, M.D.

**FROM:**   Bruce Freeman, LICSW

**DATE:**    November 6, 2001

**RE:**      **Larry Pione**        **DOB: 07/16/43**

Mr. Pione is a fifty-eight (58) year old single white male who began individual therapy with this writer on  October 18, 2001.  He was referred by his employee assistance program.  Mr. Pione has worked for Massport as a "Special Financial Project Manager" for four (4) years.  He reports "the whole work environment is so hostile."  I am a fifty-eight (58) year old man and they are pushing me out."

Increased  stress for for  "a couple of years" led to a verbal altercation with another employee on October 10, 2001.  He got physically sick after that conflict and told his secretary that "I had to leave."  Mr. Pione presents as very anxious and depressed.  He reports difficulty falling asleep, wakes up frequently, difficulty focusing, appetite is only "fair".  "I have hives all over my body."

At this time, it is difficult to imagine Mr. Pione returning to the workplace.

Respectfully,

Bruce Freeman, LICSW

BF:sjb



EXHIBIT
*13*
*L. Pione*

# EXHIBIT C

MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION  Affidavit (USDC)
ONE ASHBURTON PLACE, ROOM 601, BOSTON, MA 02108   EXHIBIT C
(617) 727-3990

MAY 2 0 2005

## -DISMISSAL and NOTIFICATION of RIGHTS-

TO: Camille F. Sarrouf, Esq.          Case: Pione v. Mass Port Authority
    Sarrouf Tarricone & Flemming       Docket No: 021302528
    95 Commercial Wharf                EEOC No: 16CA202773
    Boston, MA 02110                   Investigator: Katherine M. Martin, Esq.

---

Your complaint has been dismissed for the following reasons:

[  ]    The facts you allege fail to state a claim under any of the statutes the Commission enforces.

[  ]    Respondent employs less than the required number of employees

[  ]    Your complaint was not timely filed with the Commission, i.e. you waited too long after the
        date(s) of the alleged discrimination to file. Because it was filed outside the time limit
        prescribed by law, the Commission cannot investigate your allegations.

[  ]    You failed to provide requested information, failed or refused to appear or to be available for
        necessary interviews/conference, or otherwise refused to cooperate to the extent that the
        Commission has been unable to resolve your complaint.  You have had more than 30 days in
        which to respond to our written request.

[  ]    The Commission's efforts to locate you have been unsuccessful. You have had at least 30 days in
        which to respond to a notice sent to your last known address.

[  ]    The Respondent has made a reasonable settlement, offering full relief for the harm you alleged.
        30 days have expired since you received actual notice of this settlement offer.

[ X ]   The Commission issues the following determination. Based upon the Commission's
        investigation, the Commission is unable to conclude that the information obtained establishes a
        violation of the statutes. This does not certify that the Respondent is in compliance with the
        statutes. No finding is made as to any other issues that might be construed as having been raised
        by this complaint.

### -NOTICE of APPEAL-

If you wish to appeal the dismissal of your complaint and believe that the above stated reason for
dismissal is incorrect, you may appeal to this Commission within 10 days after receipt of this notice.
You or your attorney must make your appeal of the dismissal in writing to the appeals clerk of this
Commission. Attention: Ms. Nancy To.

All employment complaints, where applicable, were filed by the MCAD with the Equal Employment
Opportunity Commission. Our finding, which will be forwarded to its area office, JFK Federal Building,
Boston, MA will be given substantial weight provided that such findings are in accordance with the
requirements of Title VII of the Civil Rights Act of 1964, the ADEA, and/or the ADA, as amended.

Walter J. Sullivan, Jr., Esq.                        5/24/15 DATE
Investigating Commissioner

Cc: William V. Hoch, Esq.
    Sr. Employment Counsel
    Mass Port Authority
    One Haborside Dr, Suite 200S
    Boston, MA 02128



RECEIVED
MAY 27 2005
MASSACHUSETTS PORT AUTHORITY
LEGAL DEPARTMENT

# MEMORANDUM

TO: File
FR: Katherine M. Martin, Esq., Supervisor
CASE: Pione v. Mass Port Authority
MCAD NO: 021302528
EEOC NO: 16CA202773
EMPLOYEES: 25+

## RECOMMENDATION FOR DISMISSAL OF THE COMPLAINT

## ISSUES INVESTIGATED:

On July 26, 2002 the Complainant filed a complaint with this Commission alleging that he had been discriminated against because of his age, 58 (DOB 7/16/43) in that he was terminated in violation of Massachusetts General Laws, Chapter 151B, Section 4, Paragraph 1B and the ADEA of 1990 as amended.

## SUMMARY OF FINDINGS:

The Complainant cannot establish a prima facie complaint for discrimination based on age. The Complainant is a member of a protected class. The Complainant was hired as a permanent part time employee at age 54 in 1997 and was terminated at age 58.

On October 16, 2001, the Complainant was seen entering the locked office of Anita Jansky, Payroll Supervisor. The Complainant did not have authorization to enter this office outside the normal course of business1. On the date I question, the Complainant was seen by Phyllis Daigle, Internal Audit Manager, and entering Ms. Jansky's office several hours before Jansky commenced work. There is no dispute that the office was locked, that the Complainant had a key, that Complainant was not to the best of Jansky's knowledge authorized to have a key or authorized to be in her office without her knowledge or consent.

The Respondent conducted an internal investigation. The Complainant, on the advice of counsel, declined to answer any questions as to why he had the key, why he was in Jansky's office or any allegations of disparate treatment.

The Complainant has not presented any evidence that any other person who engaged in similar behavior was not terminated. While he makes vague references in his subsequent submissions of cliques and age bias, he does not show any relation between these unsubstantiated allegations and the reason for his termination, unauthorized access to a secure office.

## CONCLUSION:

For the foregoing reasons, a lack of probable cause finding is recommended.

Katherine M. Martin, Esq.
Supervisor – Enforcement Unit II

---

1 The Complainant did share a printer with Ms. Jansky. He was permitted, *when the office was already opened*, to enter the office to retrieve printed documents. There is NO information presented to show that Complainant had authorization to access the office in Ms. Janksy's absence.