COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

LARRY PIONE,                         )
                  Complainant,       )
                                     )
      vs.                            )        Docket No. 02-BEM-02528
                                     )
MASSACHUSETTS PORT                   )
AUTHORITY,                           )
                  Respondent.        )

## AFFIDAVIT OF WILLIAM V. HOCH

I, William V. Hoch, do hereby depose and state as follows:

1.    I have been employed as Senior Employment Counsel by the Massachusetts Port Authority since May of 2004.

2.    I have reviewed the records of Massport's Human Resources Department and they indicate the following current and former employees' ages in 2001 when Mr. Pione was terminated:  Leslie Kirwan – 44, Anne Fortier – 47, Maryellen Murphy – 43, Kathleen Conlin – 42, May Lee – 45, Phyllis Daigle – 45, Anita Jansky – 45, Gail Titus – 55, Marie Bowen – 37, Tonda Lumley – 38, Mary Ann Bradley – 39.

3.    Attached to this Affidavit as Exhibit A are true and accurate copies of pages from Larry Pione's first day of deposition.

4.    Attached to this Affidavit as Exhibit B are true and accurate copies of pages from Larry Pione's second day of deposition.

5.    Attached to this Affidavit as Exhibit C are true and accurate copies of pages from Phyllis Daigle's deposition.

6. Attached to this Affidavit as Exhibit D are true and accurate copies of pages from Anita Jansky's deposition.

7. Attached to this Affidavit as Exhibit E are true and accurate copies of pages from Tonda Lumley's deposition.

8. Attached to this Affidavit as Exhibit F are true and accurate copies of documents served upon Complainant in response to his discovery requests.

9. Attached to this Affidavit as Exhibit G is an Affidavit of Anne Fortier.

10. Attached to this Affidavit as Exhibit H is a true and accurate copy of a job posting that Complainant attached as Exhibit B to his Response to Respondent's Position Statement. Complainant argued in his Response that the posting indicated that Massport was trying to replace Mr. Pione.

SIGNED THIS 30th DAY OF DECEMBER 2004, UNDER THE PENALTIES OF PERJURY.

_____

William V. Hoch

# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

DKT NO. 02BEM02528

LARRY PIONE,                    )
   Complainant,                 )
                             )
V.                             )
                             )
MASSACHUSETTS PORT AUTHORITY,)
   Respondent.                  )

### DEPOSITION OF LAWRENCE PIONE,

   A Witness called by and on behalf of the Respondent, before Karen M. Parlee, a Professional Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the offices of Massachusetts Port Authority, One Harborside Drive, Easton Boston, Massachusetts. Commencing on Friday, August 20, 2004, at 10:12 a.m.

8

1    -- or whatever don't come out on paper.  You know --

2    we need --

3                THE WITNESS:  Right.

4                MR. HOCH:  -- yeses and no's.

5                        * * * * *

6            D I R E C T   E X A M I N A T I O N

7                        * * * * *

8    (BY MR. HOCH)

9    Q.  Can you just tell me your full name?

10   A.  Larry Pione.

11   Q.  And can you tell me where you live?

12   A.  I live at 36 Fowler Avenue in Revere, Massachusetts.

13   Q.  And how long have you lived there?

14   A.  Since I was twelve years -- eleven.

15   Q.  Mr. Pione, I'll do a little -- just a very little

16       bit about your background.

17           Tell me how far you got in terms of education.

18   A.  I have an associates degree in hospitality industry.

19   Q.  And tell me where that's from?

20   A.  Essex Agricultural -- Essex Institute.  They changed

21       the name.  I think it's under North Shore Community

22       now.  That's right.

23   Q.  And what year did you get that degree?

24   A.  I believe it to be '77.  I'm not certain.  I think

9

```
 1        it's 1977.

 2    Q.  Now, since getting -- you said associates degree?

 3    A.  Yes.

 4    Q.  Since getting that have you taken any course work at

 5        a college or university?

 6    A.  I did at Bently.  I took a computer -- computer

 7        course.

 8    Q.  Is that towards a degree or you just took the course

 9        to --

10    A.  No, it was a tif -- certificate.  I just took it to

11        get some knowledge.

12    Q.  Did you get the certificate?

13    A.  Yes.

14    Q.  Any other training or education that you've had.

15    A.  Well, I started very young in my teens learning

16        bookkeeping and accounting and I just kept it up.

17        I never went to school.  I had gone -- started to go

18        to Bently School of Accounting when it was on

19        Boylston Street in Boston and then I just went on

20        working.  I never formally finished it.  And I had

21        learned, basically, through the years.  I worked

22        with several accounting firms and did a lot of their

23        work that they didn't want to do, a lot of the

24        preliminary work.
```

11

```
 1              been somewhere in maybe the fall of '97.

 2      Q.      Was --

 3      A.      I think in the fall.  It may have been sooner, I

 4              don't remember.

 5      Q.      You started in Massport as a consultant, is that

 6              correct?

 7      A.      I believe.  Yeah, it says right here 1995.

 8      Q.      And then at some point you became a full-time

 9              employee?

10      A.      Correct.

11      Q.      This was created at about that time when you

12              transitioned?

13      A.      Some time in '97.  It could have been in the spring,

14              it could have been in the fall.  And I don't exactly

15              remember.

16                      MR. HOCH:  Can we mark that.

17                              (Whereupon the above-described

18                              resume was marked as Exhibit

19                              No. 1)

20      (BY THE WITNESS)

21      A.      Whenever -- whenever my -- whenever my application

22              went in -- to come in employment -- because it took

23              many  many  months  before  they  approved  the

24              application.  So I don't know how long before they
```

*Leo & Associates * Certified Court Reporters * (781) 848-9693*

14

1  A.  Yeah, their monthly or quarterly work -- you know --

2      for their payroll, filing.  Things like that.

3  Q.  Was any of that work done on Massport - with

4      Massport's computers or Massport's time?

5  A.  Absolutely not.

6  Q.  So during the time you were employed by Massport, to

7      the best of your memory, you may have had one client

8      that you did some work for?

9  A.  Yeah, yeah.  I was only a part-time at Massport.

10 Q.  During what period were you part-time at Massport?

11 A.  During most -- most --  When I was on contract I was

12     here as much as they needed me.  But then when I

13     became a permanent employee I was only a thirty hour

14     week.

15 Q.  So let's sort of start with Massport.  You started

16     with Massport in 1995, is that correct?

17 A.  As a consultant.

18 Q.  As a consultant.

19         And how did you come to get that relationship

20     with Massport?

21 A.  The CFO, Joseph Luca, was a distant cousin of mine.

22     And he needed someone with my background.  The

23     payroll was in shambles, there was a lot of things

24     they needed help on.  And he asked me if I could --

15

1        could come in to help them out.

2   Q.   Was Mr. Luca new to Massport at that time?

3   A.   He may have been here -- I don't know when he came.

4        He may have been two or three years.

5   Q.   And so when he brought you in as a consultant what

6        were you sort of charged to do?

7   A.   They brought me in my -- into the accounting area

8        and I was -- one time we were looking over -- they

9        were working with Deloitte Coeche on auditing

10       different -- different airlines and -- and -- what

11       do you call it -- concessions etcetera.

12   Q.   And so what did you do with that --

13   A.   I had to --

14   Q.   -- project?

15   A.   -- I had to research hundreds of invoices, thousands

16       of invoices in the -- in the accounts receivable

17       department.

18   Q.   Did you work with Deloitte Coeche on the audit?

19   A.   Some -- Yeah, one -- there was one of the two

20       auditors and I all -- and I also worked with the

21       audit department. It went to Prelhad and Sharma

22       cause I would give him my time sheet.

23   Q.   For the benefit of the record, do you know how to

24       spell Prelhad Sharma? If you don't it's okay.

22

1         another senior employment counsel.  You know --

2         somebody had moved on and I --

3   A.  No, I don't think anybody moved on for me.  I -- you

4         know.

5   Q.  So as far as you know this was a new position?

6   A.  Yeah.

7   Q.  I'm putting another document in front of you.  If

8         you could take a look at it please.

9   A.  Yeah, I forgot I was working on the catering and

10        stuff too.  They did that because of my food

11        background.

12  Q.  So do you know what this is?  Well, tell me what

13        this document is.

14  A.  It looks like it's a job description.

15  Q.  Well, whose job description?

16  A.  For the special financial project manager which they

17        entitled me to.

18  Q.  So this is a job description of the -- the full-time

19        position you held at Massport?

