UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 0412177MLW

| | |
|---|---|
| LARRY PIONE | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE MASSACHUSETTS PORT | ) |
| AUTHORITY, | ) |
|     Defendant | ) |

## OPPOSITION OF THE PLAINTIFF TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Now comes the plaintiff, Mr. Larry Pione, and hereby opposes the Defendant's motion for summary judgment on the grounds that Mr. Pione states a triable issue on each of the following counts of his complaint, Count I Willful Violation of Family Medical Leave Act, Count II Wrongful Termination, Count III Breach of Contract, and Count IV Defamation.

### STATEMENT OF THE FACTS

From December 31, 1997 to November 30, 2001 Mr. Larry Pione was employed by the Defendant as a Special Financial Project Manager (Ex. A. Pione Deposition 11/4/04 at 5-7, Ex. B Affidavits of Mr. Pione, Ex. C Job Description). Throughout his employment, he received excellent reviews of his work and consistent merit increases based on his work performance (Ex. D evaluations). At the time of the incident which is the subject of this complaint, his supervisor was Ms. Mariellen Murphy, the Director of Administration for Massport (Ex. A. Pione Deposition 11/4/04 at 5-6 and Ex. E Affidavit of Mariellen Murphy). Mr. Pione's duties included financial reporting for Massport's Taxi Pool Cafe (Ex. B Affidavits of Larry Pione, Ex. C Job Description, Ex. E Mariellen Murphy Affidavit, and Ex. F. Pione deposition 8/20/04 at 35-39 and 80-81).

1

Mr. Pione would arrive in his office as early as 6:00 a.m. because the Taxi Pool Cafe opened at 5:00 a.m (Ex. E affidavit of Mariellen Murphy, Ex. F Pione deposition at 35-39 and 80-81, Ex. G Affidavit of Joseph Luca and Ex. B affidavits of Mr. Pione).   Each morning he printed reports regarding the Taxi Pool Café sales (Ex. F Pione deposition at 36 and 236).  The reports he printed were anywhere from 1 to 101 pages long (Ex. F. Pione deposition at. 236).  The printer to which Mr. Pione printed was located in the payroll manager's office, Ms. Jansky's office (Ex. F Pione depo at 62 and Ex. B affidavits).

According to the sworn testimony of various Massport Department Heads, Massport had given Mr. Pione the key to Ms. Anita Jansky's office for the purpose of printing his reports (Ex. E Affidavit of Mariellen Murphy, G Affidavit of Joseph Luca, Ex. H. Affidavit of Payroll Manager Ranere).  Furthermore, Massport's Information Systems Office connected Mr. Pione to the printer in Ms. Jansky's office at the direction of the heads of Administration and Finance (Ex. F Pione deposition at 62 and Ex E Affidavit of Mariellen Murphy and Ex. G Affidavit of Joseph Luca). Massport's head of Administration also placed Mr. Pione in an office adjacent to Ms. Jansky's office, in the payroll department (Ex. E and G).   Ms. Jansky knew Mr. Pione printed to the printer in her office (Ex. I. Jansky deposition at 13) Ms. Jansky  also fell under Mariellen Murphy's command, but was not as high in the chain of command as Mr. Pione (Ex. I Jansky deposition at 16 and Ex. J Chain of Command ). The only place in Ms. Jansky's office to collate papers which had printed was on her desk (Ex. F Pione Deposition at 223-225). Ms. Jansky herself testified that there was no room to sort papers printing from the printer within her office (Ex. I at 8-9).  Ms. Jansky also testified that if someone wanted to sort papers, they would likely use her desk (Ex. I at 8-9).

On October 16, 2001, Mr. Pione opened Ms. Jansky's office entered and gathered his printing (Ex. F Pione depo at 83 and 236).  He exited her office, returned to his office, copied some of his documents, and then did some more printing (Ex. F Pione depo at 80-81, 83).  Thereafter, he

reentered Ms. Jansky's office and as he exited, he was approached by Ms. Phyllis Daigle, an audit

manager with Massport (Ex.F Pione depo at 80-81 and 83). Ms. Daigle approached Mr. Pione in an

accusatory manner and asked what he was doing in Ms. Jansky's office (Ex F Pione depo at 80, 81,

and 83). Mr. Pione thought she was kidding and asked her what she meant (Ex. A. Pione depo at

51-52 and Ex. F Pione depo at 83, 87).. He responded to Ms. Daigle by stating that he was printing

and doing his work (Ex. A. Pione depo at 51-52 and Ex. F at 83, 87). Mr. Pione asked her if there

was a problem and she abruptly responded that there was and she walked away (Ex. A). Mr. Pione

was upset by Ms. Daigle's behavior and went to talk with Ms. Daigle (Ex. A). She was again rude

and stated … (Ex. A) Mr. Pione saw her talking with supervisors and became sick (Ex. K Pione

depo at 19 and 50). He went home (Ex. K Pione depo at 50).