20  A.  Right.

21  Q.  And so did you apply for this position?

22  A.  Well, I -- I know I filled out forms.  I -- I didn't

23        -- I don't remember if this was the -- the name of

24        the position -- the title of the position or what,

85

1    A.  Absolutely not.

2    Q.  So you went down there to let Maryann know what was

3        going on.

4    A.  Yeah, I wanted to talk to her and say I don't know

5        what happened here -- you know.

6    Q.  And --

7    A.  And --

8    Q.  Okay.  I'm sorry.

9    A.  And then I went back to my office.  I tried to get

10       Mary Ellen to talk to her to tell her and I couldn't

11       get Mary Ellen cause -- you know -- Mary Ellen -- I

12       don't know what time she showed up.  But about 9:00

13       I got ill, I was vomiting and diarrhea.  And I went

14       to the -- I don't know if I went to Ann Fortier or

15       to our pool secretary if -- Colleen Bessum was in

16       and I said I've got to go home I really don't feel

17       well.  And that's what I did.  And the next day I

18       called EAP.  They set me up with a counselor and he

19       said to me, "I've had seven or eight people come

20       from Massport and there are too many stories about

21       that hostile work environment and I do not want you

22       going back there.  I want your primary care

23       physician's name and I'm going to contact him

24       immediatley and discuss it with him."  And so I

*Lee & Associates * Certified Court Reporters * (781) 848-9698*

91

1    Q.   No, so I'm just trying to --  So at that point you

2         weren't medicated for the stress or anxiety?

3    A.   Not at that time.

4    Q.   When you say sedated, --

5    A.   No, not until I went to the physician that wrote me

6         a prescription.

7                   MR. HOCH:   Should we take a five minute

8         break?  We've been going for a couple of hours.

9                        (OFF THE RECORD)

10                  MR. HOCH:  Back on the record.

11   (BY MR. HOCH)

12   Q.   Mr. Pione, one of the last things you were talking

13        about before we took our break was after you had  --

14        after October 16th you left Massport that day

15        feeling ill.  At some point --  Well, did you come

16        back to work?

17   A.   No.

18   Q.   Why not?

19   A.   I wasn't able to.  And EAP advised me not to.  I was

20        going -- I don't know if I was going weekly or every

21        other week for therapy.

22   Q.   At some point did you request a leave of absence?

23   A.   I request a -- I request the FMLA.  Is that -- that

24        what you mean as a leave of absence?

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

103

1          weeks, is that right?

2   A.   Could have been.

3   Q.   Do you think it was more or less?

4   A.   No, it was in that -- in that time.

5   Q.   Between October 19th when you got this letter that

6          we're looking at and going to Florida, at any point

7          in there did you meet with your attorney in person?

8   A.   I don't remember.

9   Q.   Did you have telephone conversations with your

10         attorney?

11   A.   I may have, yeah.

12   Q.   At some point you came into Massport and were given

13         a hearing about the incidents of October 16th and

14         whether you should be terminated.  Is that correct?

15   A.   I believe it was in January.

16   Q.   At any point between October 16th and January did

17         you meet in person with your attorney?

18   A.   I honest -- I couldn't answer.  If I said yes or no

19         I don't remember that.   I don't remember when I

20         met.   I -- I just think it was a couple of phone

21         conversations.  Oh, did I meet with --  I don't know

22         if I met with Mary Rosenfeld.

23   Q.   Did Mary Rosenfeld go with you to the hearing at

24         Massport?

104

1    A.    She did.  And I don't know if I saw her before that.

2          I don't remember.

3    Q.    Do you recall being in her office?

4    A.    I was but I don't know if it was before that or

5          after.

6    Q.    Can you look a the second letter in the packet?

7          It's dated October 22nd, 2001.

8    A.    Correct.

9    Q.    It is from Michel Kelly.  He was your attorney at

10         that time?

11   A.    Yes.

12   Q.    If you look at his second paragraph.  He says "he

13         has been told by his physician not to contact you

14         directly until his condition is stabilized."

15   A.    Right.

16   Q.    He's referring don't contact Tonda Lumley, correct?

17   A.    Correct.

18   Q.    Did your physician, in fact, tell you that?

19   A.    He may have talked to the physician.

20   Q.    Well, the sentence says, "he has been told by his

21         physician."  That referred to you.

22   A.    Yeah, well the --

23   Q.    Did your physician tell you not to have contact with

24         Massport?

121

1   prior to the holidays because you knew the holidays

2   were going to be a difficult time anyway, is that

3   correct?

4   A.  Well, I wasn't ready and I didn't -- and I didn't

5   know how quickly they would -- they would even -- I

6   was just not physically or mentally prepared to go

7   into this.  I haven't slept for three nights now

8   knowing I was coming to this deposition.  It's...

9   Q.  So Massport accommodated that request and had the

10  hearing after January 1st, is that correct?

11  A.  Right.  They had it at the end of January sometime.

12  I think they had postponed one too.  I don't

13  remember.  I think Mary Rosenfeld -- well, she was

14  involved in it by then and I think that they had

15  postponed one of the meetings.  I'm not certain.

16  Q.  The next letter is a December 11th letter from your

17  counsel, is that right?

18  A.  Right.  Correct.

19  Q.  Then the next one is December 13th it was wrote to

20  Massport.

21  A.  Correct.

22  Q.  December 19th.  And then there is a letter from you,

23  December 20th.

24  A.  Oh, yes.

125

1    Q.   I take it you walked in and sat down at a table,

2         correct?

3    A.   Correct.

4    Q.   How did the hearing start?  Who said what?

5    A.   I believe that -- Now, I don't know who -- I don't

6         know who said -- but someone said that they were

7         going to ask me questions and my attorney said that

8         they didn't want me to ask questions, that I would

9         ask the questions and she was keeping notes.  And I

10        don't know, Kathleen Conlin or -- I don't know if

11        Kathleen Conlin or Marie Bowen said that that wasn't

12        the normal procedure and she said that there would

13        be no questions.

14   Q.   Who said there would be not questions?

15   A.   The attorney.

16   Q.   Your attorney?

17   A.   Yes.

18   Q.   So your attorney said that Massport could not

19        question you.

20   A.   Right, at that time.  And then --

21   Q.   Let me ask you.  In fact, did Massport ask you any

22        questions at the hearing?

23   A.   I'm -- I'm just going to --

24   Q.   Okay.  I'm sorry.

*Leo & Associates * Certified Court Reporters * (781) 848-9698*

Hoch Affidavit (MCAD)
EXHIBIT A

126

1   A.   They have a little conference I think.  I don't know

2        who had the conference -- Marie Bowen, Kathleen --

3        I don't remember who had the -- Kathleen Kirwan or

4        who.  And they said okay well, -- okay, you can

5        conduct it that way, but we have one question of

6        him.  And my attorney just said he's not answering

7        it.  They didn't even answer -- ask the question.

8        And then they --

9   Q.   You said they did not ask you a question?

10   A.   I don't -- no I don't remember them asking me a

11        question.  So then I went ahead and I just read to

12        them what I had to ask.  I made a statement I guess

13        and then I read what I had to ask them so --

14   Q.   So I'm going to stop you.  So when the hearing

15        started you started by making a statement?

16   A.   They asked if I made the statement.

17   Q.   So they gave you the opportunity?

18   A.   Yes.

19   Q.   Did you read something or did you -- was it off the

20        top of your head?

21   A.   I -- I believe I read something.

22   Q.   Where is the document you read from?

23   A.   I don't know.

24   Q.   Who drafted the document?

141

1    A.   Probably, eventually because this was -- the

2         auditors had requested this -- the outside auditors

3         had requested this for three or four years in a row

4         when they did the June 30 audits.  And they were --

5         you know -- just getting ready -- getting around to

6         do.  It never had been done.

7    Q.   So in your mind was Massport considering sort of

8         having you transition from what you were doing to

9         the contracts administrator?

10   A.   Right.  It may have even put me into thirty-seven

11        and a half hours a week instead of the thirty hours

12        a week.

13   Q.   Although, you agree, this position is a job share.

14   A.   Yes, I don't know -- I honestly -- this has some of

15        the parameters, but I don't know why this is a level

16        four job share.