Ms. Daigle reported and testified that on the morning of 10/16/01 she was walking past the

payroll offices and she saw Larry Pione enter Ms. Jansky's office and go behind her desk and look

through papers on the desk (Ex. L Daigle depo at 14-16 and Ex M Daigle report). Ms. Daigle stated

that at that time she was not aware that Mr. Pione's printer was in Ms. Jansky's office (Ex. L Daigle

depo at 14). She admits that she did not stop and ask Mr. Pione anything, but instead continued on

to her office (Ex. L Daigle depo at 14). When she returned to the payroll area she saw Mr. Pione

copying documents (Ex. L Daigle depo at 14). She did not see and did not know what he was

copying (Ex. L Daigle depo at 15). Ms. Daigle admits that Mr. Pione could have been looking at

his own papers and could have been copying his own papers, but her assumption was that he was

copying Ms. Jansky's documents (Ex. L. Daigle depo at 16-18 and 27).

Ms. Daigle admits that she approached Mr. Pione and asked him what he was doing and

admits he said he was getting his stuff from the printer (Ex. L Daigle depo at 19). She admits that

he asked her if there was a problem and she told him that there was (Ex. L Daigle depo at 19). She

testified that her problem with it was that eight months earlier she had identified Mr. Pione's office

3

in the payroll department as an internal control issue (Ex. L Daigle depo at 19-21). She admits that she reported the location of Mr. Pione's office to Massport department heads as an internal control issue, but that Mr. Pione's office was not moved (Ex. L Daigle depo at 19-22). Ms. Daigle told Mr. Pione on October 16, 2001 that he she had an internal control issue with him (Ex. L Daigle depo at 23). She admits that Larry was visible upset w hen she spoke to him (Ex. L Daigle depo at 23). She admits that she called him an internal control issue even though she saw him open the door with a key (Ex. L Daigle depo at 24-25 and Ex. M). She reported the event to Mary Ann Bradley, the Deputy Director of Revenue Enhancement, as unauthorized access (Ex. L Daigle depo 24-25 and Ex. M Daigle Report and Ex. J Chain of Command).

Because the event was reported as unauthorized access Massport began to investigate it as an instance of misconduct and assigned Tondaleya Lumley from the Human Resources Department as the investigator (Ex. N Lumley deposition at 32-33). Ms. Lumley began her investigation on October 16, 2001 by speaking with Mary Ann Bradley, who referred Ms. Lumley to Phyllis Daigle (Ex. N Lumley deposition 32-34 and Ex. O Lumley's notes). Ms. Lumley testified that Ms. Daigle reported that Mr. Pione opened the door with a key and that Ms. Daigle thought that was odd (Ex. N Lumley depo at 43). Ms. Daigle told her that she saw Larry going through papers in Ms. Jansky's office and later saw him copying (Ex. N Lumley depo at 43-44). Ms. Lumley never asked Ms. Daigle if she saw what papers Mr. Pione was looking at or copying (Ex. N Lumley at 29).

Massport now states in its defense that Mr. Pione may have been looking at confidential documents. However, Ms. Lumley never talked with anyone about what documents may have been in Ms. Jansky's office on that date, nor did she ever go to the office to check what papers may have been there (Ex N Lumley at 49-50) Ms. Lumley admits no one ever told her during the course of her investigation that there were documents in Ms. Jansky's office that they were concerned that Mr. Pione had seen (Ex. N Lumley at 50). Ms. Lumley even admits that it is possible that Mr.

Pione was looking at his own papers (Ex N Lumley at 60).  Moreover, Ms. Jansky was not

concerned that Mr. Pione had access to any of the documents in her office (Ex I  Jansky depo at 18-

21 and 27).  Ms. Jansky stated that the documents on her desk were in the wide open on everyone's

desk in payroll (Ex. I Jansky at 46-48) and that 40-50 people had access to the payroll area (Ex. I

Jansky depo 11, 18-19 and 32-36).   Ms. Lumley admitted that the payroll area was unsecured and

that anyone could walk into the offices (Ex. N Lumley at 59-60).  Ms. Lumley was not even sure if

Ms. Jansky locked her office at night (Ex N. Lumley at 68).

        Despite her assignment to investigate the alleged unauthorized access by Mr. Pione, Ms.

Lumley states that she did not know that Mr. Pione had been given the key and access to the payroll

area by department heads (Ex N Lumley at 45).  She admits she never bothered to talk to Mr.

Pione's supervisor, Mary Ellen Murphy who had authorized Mr. Pione to have the key (Ex N

Lumley at 70, 90 and 92).  Ms. Lumley admits that she discovered that Massport had given Mr.

Pione the key to Ms. Jansky's office (Ex N Lumley at 46 and 73).

        Anne Fortier, Director of Central Services, is the Massport Official responsible for the

distribution of keys to employees (Ex. P. Fortier deposition at 11-12).  Ms. Fortier  testified that

there is a form which specifies the request for the key and the purpose and that Mr. Pione completed

the form (Ex. P Fortier deposition at 11-12).  Ms. Fortier testified that she gave the form to human

resources during the investigation (Ex. P Fortier at 11-12) Conveniently,  Ms. Lumley states that

she does not recall the form and states  that she never knew that there was a form related to Mr.