17   Q.   So is it accurate to say Massport never filled the

18        position that you held which was described in

19        Exhibit 2 as the special financial projects manager?

20   A.   They didn't fill that but they took my slot and

21        changed the -- the parameters of the -- because

22        there is some women - I believe she came from the --

23        I believe she came from the state house or somewhere

24        around that's -- that's doing -- that's working for

# EXHIBIT B

# ORIGINAL

VOLUME 1
PAGES: 1 - 54
EXHIBITS: See Index


COMMONWEALTH OF MASSACHUSETTS

MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION


LARRY PIONE,                    )
                Complainant,    )
                                )
                                )
        vs.                     )        No. 02BEM02528
                                )
                                )
MASSACHUSETTS PORT AUTHORITY,   )
                Respondent.     )


CONTINUED DEPOSITION of LARRY PIONE, a Witness called
by and on behalf of the Respondent, taken pursuant to the
applicable Massachusetts Rules of Civil Procedure, before
Vincent Martino, a Notary Public within and for the Comm.
Of Massachusetts, held at the offices of Sarouf, Tarricone
& Flemming, No. 95 Commercial Wharf, Boston, MA 02110, on
Thursday, November 4, 2004, commencing at 2:00 p.m.


COPLEY COURT REPORTING
101 Tremont Street
Boston, MA 02108
617-423-5841

20

1    myself.

2        Q.    Okay. That's helpful. Mr. Pione, let's turn to the

3    January 28, 2002 post termination hearing that Massport

4    afforded you.

5        A.    Okay.

6        Q.    Do you recall attending that hearing?

7        A.    Yes.

8        Q.    And at that hearing did either you or your lawyer

9    refuse to have you answer questions?

10        A.    My attorney did.

11        Q.    So your attorney told Massport that Mr. Pione would

12    not be answering any questions, something to that effect?

13        A.    Something to that effect.

14        Q.    Did Massport honor that request?

15        A.    I know their legal people Marie Bowen and Kathleen

16    Conlin had a little talk and then they came back and said

17    that I could and Marie Bowen said I have one question and I

18    didn't even get a chance to answer it and my attorney said

19    he's not answering it.

20        Q.    Okay.

21        A.    Then they said to go ahead and proceed with this.

22        Q.    Just so the record is clear, Kathleen Conlin was

23    the Director of Human Resources at the time and she was the

24    Hearings Officer, is that correct?

25        A.    I don't know because it seemed like Tonda was but

1    it's ---

2        Q.    She goes by Tonda?

3        A.    Tonda L-u-m-l-e-y, I believe.

4        Q.    Was it your impression that Kathleen Conlin was the

5    Hearings Officer?

6        A.    Again, you know what happens when you assume. She

7    was the Director of HR. I thought she was. I didn't know if

8    she was the legal person, either. I didn't know if it was

9    Marie Bowen.

10           The questions I asked Tonda Lumley was responding

11   to. Neither Marie Bowen that I remember or Kathleen Conlin

12   did.

13       Q.    So then it is fair to say Massport respected the

14   request of your lawyer that you not be asked any questions?

15       A.    Obviously, yes, or they would have stopped the

16   meeting.

17       Q.    So the meeting went on?

18       A.    Yes.

19       Q.    You were not asked any questions, correct, you were

20   not asked any questions?

21       A.    I don't remember being asked any questions because

22   I told you they asked -- they said we are going to ask one

23   question and my attorney said I wasn't going to answer it

24   and so then I think we proceeded with this sheet.

25       Q.    So at that point you moved on with the hearing?

COPLEY COURT REPORTING - (617) 423-5841

24

1    Q.    And ultimately everyone agreed on that. Then the

2    hearing continued?

3    A.    Right.

4    Q.    What do you recall after that?

5    A.    I think I made a statement and my attorney told me

6    to and then I started asking questions.

7    Q.    Sitting here today without looking at your notes,

8    do you recall your statement?

9    A.    Vaguely. I know I told them that I was accused

10   falsely and did not do what I was being accused of.

11   Q.    Do you recall the questions that you asked?

12   A.    I don't recall without referring to my notes.

13   Q.    Do you recall if anyone in particular answered all

14   of your questions?

15   A.    As far as I remember it was only Tonda Lumley. I

16   don't remember, I honestly don't remember if Marie Bowen or

17   Kathleen Conlin answered any questions.

18   Q.    As you sit here and without looking at your notes,

19   do you recall whether anyone else made a statement or said

20   anything at the hearing?

21   A.    I don't at this time.

22   Q.    So if I were to ask you did Tonda Lumley give a

23   description of the facts, you don't recall whether she did

24   or didn't?

25   A.    She may have and I don't recall it.

1    Q.   Now why was it that you did not want to answer any
2    questions that day?

3    A.   Under advice of counsel.

4    MR. HOCH: I don't want to know what your counsel's
5    advice was.

6    THE WITNESS: They just told me I wasn't going to
7    answer any questions.

8    Q.   Were you for either physical illness or for mental
9    illness reasons unable to answer questions that day in your
10   mind?

11   A.   I didn't think so. I was pretty distraught.

12   Q.   So there was no physical illness reason that kept
13   you from answering questions?

14   A.   I had medication for my stomach and everything else
15   but I don't know. I was just told that I wasn't going to
16   answer any questions and I don't know the reasoning and I
17   didn't question it. Whatever the attorney's strategy was I
18   don't know to this day.

19   Q.   Let's look back at this document again.

20   A.   Okay.

21   MR. HOCH: Let's mark this as Exhibit Number 12 for
22   Identification.

23                      (Marked Exhibit Number 12,

24                      Hearing Minutes.)

25   Q.   Mr. Pione, looking at Exhibit 12, you are looking

COPLEY COURT REPORTING - (617) 423-5841

# EXHIBIT C



COPY

VOLUME 1
PAGES: 1 - 44
EXHIBITS: See Index

COMMONWEALTH OF MASSACHUSETTS

MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

LARRY PIONE,                          )
                    Complainant,      )
                                      )
                                      )
          vs.                         )     No. 02BEM02528
                                      )
                                      )
MASSACHUSETTS PORT AUTHORITY,         )
                    Respondent.       )

          DEPOSITION of PHYLLIS A. DAIGLE, a Witness called
by and on behalf of the Complainant, taken pursuant to the
applicable Massachusetts Rules of Civil Procedure, before
Vincent Martino, a Notary Public within and for the Comm.
Of Massachusetts, held at the offices of Sarouf, Tarricone
& Flemming, No. 95 Commercial Wharf, Boston, MA 02110, on
Thursday, November 4, 2004, commencing at 3:30 p.m.

COPLEY COURT REPORTING
101 Tremont Street
Boston, MA 02108
/ 617-423-5841

1    A.   Yes.

2    Q.   Can you tell me on that day where you were in

3    relation to where Mr. Pione was when you first saw him?

4    A.   I first saw Mr. Pione as I was walking down the

5    hallway from the elevator to my office in the Internal

6    Audit area.

7    Q.   Where was Mr. Pione standing?

8    A.   When I first saw him, he was in front of Anita

9    Jansky's door. He was unlocking the door and he entered the

10   room and was behind her desk. At that point I passed out of

11   sight of the doorway.

12   Q.   Where were you standing?

13   A.   I was walking.

14   Q.   Prior to that date, had you ever seen Mr. Pione in

15   Ms. Jansky's office?

16   A.   No.

17   Q.   Were you aware that Mr. Pione's printer was in Ms.

18   Jansky's office?

19   A.   No.

20   Q.   When did you next see Mr. Pione on that date?

21   A.   I saw him for the second time as I passed down the

22   hallway from my office to the kitchen.

23   Q.   What did you see?

24   A.   I saw Mr. Pione at the Payroll Department copier.

25   Q.   At any time during this period did you speak with

15

1       Mr. Pione?

2           A.    No.

3           Q.    Did you observe any documents that Mr. Pione was

4       copying?

5           A.    Could you rephrase the question?

6           Q.    Sure. What did you see Mr. Pione doing at the

7       copier?

8           A.    He was making copies.

9           Q.    Of what?

10          A.    I could not see.

11          Q.    When you say Mr. Pione was behind Ms. Jansky's

12      desk, did you see anything else?

13          A.    He stood behind her desk bent over the desk and

14      started rifling the papers on her desk.

15          Q.    Was this the first time that you were passing by

16      that you had seen Mr. Pione rifling papers on Ms. Jansky's

17      desk?

18          A.    Yes.

19          Q.    You kept walking?

20          A.    Yes.

21          Q.    Is it possible that Mr. Pione was rifling papers

22      that he had printed from the printer?

23              MR. HOCH: Objection. You can answer.

24              THE WITNESS: Thank you. It didn't appear to me that

25      that would be the case.