Pione's obtaining the key (Ex. N Lumley at 74-75).

        Ms. Lumley admitted that her investigation revealed that Mr. Pione was assigned to print to

the printer in Ms. Jansky's office (Ex. N Lumley at 46).  Ms. Lumley admits that the relevant

printer was located behind Ms. Jansky's desk (Ex. N Lumley at 48 and 56).  She admits that she

never received any facts that Mr. Pione had access to any other printer (Ex N Lumley at 58).

Yet, despite knowing that Mr. Pione's was authorized to have access to Ms. Jansky's office, despite the fact that Massport placed Mr. Pione's printer in Ms. Jansky's office, despite the fact that Mr. Pione used the printer in Ms. Jansky's office on a daily basis, despite the fact that no one saw what he was allegedly looking at in the office, despite the fact that there were no confidential documents in the office, despite the fact that Mr. Pione denied doing anything wrong immediately upon being questioned by Ms. Daigle, Ms. Lumley immediately suspended Mr. Pione and asked for all Massport property back. Then she baselessly found that Mr. Pione had gained unauthorized access to Ms. Jansky's office, that he had inappropriately looked at papers on Ms. Jansky's desk, and that he copied those papers (Ex. Q Lumley investigative report T). Ms. Lumley maintains that these findings were made because Mr. Pione did not participate in her investigation of the facts (Ex. N Lumley depo at 88). Ms. Lumley tried to call Mr. Pione at home twice on 10/18/01 and once on 10/19/01 at which time she left a message (Ex. N her notes). In that message, Ms. Lumley informed Mr. Pione that he was being suspended from work and that a Massport security officer was on his way to Mr. Pione's home to collect Massport property (Ex. N Lumley notes). **Mr. Pione** knew that he was being terminated because Massport asked for all of his property back including his identification card (Ex. A. Pione depo at 106-109). Also in her notes was a reference **that Mr.** Pione was prohibited from entering a non public Massport area ( Ex N). **A Massport Police Officer** did arrive at Mr. Pione's home (Ex. A Pione deposition at 86 and Ex N. notes of Lumley). **The** officer pounded on Mr. Pione's door and tried to open it (Ex. A. Pione deposition at 86). Mr. **Pione** thought that he would be vindicated because he clearly did not gain unauthorized access he had a key, it was his printer and he was simply doing his work (Ex. F Pione depo at 107-108 and 226-227). He did not participate in the investigation because he was too ill and because he was on Family medical leave (Ex. K Pione depo at 19, 50, 56, 59 and Ex. R).

6

Mr. Pione's interaction with Ms. Daigle on 10/16/01 caused him to become stressed and ill and to go home (Ex. F Pione depo at 85, 89 and Ex. K Pione depo at 19 and 50). On October 18, 2001, Mr. Pione contacted the employee assistance program (Ex. F Pione depo at 85 and Ex. R Employee Assistance Report). The employee assistance program social worker stated that Mr. Pione was anxious and depressed after a verbal altercation with another employee and that at this time it is difficult to imagine him returning to the workplace (Ex. R). Mr. Pione visited his primary care physician, Dr. Ranere on October 23, 2001 (Ex. R). Dr. Ranere reported that Mr. Pione has had problems over the past year and a half at work, but was able to function with the Xanax he had earlier prescribed (Ex. R). Dr. Ranere reported also that Mr. Pione spoke about accusations made against him at work and that this caused him bad nausea, vomiting and chest pain (Ex. R). Dr. Ranere referred him to a psychiatrist (Ex. R). He also placed him on a high risk for heart problems (Ex. R). Mr. Pione was advised by his physician not to have contact with anyone at Massport ( Ex. K Pione depo at 56, 59). Mr. Pione has had stomach problems, sleeping problems and physical pain since the events of October 16, 2001 (Ex. K Pione depo 3/6/06 at 95-96). He has been seeing a psychotherapist since the events of October 16, 2001 (Ex. K Pione depo 3/6/06 at 60-61 and Ex. R medical reports of Dr. Kosolof).

On October 19, 2001, Mr. Pione filed to for Family Medical Leave pursuant to Massport Family and Medical Leave Act policy (Ex. S). According to Ms. Lumley's notes and testimony, she was aware that Mr. Pione had applied for the family medical leave on October 19, 2001. (Ex. N Lumley depo at 84 and her notes). Massport 's Family Medical Leave policy provided for leave to care for one's own health needs (Ex. S). Mr. Pione was granted family medical leave effective October 25, 2001 (Ex. S).

Despite knowing that Mr. Pione was on family medical leave, on October 19, 2001, Massport's head of Human Resources Kathleen Conlin sent a letter by hand delivery to Mr. Pione

that stated " we have attempted to reach you on several occasions ... You must contact Tondaleya Lumley by 10/22/01 or we will have no choice but to make a final determination of your employment status without giving you an opportunity for input. "Ms. Lumley is the only representative authorized to speak with you regarding this issue. Therefore you should be sure to direct all communications to Ms. Lumley (Ex. O)."