COPLEY COURT REPORTING - (617) 423-5841

1    Q.    Why didn't it appear to you that that would be the

2    case?

3    A.    My knowledge at that time did not include the fact

4    that Ms. Jansky had a printer in her office, furthermore

5    Mr. Pione was in the office apparently going through papers

6    on Ms. Jansky's desk.

7    Q.    But is it possible Mr. Pione was trying to collate

8    papers that he had printed?

9         MR. HOCH: Objection.

10        THE WITNESS: That wasn't the impression that I

11   received.

12   Q.    Do you have any facts upon which to base your

13   impression?

14        MR. HOCH: Objection.

15        THE WITNESS: The scenario that I saw was Mr. Pione

16   unlocking the office, going into the office, going behind

17   Ms. Jansky's desk and then proceeding to go through the

18   papers on her desk.

19   Q.    Did you notice if Mr. Pione had any papers in his

20   hands when he entered?

21   A.    He did not.

22   Q.    Do you know whether or not Mr. Pione had been in

23   there earlier printing papers?

24   A.    I do not.

25   Q.    Were you aware at the time Mr. Pione had been given

1    a key to Ms. Jansky's office?

2        A.    I was not.

3        Q.    Has anyone informed you of that to date?

4        A.    At some point I was made aware that Mr. Pione had

5    received a key.

6        Q.    Had you known at the time that you saw Mr. Pione

7    behind Ms. Jansky's desk that he had been given a key to

8    the office and that his printer was located in that office,

9    do you think it is possible that your impression that he

10   was rifling through papers on Ms. Jansky's desk could have

11   been different?

12           MR. HOCH: Objection.

13           THE WITNESS: Frankly I don't know if that would

14   have changed my impression or not.

15       Q.    Was there another factor in your impression that we

16   haven't talked about?

17       A.    I don't know how to comment on that.

18       Q.    Is it that you don't understand my question?

19       A.    The question seems to be a what if type question

20   and it seems to be speculation.

21       Q.    I'm just trying to establish every fact in your

22   mind that gave you the impression that Mr. Pione was going

23   through Ms. Jansky's papers as opposed to his own.

24       A.    Again, the event that I saw was Mr. Pione unlocking

25   the door to an office not his own, going into that office

18

1    and proceeding to go through the paperwork on someone's

2    desk.

3        Q.    What time in the morning was that?

4        A.    This was approximately 6:50 a.m.

5        Q.    Was that your usual time to go to work?

6        A.    That day I arrived a bit earlier than usual. I

7    would typically arrive between 7:10 and 7:30 a.m.

8        Q.    Was Mr. Pione usually there in the mornings before

9    yourself?

10       A.    I don't know.

11       Q.    You have no way of knowing, correct, whether Mr.

12   Pione had printed papers in Ms. Jansky's office before you

13   walked by?

14       A.    Correct.

15       Q.    Did you ever see what documents you allege that he

16   was going through?

17       A.    No.

18       Q.    Those documents could have been his own, correct?

19             MR. HOCH: Objection.

20             THE WITNESS: I don't know one way or the other

21   whether they could have been his.

22       Q.    But they could have been his?

23             MR. HOCH: Objection.

24             THE WITNESS: They could have been.

25       Q.    Did you have any conversation with Mr. Pione after

COPLEY COURT REPORTING - (617) 423-5841

1    seeing him in Ms. Jansky's office or at the copier?

2       A.   Yes. In my return to the kitchen, Mr. Pione was

3    leaving Ms. Jansky's office with papers in his hand and at

4    that point I stopped and asked him Larry, what are you

5    doing.

6       Q.   What did he say to you?

7       A.   He said something to the effect that he had to go

8    into Ms. Jansky's office to get stuff from the printer.

9       Q.   Did you say anything else to him?

10      A.   He asked me if there was a problem and I responded

11   yes, I think there is.

12      Q.   Why did you think there was a problem?

13      A.    In an audit earlier that year performed by the

14   Internal Audit Department, the location of Mr. Pione's

15   office in the middle of the Payroll Department had been

16   identified as an internal control issue.

17      Q.   What is an internal control issue?

18      A.   An internal control is a mechanism implemented by

19   an organization management to assure the safeguarding of

20   assets to ensure that financial information and all other

21   information is properly secured, that all approvals are

22   obtained where necessary and that the operation of the

23   Authority is properly monitored and reported on.

24      Q.   Why was Mr. Pione's office raised as an internal

25   control issue?

1    A.    Payroll information is highly confidential.

2    Q.    What aspects -- I'm sorry. Why is it highly

3    confidential?

4    A.    Payroll information includes things like individual

5    home addresses, phone number, wage and salary information,

6    garnishment information, withholdings, all this information

7    is considered confidential and not for the general public.

8    Q.    Now who raised Mr. Pione's office as an internal

9    control issue?

10   A.    Please rephrase.

11   Q.    Who or what raised Mr. Pione's office location as

12   an internal control issue?

13   A.    The issue was documented as part of the audit of

14   the Payroll area.

15   Q.    Who was aware that it was so documented?

16   A.    I would say the Director of Internal Audit, the

17   Manager of the audit and I was aware of it as someone who

18   had reviewed the report prior to its issuance for editorial

19   and quality control issues.

20   Q.    Who was the Manager?

21   A.    The Manager was P-r-e-h-l-a-d S-h-a-r-m-a.

22   Q.    Was the Director of Internal Audit at that time

23   that this was documented as an internal control issue Gail

24   Titus?

25   A.    That is correct.

1    issued a key at one point when he was in charge of the

2    department.

3        Q.    When you found out Mr. Pione's printer was in the

4    office, did you stop and think oh, maybe he was just going

5    through his own documents?

6        A.    No.

7        Q.    Why not?

8        A.    Again, because he was going through papers on Anita

9    Jansky's desk.

10       Q.    It never occurred he might have been trying to

11   collate all his printing?

12       A.    No.

13       Q.    Why not?

14       A.    His manner was not that of someone who was

15   collating.

16       Q.    What about his manner?

17       A.    Clarification?

18       Q.    I'm looking for clarification from you. I'm trying

19   to figure out what about his manner gave you the impression

20   that he wasn't looking through his own printed papers?

21       A.    The papers were on Ms. Jansky's desk in a pile. Mr.

22   Pione was bent over and proceeded to rifle through them one

23   page after another.

24       Q.    Okay.

25       A.    He made no attempt to rearrange the papers or pull

1    papers out and set them aside in the pile.

2        Q.   You don't know whether he was just counting the

3    papers?

4        A.   No.

5        Q.   You don't know that?

6        A.   I do not know that.

7            MS. BRASSIL: I don't have any other questions for

8    you. Thank you.

9            MR. HOCH: I have two clarification questions.

10   CROSS-EXAMINATION BY MR. HOCH:

11       Q.   Ms. Daigle, you were asked about the handwriting on

12   your October 16, 2001 memo?

13       A.   Yes.

14       Q.   Which we have also marked as Exhibit 3. Was your

15   handwriting essentially -- are these questions Ms. Linley

16   was asking you, is that what you are writing down there?

17       A.   They were the questions that she was asking. In

18   particular I was noting new questions so to speak.

19       Q.   What do you mean noting new questions?

20       A.   As part of my description of events, and talking

21   with Gail Titus and I suppose Maryann Bradley, I had been

22   asked to clarify certain points and be more specific as to

23   what I saw and when I saw it, that sort of thing.

24            Tonda was asking questions that were new as far as

25   my being asked to describe the events were concerned.