In response, on October 22, 2001 Mr. Pione's attorney wrote to Tondaleya Lumley and advised her of his representation of Mr. Pione and informed her that Mr. Pione was under a physician's care for stress and was advised not to contact them until stable. (Ex. R). Nevertheless on October 26, 2001 Ms. Lumley wrote to Larry Pione and stated, "I am in receipt of your attorney's letter to me dated October 22, 2001. I do understand, per that letter that you have been advised not to contact me at this time. As noted in my October 19, 2001 letter to you, however, unless I am able to speak with you immediately, we will have no choice but to reach a determination on the matter without your input. Therefore if you wish you must provide information by October 30 at 5:00 p.m. (Ex. O). Ms. Lumley made no effort to talk with Mr. Pione's supervisor from whom she would have learned that Mr. Pione had been given a key to Ms. Jansky's office and that his printer was placed in the Ms. Jansky's office with the supervisor's knowledge and intent (Ex. N. Lumley depo at 70, 76, 92 and Ex. E Mariellen Murphy affidavit).

The, threat, exacerbated Mr. Pione's condition (Pione depo at 112). On October 29, 2001, Mr. Pione's attorney, Michael Kelly wrote to Ms. Lumley and stated, "as stated in my letter to you dated October 22, 2001, "Mr. Pione is presently under a physician's care ... He has been told by his physician not to contact you directly until his condition has stabilized." You have either failed to understand my letter to you or you have chosen to ignore it. Mr. Pione's condition was worsened by your threatening correspondence. He remains under a physician's care. "I demand that you do not contact Mr. Pione in the future. He has suffered enough from your callous behavior." (Ex. R).

8

Ms. Lumley understood from Mr. Kelly's first letter that her notices were making Mr. Pione unwell (Ex. N Lumley at 97). She knew that Mr. Pione could not contact her until his condition stabilized (Ex. N Lumley at 82-83). Her efforts to contact him were a violation of FMLA and the policy. Ultimately, he was fired for not contacting Ms. Lumley (Ex. N. Lumley at 87-88). Mr. Pione maintains that firing him for not be able to participate in the investigation was a willful violation of the Family Medical Leave Act and Policy and was retaliatory. The Family Medical Leave Act Policy is not the only policy Massport violated.

Massport's policy provides that an employee who receives notice that discipline is contemplated "generally will thereafter have an opportunity to meet with his or department head or the department head's designee and the director of human resources to discuss the action that is being contemplated." (The policy Ex. T and Exhibit U Deposition of Massport's human resources director Kathleen Conlin at 29). Mr. Pione was not granted his rights. He was not given notice that discipline was being contemplated. Instead, he was suspended and told to turn in his property (Ex. N Lumley notes). Mr. Pione tried to speak to his supervisor but Human resources had told her she could not speak with him and he could not speak with her (Pione depo 3/6/06 at 18, 52, 53, 143, 146) He left a message for Mary Ann Bradley and she did not call him back (Pione depo at 53). Ms. Lumley wrote the message down "I am at home because I'm really sick to my stomach, you know that the incident is about. I don't feel that I should have been ostracized that way that I was by Phyllis Daigle from walking out of an office where my printer is located and I'm just doing my job. I don't want anyone to think that I'm a derelict from my duties. I want to talk to you further about this call me at home (Ex. N Lumley notes). Mary Ann Bradley never called him (Ex. A Pione depo at 53). In sum, Massport never allowed Mr. Pione to speak to his department head or the human resources director to discuss the contemplated action and thus violated its own policies (Ex Lumley depo at 87-88, message at Ex. N, Ex. U Conlin deposition at 28, 29, 31, 32).

Massport also violated its in policies which provide employees a right to a progressive disciplinary. The process is set forth in section VII A 1 of Massport's terms and conditions of employment as follows: "the Authority, acting through the Executive Director or his/her designee, typically shall impose a progressive disciplinary process when an ESPM employee has had a problem on the job which may lend itself to rectification through such process (Ex. T)."

There was no progressive discipline in this case. On November 30, 2001 Mr. Pione was terminated by way of letter from Ms. Lumley (Ex. V).

Massport stated in the termination letter that Mr. Pione was terminated because the investigation concluded that he gained unauthorized access to a co-worker's locked office, reviewed documents on the desk in this office and Xeroxed various documents form that co-worker's office (Ex. V). The evidence is clear that Mr. Pione was authorized to have access to the office, the Defendant's readily admit that he may very well have been looking at his own documents, and there were no confidential documents in Ms. Jansky's office. Moreover. Massport's own policies provide that there is no right of privacy in one's work areas (Ex. W). Mr. Pione maintains that he was fired for false reasons and that the issues involved could have been rectified had Massport followed its policy of allowing employees to speak with their department head or the head of human resources. Accordingly, the leap to firing him violated the progressive discipline policy.