COPLEY COURT REPORTING - (617) 423-5841

# EXHIBIT D

1
         COMMONWEALTH OF MASSACHUSETTS
   MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION
2
      Docket No. 02BEM02528 No. 16CA202776

3

4
   **************************************
                             *
5
   LARRY PIONE,                   *
               Complainant    *
6
                             *
7
     vs.                      *
                             *
8
   MASSACHUSETTS PORT AUTHORITY,     *
               Respondent     *
9
                           *
   **************************************

10

11

12

13

14
          **DEPOSITION OF ANITA JANSKY**, a witness
   called on behalf of the Complainant, taken
15
   pursuant to the provisions of the Massachusetts
   Rules of Civil Procedure, before Christine D.
16
   Warwick, a Registered Professional Reporter,
   Certified Shorthand Reporter and Notary Public in
17
   and for the Commonwealth of Massachusetts, at the
   offices of MASSPORT, One Harborside Drive, Suite
18
   200S, Boston, Massachusetts 02128, on Tuesday,
   November 9, 2004, commencing at 10:15 a.m.
19

20

21

22

23
       COPLEY COURT REPORTING
         101 Tremont Street
24
      Boston, Massachusetts 02108
         (617) 423-5841

9

```
 1   A.   Where would they put them?  In their hands.  I
 2        have -- I can't say.  I can't answer that.
 3   Q.   Where could they put them?  You've said in their
 4        hands.  What if they wanted some place to support
 5        them?
 6   A.   On the other side, on the top of my desk.
 7   Q.   They could put them on your desk?
 8   A.   (Witness nods head.)
 9   Q.   Were you aware that Mr. Pione had a key to your
10        office?
11   A.   No.
12   Q.   You were aware that he used the printer that was
13        in your office?
14   A.   The printer.
15   Q.   Were you aware of his work hours?
16   A.   Earlier than myself, my own, mm-hmm.
17   Q.   When did you first meet Mr. Pione?
18   A.   When he started his employment with MassPort.
19        Exact dates, I can't recall exact dates, but.
20   Q.   To your knowledge, did he ever hold a position in
21        the payroll department?
22   A.   No.
23   Q.   His office was located next to your own, correct?
24   A.   Yes.
```

Hoch Affidavit (MCAD)
EXHIBIT D

15

1   A.  That I don't know.

2   Q.  Are they contract employees, or are they MassPort

3       employees?

4   A.  They're not MassPort employees.

5   Q.  What was your process with regards to locking up

6       your office in the evening?

7   A.  I would lock it if the cleaning people had been

8       there.  If they hadn't, I would leave it open if

9       they were in the area.  They usually hit my area

10      around the time that I go home, vacuuming and

11      emptying the trash.

12  Q.  When you would come in in the morning, would you

13      ever find your office open?

14  A.  No.  If I was on vacation, but I wouldn't be

15      there.

16  Q.  What time would you generally come into the

17      office?

18  A.  Nine, 9:15.

19  Q.  And what time would you leave, generally?

20  A.  After five, 5:30, anywhere between five and six,

21      6:30 maybe sometimes.

22  Q.  Did you ever try to obtain keys to any offices

23      other than your own office?

24  A.  No.

20

1    Q.    Do you know if someone has assumed Mr. Pione's

2          duties?

3    A.    No, I don't know that.  I don't believe so.

4    Q.    Who works on the taxi pool now?

5    A.    That department's been absolved.  It's no longer.

6    Q.    And how was it absolved?

7    A.    The employees that were there moved elsewhere.

8    Q.    When did that occur?

9    A.    Maybe six months perhaps, seven months.

10   Q.    Prior to that six months, who was working on the

11         taxi pool accounts?

12   A.    On the accounts, I don't know.  I know the

13         employees there.  I don't know.  I can't answer

14         that.

15   Q.    At some point, did you speak with Tonda Lumley

16         about the incident involving Mr. Pione?

17   A.    Yes.

18   Q.    And what was the conversation between the two of

19         you?

20   A.    She asked the same types of questions, Did I know

21         he had a key?  Where is the printer?  Where was my

22         office in relation to his?  Where was the printer

23         in relation to his office, that type of thing,

24         logistics.

Noch Affidavit (MCAD)
EXHIBIT D

31

1   A.   Because it's a dead end.  It's specific to payroll
2        unless they were doing payroll business.  If they
3        were going down the hall, they would walk down the
4        open path.
5   Q.   So other than seeing someone who worked in payroll
6        looking at the papers on the payroll assistants'
7        desks, have you ever seen somebody going through
8        those papers?
9   A.   No.
10  Q.   What type of information is contained in the
11       payroll records that you keep in your office and
12       the payroll assistants have on their desks?  What
13       type of individual information is there?
14  A.   Names, addresses, social security numbers, bank
15       accounts, bank account numbers, salaries
16       obviously, information regarding HR status,
17       promotions, resignations, terminations.  It could
18       be anything.
19  Q.   Do you consider any of that information
20       confidential?
21  A.   Yes.  It's confidential to us, but we access it
22       all the time.  That's why we can't often take
23       every piece of paper and lock it in a file.
24  Q.   Would you share that information with someone

32

```
 1      outside the payroll department?

 2   A. No.

 3   Q. Why not?

 4   A. Confidential.

 5   Q. Now, talking about your office, could you describe

 6      the layout of your office?  Just so I can get you

 7      oriented, if you're standing in your doorway, is

 8      it fair to say your doorway is on the left side of

 9      your office as you're looking into the office?

10   A. If I'm sitting at my desk, my doorway is to the

11      left, correct.

12   Q. Okay.  If I'm standing in your doorway --

13   A. Yes.

14   Q. -- which direction is your desk?

15   A. My desk is to the right.

16   Q. So you would walk into your office and turn right?

17   A. Mm-hmm.

18   Q. And that would be your desk?

19   A. Yes.

20   Q. Let's just to make this simple, I'm just going to

21      give you a piece of paper.  I'll let counsel look

22      at it when we're done.  Essentially, I've drawn a

23      line which I represent as your wall, and I put

24      your door in it.
```

Hoch Affidavit (MCAD)
EXHIBIT E

# EXHIBIT E

rec'd 12/13/04

1

VOLUME:  I
PAGES:  1 through 99
EXHIBITS:  See Index

COMMONWEALTH OF MASSACHUSETTS

MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

Docket No. 02BEM02528 No. 16CA202773

* * * * * * * * * * * * * * * * * * * * * * * * * * * *
LARRY PIONE,                    )
                 Complainant,   )
                                )
     VS.                        )
                                )
MASSACHUSETTS PORT AUTHORITY,   )
                 Respondent.    )
* * * * * * * * * * * * * * * * * * * * * * * * * * * *

          DEPOSITION OF TONDALEYA LUMLEY,
a witness called on behalf of the Complainant,
taken pursuant to the provisions of the
Massachusetts Rules of Civil Procedure,
before Sheila M. Duffy, a Registered
Professional/Certified Shorthand Reporter
(#146199) and Notary Public in and for the
Commonwealth of Massachusetts, at the offices
of Sarrouf, Tarricone & Flemming, P.C.,
95 Commercial Wharf, Boston, Massachusetts,
on Tuesday, October 19, 2004, commencing
at 10:19 a.m.

COPLEY COURT REPORTING
101 Tremont Street
Boston, Massachusetts 02108
(617) 423-5841

COPLEY COURT REPORTING

Hoch Affidavit (MCAD)
EXHIBIT E

61

1    Q.    Bell --

2    A.    L-e-e, May Lee.

3    Q.    What did you discuss with May Lee?

4    A.    I discussed with her whether or not she

5    was aware of the access that Larry Pione had to

6    Anita's office.

7    Q.    And what was her response?

8    A.    She, she indicated that she was unaware

9    that he had access to Anita's office.

10    Q.    Did you speak to anyone else with

11    regard to --

12    A.    I also spoke with Anita herself.

13    Q.    And what did you discuss with

14    Ms. Jansky?

15    A.    Was whether or not she was aware he

16    had, Larry had access to her office, in which she

17    stated she was unaware as well that he had access

18    to her office when she was not there.  She did

19    stipulate that when she was there and her office

20    was open, he utilized her printer.  She was aware

21    of that, but only when her office was made

22    available to the payroll department.

23    Q.    Did you discuss anything else with

24    Ms. Jansky?

COPLEY COURT REPORTING

93

1    a couple of quick questions for you, specific

2    questions.

3              Tell us who May Lee is.

4        A.    The manager of payroll.

5        Q.    And what was her relation to Anita

6    Jansky in 2001?

7        A.    She was Anita's supervisor.

8        Q.    Okay.  Did May Lee -- as part of your

9    investigation did you find out or did you ask

10   whether May Lee knew that Larry Pione had a key

11   that would give him access to Anita Jansky's

12   office?

13       A.    I did.

14       Q.    And what was May Lee's response?

15       A.    She was unaware that he had access to

16   Anita's office.

17       Q.    And did you ask Anita Jansky if she

18   knew whether Larry Pione had a key to gain access

19   to her office?

20       A.    I did, and she also indicated that she

21   had no idea he had access to her office when she

22   wasn't there, when she couldn't -- if her door was

23   locked, that he could gain access with a key, she

24   was unaware of that.

COPLEY COURT REPORTING

94

1     Q.    And let me ask you, you were asked

2  questions about the reasons for the termination of

3  Larry Pione.  I just want to make sure that we are

4  clear on the record.