In a letter dated December 3, 2001 from Mr. Pione's attorney to Leslie Kirwin (receipt acknowledged by Massport counsel) Mr. Pione disputed all of the facts listed by Ms. Lumley as reasons for his termination (Ex. X). He specifically denied that he gained unauthorized access to a co-worker's locked office (Ex. X). He specifically denied that he reviewed documents on the desk and that he Xeroxed documents from that co-worker's office (Ex. X). In that same letter Mr. Pione formally requested that they withdraw their reasons and reverse them and said he still does not

waive his right to meet with his department head or director of human resources and requested a formal hearing (Ex. X).   A similar letter was written to Ms. Lumley (Ex. X).

A post termination hearing was conducted regarding Mr. Pione.  The hearing was held and was conducted by Kathleen Conlin, the human resources director who had overseen Ms. Lumley's investigation of the 10/16/01 incident (Ex. U Conlin depo at 25-27).  Massport allegedly conducted the hearing under its policy which provided an opportunity for the employee to respond when discipline is being contemplated (Ex. U Conlin deposition 25-28). However, the hearing was conducted post termination and that was a fourth violation of Massport policy (Ex. T).

Mr. Pione attended the hearing denied all matters he had been accused of and stated that he was falsely accused (Ex. A. Pione depo at 24).  Yet, the findings of the hearing officer indicate that she accepted all of Ms. Lumley's findings that "Mr. Pione entered Ms. Jansky's locked office without her permission and reviewed and photocopied documents from her desk without authorization to do so (Ex. Y Findings of the Hearing Officer). Then in an addendum to the findings, Tondaleya Lumley submitted a signed statement that "during the investigation I obtained information among other things that Mr. Pione obtained a key to Ms. Jansky's office in June 2000 without proper authorization.  (Ex. Y signed statement of Lumley dated 6/20/02).

Each of the foregoing publications, the hearing officer's findings (Ex. Y), Ms. Lumley's investigative report, and Ms. Lumley's addendum (Ex. Y) which were published to Massport officials were defamatory.  Ms. Lumley's notes from the name clearing hearing also indicate that defamatory statements were published at the hearing (Ex. N). Mr. Pione testified that Massport's human resources personnel and Phyllis Daigle defamed him by stating that he was in the office without authorization and copied another's documents and published these statements in such a way to cause his termination (Ex. A. Pione 3/6/06 deposition 25, 26, 28-31, 36, 37, 39, and 41).  Mr. Pione testified that the defamation cost him his job and ruined his life (Ex. A Pione 3/6/06

deposition 44).  He further testified that he suffered distress as a result of these statements and he

suffered distressed that the hearing never cleared his name (Ex. A. Pione deposition 3/6/06 at 101).

     Mr. Pione is not seeking reinstatement to his position (Pione deposition 3/6/06 at 110).  He

is not now capable given what the stress of these events has done to his health to return to his

position (Pione deposition 3/6/06 at 110).  Things may have been different if his name was cleared

at his name clearing hearing and he was restored to his position (Pione deposition 3/6/06 at 110).

Unfortunately, that is not the scenario (Pione deposition 3/6/06 at 110).  Mr. Pione is seeking

compensatory damages.

<div align="center">ARGUMENT</div>

I.    THERE ARE TRIABLE ISSUES REGARDING THE PLAINTIFF'S CLAIMS
    UNDER THE FAMILY MEDICAL LEAVE ACT.

    A.  Plaintiff's FMLA claims are not Time Barred.

    A willful violation of section 2615 of Title 29 may be brought within 3 years of the date of

the last event constituting the alleged violation for which such action is brought.  29 U.S. C. A.

section 2617 (c)(2).   The First Circuit Court of Appeals has determined that for a plaintiff to prove

the requisite willfulness under the Family Medical Leave Act for the three year statute of limitations

to apply, the plaintiff must prove that the employer either knew or showed reckless disregard for the

matter of whether its conduct was prohibited by the statue.   Hillstrom v. Best Western TLC Hotel,

3554 F. 3d 27, 33 (2003), citing McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133

(1988)(interpreting a parallel distinction between willful and negligent violations in the FLSA

statue of limitations).  The Hillstrom Court stated, "As the Supreme Court explained in

McLaughlin:  If an employee acts reasonably in determining its legal obligation, its action cannot be

deemed willful. If an employer acts unreasonably, but not recklessly, in determining its legal

<div align="center">12</div>

obligation the … it should not be .. considered (willful). In other words willful refers to conduct that is not merely negligent.   Willful conduct is present here by Massport.

On October 19, 2001, Mr. Pione filed to for Family Medical Leave pursuant to Massport Family and Medical Leave Act policy (Ex. S).  According to Ms. Lumley's notes and testimony, she was aware that Mr. Pione had applied for the family medical leave on October 19, 2001.  (Ex. N Lumley depo at 84 and her notes).  Massport 's Family Medical Leave policy provided for leave to care for one's own health needs as does the Act itself (Ex. S). Mr. Pione was granted family medical leave effective October 25, 2001 (Ex. S).

Yet, despite knowing that Mr. Pione was on family medical leave, on October 19, 2001, Massport's head of Human Resources Kathleen Conlin sent a letter by hand delivery to Mr. Pione that stated " we have attempted to reach you on several occasions … You must contact Tondaleya Lumley by 10/22/01 or we will have no choice but to make a final determination of your employment status without giving you an opportunity for input. "Ms. Lumley is the only representative authorized to speak with you regarding this issue.  Therefore you should be sure to direct all communications to Ms. Lumley (Ex. O)."