5         What was the reason that Massport

6  terminated Larry Pione?

7     A.    Well, we terminated him for not being

8  able to provide us -- not being willing to provide

9  us with information; but it was relative to, you

10  know, him having unauthorized access and that

11  meant, you know, we knew that he had a key, we

12  determined that he received it in some manner, but

13  that Anita didn't know that he could gain access

14  to her office when it was located.  That was a

15  concern for us.

16         Also, that he was observed rifling

17  through, reviewing papers on Anita's desk, and we

18  don't know what those documents were.  We have no

19  clue, but he was reviewing documents on her desk

20  and that was an issue for us as well.

21     Q.    So, was Larry Pione terminated from

22  Massport for misconduct?

23     A.    Yes.

24     Q.    And what tell me what the misconduct

95

1    was.

2          A.     The misconduct was reviewing papers on

3    Anita's desk and gaining unauthorized access to

4    Anita's office.

5          Q.     And tell me what you mean by gaining

6    unauthorized access.

7          A.     Unauthorized access is Anita not being

8    aware that he was able to gain access to her

9    office when it was locked --

10         Q.     Okay.  Thank you.

11         A.     -- because she knew he had access

12   outside of that.

13         Q.     Tell me what you mean by that.

14         A.     That when she was, you know, she is at

15   work for the day, she goes to a meeting, I mean,

16   she knew he used her printer.  She knew he would

17   come in her office and print documents and things

18   of that nature.  She knew he had access in that

19   sense.

20                She was unaware that when she left for

21   the day and her office was locked that he could

22   get into her office.  She had no idea that that

23   was the situation.

24                MR. HOCH:  Thank you.  I have no

COPLEY COURT REPORTING

96

1  further questions.

2          MS. BRASSIL:  I have a couple more

3  questions.

                REDIRECT EXAMINATION

5     Q.   (By Ms. Brassil)  When we were speaking

6  earlier today it's true, isn't it, that you told

7  me that a big part of the decision to terminate

8  Mr. Pione was his unwillingness, as you put it, to

9  participate and provide you information, correct?

10     A.   I did state that.

11     Q.   And at that time, during that line of

12  questioning, you did not articulate what you just

13  articulated now?

14     A.   Correct.

15     Q.   Okay.  And your testimony now comes

16  after taking a break and meeting with your

17  counsel, correct?

18     A.   Mm-hmm, correct.

19     Q.   And with regard to Exhibit No. 8,

20  when you received it did you notice the second

21  paragraph where it indicates Mr. Pione has

22  suffered enough from your callous behavior, did

23  that give you any reason to make inquiry, what

24  did you think that the attorney was referring to

COPLEY COURT REPORTING

# EXHIBIT F

AUG-20-2001  11:00        MASSPORT AUTHORITY

**Responses to questions asked to Anita Jansky on October 17, 2001 regarding the Larry Pione issue.**

1) Are you aware Larry had access to your office?
   - No

2) Where is your printer located in your office in relation to your desk?
   - Approximately 3 feet from the desk – if information prints (the document) faces the wall.

3) Are you aware that Larry Pione prints documents to your printer?
   - Yes – he uses it on a regular basis. It is his primary printer.

4) Have you given Larry authorization to access your office when you are not in?
   - No

**Clarification questions asked to Anita Jansky on October 18, 2001.**

1) Did you know Larry had access to your office?
   - No –

2) Did you know Larry had a key to your office?
   - No – I did not know he had a key, however, I knew that he came in my office when I was at work to use the printer.

3) What would happen when you were on vacation or out of the office for the day?
   - The payroll staff would open my office. There is information kept in my office that would be utilized throughout the day. Larry would have access when the office was open.

4) Do you have a key to Larry's office?
   - Yes – Larry gave me one so that I could water his plants when he went on vacation, 1–2 times a year.

5) Does Larry do the same for you, water your plants while you are on vacation?
   - No – the payroll staff does that for me.

**Additional reiterated feedback from Anita:**
I did not know Larry had a key to my office. There was no agreement with him that we would water each others plants. Larry gave me a key to his office because he wanted me to water his plants when he went on vacation. He goes on vacation for about 2 + weeks at least one time during the year.

I agree that the above indicated responses to the questions are truthful statements made by me _____    Date: 11-20-01

Anita Jansky

000024        TOTAL P

Hoch Affidavit (MCAD)
EXHIBIT F

## FINAL - INVESTIGATION REPORT

(Compiled by Tonda Lumley, Human Resources Manager – initial draft November 20, 200

| | |
|---|---|
| Complaint Reported to Human Resources by: | Mary Ann Bradley, Deputy Director, Revenue Enhancements |
| Date Complaint Reported to Human Resources: | Tuesday, October 16, 2001 |
| Employee(s) Involved in Complaint: | Larry Pione, Special Financial Project Manager |
| Unit #: | 5250 |

### Summary of Complaint:

Mary Ann Bradley indicated that on Tuesday, October 16, 2001 a complaint was brought to
attention by Gail Titus, Director, Internal Audit. Ms. Titus was informed earlier that morning
by one of her staff members Ms. Phyllis Daigle, an Audit Manager of a issue of concern. M
Daigle had stated to Ms. Titus that she arrived to work earlier than usual on October 16, 200
When she arrived she observed Ms. Pione gain access to Ms. Jansky's office, look through
papers on Ms. Jansky's desk and copy documents from Ms. Jansky's office. Ms. Daigle wa
very concerned with what she observed. Ms. Daigle felt very uncomfortable with what she
witnessed and told Ms. Titus.

Ms. Bradley also indicated that later on in the day she was notified that Larry Pione left earl
saying that he felt ill.

### Interviewed Witness:

On Tuesday, October 16, 2001 Ms. Daigle indicated that she reported to Ms. Titus an allege
incident, which occurred earlier that morning concerning Larry Pione, Special Financial
Project Manager, and access to a locked office belonging to Anita Jansky, Supervisor of
Payroll.

When Ms. Daigle arrived to work on Tuesday, October 16, 2001 at approximately 6:50 a.m.
(nearly a hour earlier than her normal arrival time) she walked up to the entrance to Ms.
Jansky's office and she observed Mr. Pione bending down opening Ms. Jansky's office with
key, into Anita Jansky's locked office. Moments later she observed Mr. Pione inside Ms.
Jansky's office moving papers around. Mr. Pione was standing in front of Ms. Jansky's desl
(where she would sit) bending over riffling through papers on the desk. At this time nothing
was in his hands. Ms. Daigle proceeded to her office to put her belonging down and came
back through the payroll office area when she then observed Mr. Pione at the copier xeroxin
various documents. Ms. Daigle then observed Mr. Pione exiting Ms. Jansky's office and he
had documents in his hands.

At his point Ms. Daigle confronted Mr. Pione about his access to Ms. Jansky's office and he
responded by saying he was printing something from Ms. Jansky's printer in her office. Mr.
Pione asked Ms. Daigle if there was a problem with that and Ms. Daigle replied "yes, it is a
secure area". Ms. Daigle also stated that a while later Mr. Pione came to Ms. Daigle's office

000033

(on two occasions) and Mr. Pione said "I don't know why you think this is a problem", I thought we were comrades", "Confidential things are all over this place " and "I am offended by this".

Ms. Daigle had concerns with Mr. Pione's access to this office because she was aware through an audit of Payroll that there were some concerns regarding security over confidential information and Mr. Pione's name was noted in the Audit. There were strong concerns of Mr. Pione around misappropriation of recorded work hours

### Additional Information:

Mr. Pione's office is located next to (to the right of) Ms. Jansky's office and is situated in the payroll area space.

### Discussion with May Lee, Manager, Payroll-

On Wednesday, October 16, 2001 Ms. Lee indicated that she is only aware that Ms. Jansky and her have keys to payroll offices. Mrs. Lee believes Mr. Pione's computer is tied to Ms. Jansky's printer and Mr. Pione occasionally printed stuff that goes to it. However, there is a shared printer in the common area that people use and that is readily available to Mr. Pione. Ms. Lee doesn't understand why Mr. Pione prints to Ms. Jansky's office printer.