In response, on October 22, 2001 Mr. Pione's attorney wrote to Tondaleya Lumley and advised her of his representation of Mr. Pione and informed her that Mr. Pione was under a physician's care for stress and was advised not to contact them until stable.  (Ex. R).  Nevertheless on October 26, 2001 Ms. Lumley wrote to Larry Pione and stated, "I am in receipt of your attorney's letter to me dated October 22, 2001.  I do understand, per that letter that you have been advised not to contact me at this time.  As noted in my October 19, 2001 letter to you, however, unless I am able to speak with you immediately, we will have no choice but to reach a determination on the matter without your input.  Therefore if you wish you must provide information by October 30 at 5:00 p.m. (Ex. O).  Ms. Lumley made no effort to talk with Mr.

Pione's supervisor from whom she would have learned that Mr. Pione had been given a key to Ms. Jansky's office and that his printer was placed in the Ms. Jansky's office with the supervisor's knowledge and intent (Ex. N. Lumley depo at 70, 76, 92 and Ex. E Mariellen Murphy affidavit).

The, threat, exacerbated Mr. Pione's condition (Pione depo at 112). On October 29, 2001, Mr. Pione's attorney, Michael Kelly wrote to Ms. Lumley and stated, "as stated in my letter to you dated October 22, 2001, "Mr. Pione is presently under a physician's care … He has been told by his physician not to contact you directly until his condition has stabilized." You have either failed to understand my letter to you or you have chosen to ignore it. Mr. Pione's condition was worsened by your threatening correspondence. He remains under a physician's care. "I demand that you do not contact Mr. Pione in the future. He has suffered enough from your callous behavior." (Ex. R). Ms. Lumley understood from Mr. Kelly's first letter that her notices were making Mr. Pione unwell (Ex. N Lumley at 97). She knew that Mr. Pione could not contact her until his condition stabilized (Ex. N Lumley at 82-83). Her efforts to contact him were a violation of FMLA and the policy. Ultimately, he was fired for not contacting Ms. Lumley (Ex. N. Lumley at 87-88). Mr. Pione maintains that firing him for not be able to participate in the investigation was a willful violation of the Family Medical Leave Act and Policy and was also retaliatory. The Family and Medical Leave Act provides in relevant part:

> It shall be unlawful for any employer to interfere with, restrain or deny the exercise of or the attempt to exercise any right provided under this subchapter …
> It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.
> Family and Medical Leave Act, Title 29 USCA section 2615 (a)(1 and 2).

To establish a prima facie claim of retaliation under the Family Medical Leave Act, the plaintiff must show that (1) employee availed himself or herself of a protected right under the FMLA (2) employee was adversely affected by an employment decision and (3) there is a causal

connection between the employee's protected activity and the employer's adverse employment action. Hodgens v. General Dynamics Corp., 144 F.3d 151 (C.A. 1 R.I. 1998).

Pursuant to regulation by the Department of Labor the burden is on the Defendant to show that Mr. Pione would have been terminated even if Mr. Pione had not exercised his rights under the Act. Parker v. Hanhemann University Hosp., D.N.J. 2002, 234 F. Supp.2d 478.

Where an employee is terminated while taking leave, the court must determine whether the termination was illegally motivated by the employee's choice to take the leave or by other valid reasons. Phelan v. City of Chicago, 347 F. 3d 679 (C.A. 7 Ill 2003).

To establish the causation element the plaintiff must only show that the protected activity and the adverse action were not wholly unrelated i.e. that the decision maker was aware of the protected conduct at the time of the adverse employment action. Brungart v. BellSouth Telecommunications, Inc., 231 F. 3d 791(C.A. 11 Ala).

In the instant case, Massport's 30b6 testimony was that Mr. Pione was fired because he did not participate in the investigation. Mr. Pione could not participate in the investigation because he was on leave caring for his personal health needs and was instructed not to have any contact with Massport. Mr. Pione has stated sufficient evidence for the issue of retaliation under the Family Medical Leave Act to go to a jury.

The Defendant seems to argue that the plaintiff's complaint does not state a retaliation claim in response I point this court to Dressler v. Community Service Communications, Inc., 275 F. supp. 2d 17 (D. Me. 2003) wherein the court stated that a claim by a terminated employee was not restored to his job because he had been on FMLA was actually a retaliation claim not a mere interference with or denial of a right to be restored.

Finally, on the damages question, according to 29 U.S.C.A. section 2617, an employer who violates section 2615 shall be liable to an eligible employee for damages equal to : "any wages,

salary, employment benefits or other compensation denied or lost to such employee by reason of the violation or . and interest, reasonable attorneys fees and costs.  Mr. Pione is also entitled to his health benefits and that which his health benefits should have covered from the date of termination to the date of judgment.  Sherman v. AI/FOCS, Inc., (D. Mass) 113 F. Supp.2d 65 (2000).  Accordingly, although Mr. Pione is not well enough to return to Massport now, other damages are available to him.