### Interview with Anita Jansky, Supervisor, Payroll-

On Wednesday, October 17, 2001 Ms. Jansky indicated that she was not aware that Mr. Pione had access to her office when it was locked in her absence. Ms. Jansky is aware, however, that Mr. Pione uses her printer on a regular basis. Ms. Jansky further indicated that she did not give Mr. Pione authorization to access her office when she was not in and was not aware that Mr. Pione had a key to her office an did not provide him with such access (see Exhibit A). Ms. Jansky's did however, state that she was aware that Mr. Pione used her printer in her office when she was in. Ms. Jansky also stated that Mr. Pione provided her a key to his office to water his plants when he went on vacation, however, there was never any arrangement to access one another's office to water plants. In fact, her plants were watered by the other payroll staff when she was not in the office. Ms. Jansky stated that she never asked Mr. Pione to water her plants.

### Discussion with Anne Fortier, Manager, Support Services and Enda Thornton, Asst. Manager-

On Thursday, October 18, 2001 Ms. Fortier stated that Mr. Pione was given a key to Ms. Jansky's office on June 27, 2000 by Support Services. Ms. Fortier further indicated that Support Services had no approval or notification process to Ms. Jansky around this. Ms. Fortier cannot recall who gave Mr. Pione the key, however, either Ms. Fortier or Ms. Thornton would have been the one to provide Mr. Pione with the key. Additionally, Ms. Thornton indicated that Ms. Jansky signed for a key to her own office on December 2, 1999.

000034

On October 16, 2001 Ms. Fortier sent an email (Exhibit B) to Ms. Bradley indicating that Mr. Pione had asked her to notify Ms. Bradley that he was going home sick, He was just sick to his stomach and can't stay. He also said that he is very concerned about the anthrax issue and assisting them with mail.

### *Attempts to contact Mr. Pione regarding this investigation:*
On October 18, 2001 called Mr. Pione on two occasions and there was no answer
On October 19, 2001 called Mr. Pione. received an answer by someone who indicated Mr. Pione was not available. I left a message to have him contact me immediately and left my name and telephone number.

### *Mr. Pione's contact with other Massport employees following this complaint issue:*
Mr. Pione contacted Ms. Fortier on October 16, 2001 to tell her that "he is going home sick" (around 8:00/8:30 a.m.). "He was just sick to his stomach and can't stay." "He said he is very concerned about the anthrax issue and assisting with the mail."

On October 17, 2001 a voice mail from Mr. Pione was left for Ms. Bradley and forwarded to me on the same day at 8:25 a.m. "I am at home because I'm really sick to my stomach, you know what the incident is about. I don't feel that I should have been ostracized the way that I was by Phyllis Daigle from walking out of an office where my printer is located and I'm just doing my job and I don't want anyone to think that I'm a derelict from doing my duties. I will talk to you further about this. Call me at home #781-284-4518."

On October 19, 2002 Mr. Pione spoke with Ms. Catrenia Cain-Simon, HR Assistant. Mr. Pione called Human Resources and indicated that he needed forms (FMLA) faxed to his doctor. Ms. Cain-Simon asked Mr. Pione if he requested FMLA leave yet and that she would send him the paperwork. Mr. Pione apparently did not like Ms. Cain-Simon's answer and would not give her or was reluctant to give her any additional information. Ms. Cain-Simon tried to explain the proper procedures for FMLA leave requests and Mr. Pione seemed upset and did not want to hear what Ms. Cain-Simon was telling him. Mr. Pione had stated that he had talked to Ms. Andrus, Compensation and Benefits Analyst but Ms. Cain-Simon told him she was not available then. Mr. Pione told Ms. Cain-Simon he would call Ms. Andrus on Monday. Mr. Pione told Ms. Cain-Simon that he did not request leave and that he needed papers (forms) faxed to his doctor.

### *The following are documents attached to this investigation report:*

| | |
|---|---|
| Attachment 1 | Suspension letter & request for information letter (October 19, 2001) |
| Attachment 2 | Second Request for information letter (October 26, 2001) |
| Attachment 3 | Termination letter (November 30, 2001) |
| Exhibit A | Email sent to Mrs. Bradley |
| Exhibit B | Signed testimony (Anita Jansky) |
| Attachment 4 | Massport's current Policy on Employment Terms and Conditions (dtd 9/21/00) |

000035

**Action Taken:**
On October 19, 2001 Mr. Pione was suspended with pay pending a complete investigation.
Letter hand delivered by Office Cash late afternoon on October 19, 2001.

On November 30, 2001 Mr. Pione's employment at Massport was terminated.


**Hearing(s):**
On January 28, 2002 a hearing was held. On March 6, 2002 a decision was made regarding the
hearing. The termination action was upheld.


**Updated information:**
In May 2002 the Worker's Compensation Department requested information pertaining to the
investigation to use for a claim Mr. Pione made for Worker's Compensation. On June 20,
2002 I provided a signed statement of specific facts as requested by the Worker's
Compensation Department.

FINDING OF HEARING OFFICER KATHLEEN CONLIN

Re:    Larry Pione

On January 28, 2002, a name clearing hearing was held per the December 19, 2001 written request of Michael D. Kelly, Esq., Mr. Pione's former counsel. This hearing also served as the meeting provided for under the terms of Section VII.A.3 of Massport's Policy on Employment Terms and Conditions, per the request set forth in Mr. Pione's December 20, 2001 letter. In accordance with Mr. Pione's request, the hearing was held subsequent to January 1, 2002. In attendance at the meeting were Mr. Pione; Mr. Pione's counsel, Mary Rosenfeld, Esq. of Sarrouf, Tarricone & Flemming; Human Resources Manager Tondaleya Lumley; Deputy Director of Administration and Finance Mary Ann Bradley; and Massport's counsel, Marie Bowen, Esq.

## BACKGROUND

On October 17, 2001, the Human Resources Department was informed that Audit Manager Phyllis Daigle had reported that, at approximately 6:50 a.m. on October 16, she observed Mr. Pione inside Payroll Supervisor Anita Jansky's office when Ms. Jansky was not yet at work. Ms. Daigle reportedly witnessed Mr. Pione reviewing papers on Ms. Jansky's desk and copying them at the photocopier near Ms. Jansky's office. It was also reported that Mr. Pione left work early on October 16, and called in sick on October 17.

Human Resources Manager Tonda Lumley commenced an investigation into this matter on October 17. Ms. Lumley's investigation included repeated attempts to contact Mr. Pione, who remained out of work on October 18 and 19, to provide him with an opportunity to present his version of events. Upon calling Mr. Pione's home again on the morning of October 19, Ms. Lumley was informed by the individual who answered the telephone that Mr. Pione was unavailable. At that point, Mr. Pione was informed in writing that Ms. Lumley had been unable to reach him to obtain information concerning the reported events of October 16 and that he was suspended with pay effective immediately. Mr. Pione was further informed, in writing, that any information he wished to provide concerning this issue had to be received by Ms. Lumley no later than the close of business on October 22, 2001 and that his failure to provide any information would result in a final decision being made as to his employment status based entirely on the information received from others. By way of a letter dated October 22, 2001, counsel for Mr. Pione informed Ms. Lumley that Mr. Pione would not be providing any information relating to this matter. Although Ms. Lumley extended through October 30, 2001 the time for Mr. Pione to provide his input, Mr. Pione never provided any information.

On November 30, 2001, Mr. Pione was informed in writing that the investigation into the allegations against him was complete, and that it had been concluded that Mr. Pione "gained unauthorized access to a co-worker's locked office, reviewed documents on the desk in this office and Xeroxed various documents from that co-worker's office." Mr. Pione was further informed in the November 30 letter that his Massport employment was terminated for cause in accordance with Massport's Policy on Employment Terms and Conditions.

C00134

## FINDINGS

At the January 28, 2002 hearing, Ms. Lumley detailed the allegations against Mr. Pione, the steps she took to investigate them and the substance of the evidence gathered during her investigation. Ms. Lumley's investigation included obtaining statements from Ms. Daigle, who first reported the incident giving rise to this matter, and Ms. Jansky, in whose office Ms. Daigle reported seeing Mr. Pione early in the morning, prior to Ms. Jansky's arrival at work. Ms. Daigle confirmed that she observed Mr. Pione use a key to enter Ms. Jansky's office, review documents on Ms. Jansky's desk (rather than at the printer behind her desk), and leave the office with these documents, at roughly 6:50 a.m. Ms. Daigle also stated that she confronted Mr. Pione almost immediately thereafter, while he was apparently photocopying some of these documents at the copier near Ms. Jansky's office. Mr. Pione reportedly became agitated and responded that he was printing something on Ms. Jansky's printer. He also asked Ms. Daigle if she had a problem with that. Ms. Daigle responded that she did have a problem with it because the payroll area where Ms. Jansky's office is located is a secure area. In addition, Ms. Jansky indicated that her office was locked in her absence and that, although she did permit Mr. Pione to use her printer during the workday, she had not authorized Mr. Pione to access her office when it was locked and was unaware that he was able to do so. Ms. Lumley also reported that, although Mr. Pione had obtained a key to Ms. Jansky's office from the Support Services Department, there was no evidence that he had obtained Ms. Jansky's permission to do so. Ms. Lumley also described her unsuccessful efforts to obtain Mr. Pione's version of events before concluding her investigation.