## II.    THE PLAINTIFF DOES STATE A CLAIM FOR BREACH OF CONTRACT.

In Jackson v. Action for Boston Cmty. Dev. Inc., the Massachusetts Supreme Judicial Court held that a personnel manual may form the basis for an implied contract of employment.  Jackson v. Action for Boston Cmty. Dev. Inc., 403 Mass 8, 13 (1988)  In a later case the SJC reasoned that a personnel manual may form the basis for a contractual action because management offers and defines the terms of benefits, employees like Mr. Pione have a reasonable expectation that management will adhere to the terms of the policy as long as it exists even if the employer retained the right to unilaterally modify the policy.  O'Brien v. New England Tel & Tel. Co., 422 Mass. 686 (1996).

If an employee like Mr. Pione reasonably believes that the employer offers to continue the employee's employment on the terms of the policy, the employee's continuing to work for the employer after receipt of the policy is an acceptance of an offer of a unilateral contract and the promise is not illusory regardless of whether the employer intended to make the offer.  O'Brien v. New Eng. Tel & Tel. Co., 422 Mass. at 692-693.  Even an express disclaimer may not be sufficient to erase the contractual obligations created by a policy manual because manuals "instill a reasonable belief in the employees that management will adhere to the policies therein expressed."  Ferguson v. Host Int'l, Inc., 35 Mass. App. Ct. 96 (2001).

16

In <u>Ferguson v. Host International, Inc.</u>, 53 Mass. App. Ct. 96 (2001), the Massachusetts Appeals Court held that where an employer's manual contains a progressive discipline policy, excepting only major infractions, the employer's failure to use progressive discipline for a lesser offense could constitute a breach of an employment contract even where an employee is an at will employee. Despite language in the employment manual that no contract was intended and despite the reservation of right to modify the manual at any time, such manuals will be enforced to the extent that they instill a reasonable belief in the employees that management will adhere to the policies therein expressed. <u>Ferguson</u>, 53 Mass. App. Ct. at 101.

The Ferguson Court cited the following reasoning, "it would be unfair to allow an employer to distribute a policy manual that makes the workforce believe that certain promises have been made and then allow the employer to renege on those promises. What is sought here is basic honesty: if the employer, for whatever reason, does not want the manual to be capable of being construed by the court as a binding contract, there are simple ways to attain that goal. All that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing. <u>Ferguson</u>, 53 Mass. App. Ct. at 103 <u>citing</u> <u>Woolley v. Hoffmann-LaRoche, Inc.</u>, 99 N.J. 10, 499 A.2d 515 (1985).

Massport policies provide employees a right to a progressive disciplinary process by stating in section VII A 1 (Ex. T). Massport polices provided employees with up to 12 weeks of **job protected**, unpaid leave (Ex. S). Massport policy also provided that an employee who receives notice that discipline is contemplated "generally will thereafter have an opportunity to meet with his or department head or the department head's designee and the director of human resources to discuss the action that is being contemplated." (Es. T and Ex. U deposition of Massport's human resources director at 29). Mr. Pione was not granted these rights.

Massport's policies gave Mr. Pione a reasonable expectation that the provisions of Massport's policies and procedures would apply to him, that the policies would be fairly applied, and that he would not be treated unfairly and ultimately terminated.  In accordance with Jackson, O'Brien and Ferguson, Mr. Pione states claims for wrongful termination in breach of policy and for breach of contract.

Even where a plaintiff cannot prove than an enforceable contract exists, he or she may attempt to enforce the employer's policy manual under a theory of promissory estoppel.  To succeed on such a claim the plaintiff must show: a) that the employer made a representation that it should have reasonably expected to induce action or forbearance of a definite and substantial character on the part of the employee; (b) that the representation does in fact induce such action or forebearance; and (c)  that injustice can be avoided only by enforcing the representation.  See Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1124 n. 4 (1st Cir. 1995) Hall v. Horizon House Microwave, 24 Mass App. Ct. 84, 93-94 (1987).  Mr. Pione also states a claim under promissory estoppel theory.  Summary judgment must be denied.

III.    THE PLAINTIFF STATES A TRIABLE DEFAMATION CLAIM.

To prevail on a defamation claim, a plaintiff must establish that the Defendants published a false statement about the plaintiff to a third party that either caused him economic loss or was of the type that is actionable without proof of economic loss.  Phelan v. May Department Stores Company, 443 Mass. 52, 819 N.E.2d 550 (2004).  A false statement that would tend to hold the plaintiff up to scorn hatred ridicule or contempt in the minds of any considerable and respectable segment in the community is defamatory.  Phelan, 443 Mass. at 56, 819 N.E.2d at 553.  Defamatory statements that harm a plaintiff's professional or business reputation are actionable without proof of economic loss.  Ravnikar v. Bogojavlensky, 438 Mass. 627, 629-630, 782 N.E.2d 508 (2003) citing Lynch v. Lyons 303 Mass. 116, 118-119, 20 N.E.2d 953 (1939).