Unfortunately, although Mr. Pione asked Ms. Lumley a number of prepared questions at the hearing, he declined to provide any information other than the cursory statement that he had not reviewed or copied Ms. Jansky's documents and that he had not gained unauthorized access to Ms. Jansky's office. Because Mr. Pione chose not to avail himself of multiple opportunities, both before and during the hearing, to present his version of events, I must base my findings solely on the evidence presented by Ms. Lumley. Consequently, I conclude that all of the information before me substantiates the charge that Mr. Pione entered Ms. Jansky's locked office without her permission and reviewed and photocopied documents from her desk without authorization to do so. As a result, I find that the facts are sufficient to support the stated reasons for the termination for cause of Mr. Pione's at-will employment.

C00135

Hoch Affidavit (MCAD)
EXHIBIT F



**Massachusetts Port Authority**
One Harborside Drive, Suite 200S
East Boston, MA 02128-2909
Telephone (617) 428-2800
www.massport.com

November 30, 2001

**Via Certified Mail Return Receipt**
**and First Class Mail**

Mr. Larry Pione
c/o Michael D. Kelly, Esq.
411 Waverly Oaks Road
Waltham, MA 02452

Dear Mr. Pione:

   We have completed our investigation regarding an incident which reportedly occurred on Tuesday, October 16, 2001 at your work place. As a result of this investigation it has been concluded that you gained unauthorized access to a co-worker's locked office, reviewed documents on the desk in this office and xeroxed various documents from that co-worker's office.

   For the foregoing reasons your Massport employment is terminated for cause effective immediately in accordance with Section VII.A of Massport's Policy on Employment Terms and Conditions.

   If you would like an opportunity to be heard at a name clearing hearing, or if you would like an opportunity to meet as described in Section VII.A.3, please inform me of that fact in writing by Friday, December 7, 2001.

Sincerely,

Tondaleya B. Lumley
Human Resources Manager

TBL
cc:   L. Pione File
      L. Kirwan
      M. Bradley

000161

**Operating** | Boston Logan International Airport · Port of Boston general cargo and passenger terminals · Tobin Memorial Bridge · Hanscom Field · Boston Fish Pier · Commonwealth Pier (site of the World Trade Center Boston) · Worcester Regional Airport

Hoch Affidavit (MCAD)
EXHIBIT F



**Massachusetts Port Authority**
One Harborside Drive, Suite 200S
East Boston, MA 02128-2909
Telephone (617) 428-2800
www.massport.com

**Mark E. Robinson**
Chairman

**Virginia Buckingham**
Executive Director and CEO

November 6, 2001

*Via Facsimile*

Michael D. Kelly, Esq.
411 Waverly Oaks Road
Waltham, MA  02452

      Re:   <u>Larry Pione</u>

Dear Mr. Kelly:

      I am writing in response to your October 29, 2001 letter to Tondaleya Lumley. Please address all future correspondence regarding this matter to my attention.

      Many of the assertions in your correspondence are incorrect. Rather than engage in a point by point rebuttal at this time, however, I simply will clarify that the statement in your letter that "Massport has terminated [Mr. Pione] without cause" is in error. In fact, Mr. Pione's employment with Massport has not been terminated; rather, and as was clearly communicated to him in writing on October 19, Mr. Pione currently is suspended with pay.

      Since you have indicated that Ms. Lumley will not be able to obtain information from Mr. Pione at this time, she will make a final determination on the matter at issue based on those facts currently available to her. Per your request, Ms. Lumley will not forward her determination to Mr. Pione directly but rather will provide it to him care of your office.

      Also enclosed per your request is a copy of Massport's Policy on Employment Terms and Conditions for Administrative Employees, which describes Mr. Pione's status as an at-will ESPM employee.

                  Sincerely,

                  Marie H. Bowen
                  Senior Employment Counsel

Enclosure

                                   C00162



**Massachusetts Port Authority**
One Harborside Drive, Suite 200S
East Boston MA 02128-2909
Telephone (617) 428-2800
www.massport.com

**Mark E. Robinson**   **Virginia Buckingham**
Chairman                    Executive Director and CEO

October 26, 2001

Larry Pione
36 Fowler Avenue
Revere, MA  02151-1703

Dear Larry:

I am in receipt of your attorney's letter to me dated October 22, 2001. I do understand, per that letter, that you have been advised not to contact me at this time. As noted in my October 19, 2001 letter to you, however, unless I am able to speak with you immediately, we will have no choice but to reach a determination on the matter referenced in the prior letter sent to you without our input. Therefore, if you wish to provide information for my consideration in assessing this issue, please contact me by Tuesday, October 30, 2001 by 5:00 p.m.

Sincerely,

Tondaleya B. Lumley
Human Resources Manager

TBL
cc:   M. Murphy
      M. Bradley
      L. Kirwan
      K. Conlin

C00182

## MICHAEL D. KELLY

*Attorney at Law*
411 Waverley Oaks Road
Waltham, Massachusetts 02452
Telephone  (781) 891-0765
Facsimile   (781) 893-5004

October 22, 2001

### *Hand Delivered*

Ms. Tonda Lumley
**Massport**
One Harborside Drive
East Boston, MA  02128

Re:     Larry Pione

Dear Ms. Lumley:

Please be advised that I represent Mr. Larry Pione of Revere, Massachusetts. I have been in contact with him and he has received a letter from Kathleen Conlin. Enclosed are the items requested by Ms. Conlin's letter. The fact that these items represent his work tools for Massport, Mr. Pione has been terminated from his position at Massport.

Mr. Pione is presently under physician's care for the stress caused by his employment at Massport. He has been told by his physician not to contact you directly until his condition has stabilized. I would request that you forward to me all the background regarding his termination at Massport. Mr. Pione does not have any information regarding the decision of Massport to terminate him. It was a job that he enjoyed and pursued diligently despite the stress caused by his co-employees.

Very truly yours,

Michael D. Kelly

000183

MDK/lm
Enclosure (Inventory of items being returned)



**Massachusetts Port Authority**
One Harborside Drive, Suite 200S
East Boston MA 02128-2909
Telephone (617) 428-2800
www.massport.com

**Mark E. Robinson**   Virginia Buckingham
Chairman                     Executive Director and CEO

October 19, 2001

BY HAND AND
✓FIRST CLASS MAIL

Larry Pione
36 Fowler Avenue
Revere, MA  02151-1703

Dear Larry:

    We have for the last 48 hours unsuccessfully attempted to reach you on several occasions regarding an incident in your work place, which reportedly occurred on Tuesday, October 16, 2001.  As recently as this morning, we attempted to contact you and spoke with someone at your listed telephone number and it was communicated that you were not available.  Given that we have been unable to speak with you regarding the incident, please let this letter serve as notice that you are suspended with pay effective today.

    You must contact Tonda Lumley at (617) 568-3914 upon receipt of this letter so that we may complete our review of the events that reportedly occurred on Tuesday.   If Tonda Lumley does not hear from you by the close of business (5:00 p.m.) on Monday, October 22, 2001 we will have no choice but to make a final determination of your employment status without giving you an opportunity to provide input as to the issues surrounding Tuesday's events.  Please be advised that Ms. Lumley is the only representative authorized to speak with you regarding this issue.  Therefore, you should be sure to direct all communications to Ms. Lumley.

    You must return **all** Massport equipment and property immediately, preferably to the bearer of this letter.  This includes keys, pager, cell phone, lap tops and Massport identification.

    Let me stress the importance of this matter and suggest that you respond immediately.

Sincerely,

Kathleen M. Conlin
Director, Human Resources

KMC/tbl                                                                 C00185
Cc:    M. Murphy, M. Bradley
     L. Kirwan, T. Lumley
**Operating**  Boston Logan International Airport • Port of Boston general cargo and passenger terminals • Tobin Memorial Bridge •
Hanscom Field • Boston Fish Pier • Commonwealth Pier (site of World Trade Center Boston)
RECYCLED PAPER