According to the Supreme Judicial Court in <u>Lynch</u> statements that tend to harm a plaintiff's professional or business reputation are statements that impute to the plaintiff corruption, dishonesty, misconduct in his office, profession or business. <u>Lynch v. Lyons</u>, 303 Mass. at 120.

If a plaintiff proves a statement which is harmful to his professional or business reputation, then the plaintiff may recover for emotional injury and damage to reputation. <u>Ravnikar</u>, 438 Mass. at 630, 782 N.E.2d at 511.

The element of publication is satisfied where the defamatory communication is transmitted to even one person other than the plaintiff.   <u>Phelan</u>, 443 Mass. at 56; 819 N.E.2d at 554.

Mr. Pione maintains that the statements of Massport contained in the hearing officer's findings (Ex. Y), Ms. Lumley's investigative report, and Ms. Lumley's addendum (Ex. Y) which were published to Massport officials were defamatory. Ms. Lumley's notes from the name clearing hearing also indicate that defamatory statements were published at the hearing (Ex. N).

Mr. Pione specifically testified that Massport's human resources personnel and Phyllis Daigle defamed him by stating that he was in the office without authorization and copied another's documents and published these statements in such a way to cause his termination (Ex. A. Pione 3/6/06 deposition 25, 26, 28-31, 36, 37, 39, and 41). Mr. Pione testified that the defamation cost him his job and ruined his life (Ex. A Pione 3/6/06 deposition 44). He further testified that he suffered distress as a result of these statements and he suffered distressed that the hearing never cleared his name (Ex. A. Pione deposition 3/6/06 at 101).

An employer's privilege to disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job is lost when the employer recklessly makes "unnecessary, unreasonable or excessive publications. <u>Bratt v. International Business Machs. Corp.</u>, 392 Mass. 508, 509, 515, 467 N.E.2d 126 (1984). In the context of employment, a defamatory remark uttered

with knowledge of its falsity or with reckless disregard as to its truth is to be distinguished from a defamatory remark uttered with mere negligence, which is protected by the employer's conditional privilege. Bratt, 392 Mass. at 513-515, 467 N.E.2d 126 (1984). The plaintiff must prove that the defendant employer published the defamatory information recklessly. Bratt, 392 Mass. at 509, 467 N.E.2d at 129. As examples of the necessary recklessness the Bratt court cited reckless disregard of the plaintiff's rights and the consequences that may result to him. Bratt, 392 Mass. at 514, 467 N.E.2d at 131. Other cited examples are publication with knowledge of falsity or with reckless disregard of the truth. Bratt, 392 Mass. at 514, 467 N.E.2d at 131-132. The Bratt court stated, "the jury may find for the plaintiff from proof that the defendant knew the charges to be false, or had no reason to believe them to be true, and also form the terms in which the communication is made." Bratt, 392 Mass. at 514-515, 467 N.E.2d at 132, quoting Atwill v. Mackindtosh, 120 Mass. 177, 183 (1875).

Massport's statements regarding Mr. Pione's alleged unauthorized access were stated with reckless disregard for the truth because Massport did not contact Mr. Pione's supervisor to verify that he had been given the key and access to the office in question, because there were no confidential documents in Ms. Jansky's office, Ms. Jansky had no right to privacy in her office, and no one is able to refute Mr. Pione's immediate response that he was doing his own work and retrieving his own printing.

Finally, written words are actionable under the broader rules regarding liable. Lynch, 303 Mass. at 122, citing Friedman v. Connors, 292 Mass. 371 at 375 , 198 N.E. 513.

The general test for liable is would the written words tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community. Stone v. Essex County Newspapers, Inc., 365 Mass. 246, 250, 311 N.E.2d 52, 55 (1974), citing Ingalls v. Hastings & Sons Publishing, Co., 304 Mass. 31, 22 N.E.2d 657 (1939).

If there is a question regarding the publication aspect of the claim, the Massachusetts Supreme Judicial Court has decided that a defamatory communication between agents of the same corporation with reference to some aspect of corporate business constitutes a publication for the purposes of maintaining a libel action.  Bratt, 392 Mass. at 518, 467 N.E.2d at 134, citing Arsenault v. Allegheny Airlines, Inc., 485 F. Supp. 1373, 1379 (D. Mass.) aff'd, 636 F.2d 1199 (1st Cir. 1980), cert. denied, 454 U.S. 821, 102 S. Ct. 105, 70 L.Ed.2d 93 (1981).

Mr. Pione has stated sufficient facts of defamation.  Summary judgment must be denied.

<div align="center">CONCLUSION</div>

For the foregoing reasons, there are sufficient facts on Mr. Pione's claims under the Family Medical Leave Act, Breach of Contract, and Defamation such that summary judgment must be denied.

<div style="margin-left:40%">For the Plaintiff LARRY PIONE,<br>By His Attorney,</div>

<div style="margin-left:40%">_____<br>ELISE A. BRASSIL, ESQ.,BBO#: 641411<br>SARROUF, TARRICONE & FLEMMING<br>95 COMMERCIAL WHARF<br>BOSTON, MA 02110<br>TEL.: (617) 227-5800</div>

DATED:_____